

FILED
APR 12 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT FEDERAL COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHRISTOPHER KING, JD
A/K/A KingCast,_

Plaintiff,

vs.

FACEBOOK, INC.,

Defendant.

) CASE NO. _____

**CV 19 - 1987** WHO

) JUDGE _____

)

) JURY DEMAND

## COMPLAINT

NOW COMES PLAINTIFF, CHRISTOPHER KING, J.D. to bring this Action to help hold Facebook accountable to its Terms of Service Contractual arrangements, on an objective basis, free from racism and cultural hegemony.

### PROLOGUE AND CONTEXT

This case is dedicated to Plaintiff's Mother, Betty J. King, who moved on from this Earth during a wrongful suspension against Plaintiff, such that he could not freely communicate with his 1,900 friends about the subject.

This Action sounds in Bad Faith, Fraudulent and Retaliatory Breach of Contract, Racism per 42 U.S.C. §1981 and False and Deceptive Business Practices that violate the Covenant of Good Faith and Fair Dealing as countenanced by both Washington and California Law. The facts will reveal that Defendant's misconduct this case, and likely in many others is a Fraudulent Breach of your ToS and Defendant's own Learned Amicus Counsel David K. Lukmire concurs with Plaintiff in that:

> The case for restricting the subject matter of section 230 immunity is equally strong......
> One thing is for certain: unless courts narrow their interpretations of section 230,
> deserving plaintiffs will be without redress.

> As discussed, the statute should be interpreted in light of its language, which clearly
> sounds in defamation law. Allowing certain claims that are close to textbook defamation
> will help clear up whether the plaintiff has artfully pleaded garden variety tort claims in
> order to evade the proper boundaries of section 230. **Courts should almost never
> dismiss other claims, such as allegations under civil rights laws or breach of contract
> claims, on section 230 grounds, for they are much too far removed from the tort of
> defamation.** If those claims are meritless, they should be dismissed on the merits instead
> of by application of the statute. (emphasis added).

1

The day after Plaintiff directly referenced this NYU Law School Learned Treatise by Attorney Lukmire in Open Court…. it disappeared from the Internet and one may no longer read his seminal work, "Can the Courts Tame the Communications Decency Act? The Reverberations of Zearn v. America Online." Note the following thumbnails showing what used to be there, and what now appears in its place: "This site can't be reached."

unknown Seq: 1 12-OCT-10 16:53

**CAN THE COURTS TAME THE COMMUNICATIONS DECENCY ACT?: THE REVERBERATIONS OF *ZERAN V. AMERICA ONLINE***

*BY DAVID LUKMIRE**

Congress passed the Communications Decency Act of 1996 (CDA)[1] amid concern over minors' access to Internet pornography.[2] Congress enacted the CDA, which included various provisions regulating objectionable Internet content,[3] as part of the Telecommunications Act of 1996,[4] which broadly overhauled United States telecommunications policy.[5] Passage of the CDA led to vigorous commentary and scholarship concerning freedom of speech on the Internet,[6] and the CDA was front-page news when the Supreme Court, in *Reno v. ACLU*, struck down as unconstitutional the portions of the Act making it a crime to transmit indecent material in a way accessible to minors.[7] After *Reno*, public





As Defendant tries to explain why it initially failed to censor the white

separatist/supremacist hate speech of one Faith Goldy after claiming to ban white nationalism and

separatism...... Plaintiff recently noted on Defendant's own "platform:"

> Nigger is my word Mark not yours. Some of the worst elements of white people have
>
> foisted that word on my ancestors and me while they were also busy murdering my
> Cherokee ancestors, fact.

And I have a right to use my word in my way as long as I am not degrading someone and I never
once used it in that capacity.

> I used it to complain about racism including YOURS according to Mark S Luckie and
> many, many others.

> Meanwhile as will be detailed subsequently in this Complaint, seventy-nine (79) different
Civil Rights and media and law groups joined together to twice protest unfair Facebook
censorship concerns, to wit:

> It is critical that Facebook be a platform that supports the protection of human rights
> above all else and does not discriminately apply its policies on the basis of race, creed,
> national origin, gender, and/or sexual orientation. When the most vulnerable members of
> society turn to your platform to document and share experiences of injustice, Facebook is
> morally obligated to protect that speech.

Moreover, In December of 2018 Facebook Diversity VP Mark S. Luckie resigned and noted:

> "Facebook's disenfranchisement of black people on the platform mirrors the marginalization
> of its black employees," he wrote. More on this later.

Defendant Zuckerberg acknowledges negligent and/or reckless misconduct:

> "If you're building a product that people love you can make a lot of mistakes."[1]

The Facebook Dilemma Part One, PBS Frontline Part One Oct. '18.
https://www.pbs.org/wgbh/frontline/film/facebookdilemma/?fbclid=IwAR3ueCowWV6eANhkMmh
Pksh4zpmdyQgkmiIGgGfW_v11dbDSguY6nLiF4GM

<div align="center">JURISDICTION, PARTIES, AND VENUE</div>

1.     This court has subject-matter jurisdiction over this action.

2.     Plaintiff CHRISTOPHER KING resides in Seattle, King County.

3.     Defendant Facebook, (hereinafter "Defendant" or "Nation State Facebook") is a

multimedia news and entertainment community-sharing platform with far-reaching vertical and

horizontal monopolies doing substantial business in the forum State. It is without question the

largest single platform in existence for social media and the marketplace of ideas.

---

[1] The Court may of course take Unofficial Judicial Notice that not everyone loves Facebook anymore.

4.      Defendant has an adhesion or click-wrap clause in its Terms of Service that requires Plaintiffs to sue in Northern California Courts even though Canada Courts have soundly rejected this mandate. See *Douez v Facebook, Inc*, 2017 SCC 33 (2017).

5.      This court has personal jurisdiction over all named defendants.

6.      Venue is proper.

### THE PARTIES

7.      Plaintiff joined Facebook in or about 2010.

8.      Plaintiff is a professionally-trained journalist who has edited and written in weekly and large daily newspapers including but not limited to the Ohio Call and Post (editor) and the Indianapolis Star (reporter).  He has also co-hosted a radio show that led to a First Amendment-related Jury Verdict in a Defamation case for $570,000.00 after he secured Counsel for the Plaintiff he had interviewed.

9.      He is also a former Civil Rights Attorney who has won several First Amendment Jury Trials and otherwise enhanced his clients' positions in State and Federal Court. While working for Ohio Attorney General Lee Fisher and Cleveland Civil Rights Lawyer Terry H. Gilbert in 1992 he hosted a Hate Crimes forum at Case Western Reserve University School of Law (Gund Hall School of Law).

### FACTS

10.      With 2.27 Billion – that's with a capital 'B' -- Defendant **is the World's largest single alleged protector of Public Speech Rights the World has ever seen.**

11.      Defendant Facebook founded itself publicly "to make the world more open and connected" on the oft-quoted notion of CEO Mark Zuckerberg. In 2017 that Mission was changed to ""Give people the power to build community and bring the world closer together."

12.      In reality Facebook had an underlying mission all along to create a "Nation State: according to Tim Sparapani, Esq.  As the first Facebook Director of Public Policy he went on record in an October 2018 PBS Frontline news feature as stating that Facebook was creating its own "Nation State."

13.      The purpose of that "Nation State" was to crush all competition according to the New York Times in its December 6, 2018 Feature:

*https://www.nytimes.com/2018/12/05/technology/facebook-emails-privacy-data.html*
*Facebook Emails Show Its Real Mission: Making Money and Crushing Competition*

14.     Facebook has a contractual, adhesion set of Terms of Service for its users. Included in the Terms of Service are provisions that clearly indicate that minorities in a protected class are permitted to use otherwise derogatory terms in a "self-referential" or in an "empowering way." Facebook quidelines lain down by their information czar also make it clear that context is paramount. (Appendix A).

15.     Interesting as of this writing GLBTi are mentioned in the hate speech terms of service but blacks are not directly mentioned.  (*Id*).

16.     Defendant pays lip service to appease critics while their real policies typically belie the promises set forth.  For example Defendant initially failed to censor the white separatist/supremacist hate speech of one Faith Goldy after claiming to ban white nationalism and separatism...... until public outcry and publicity commanded a policy shift.

*POLITICS*
04/02/2019 08:19 pm ET

# Facebook Says White Nationalist Video Doesn't Break New Policy Against White Nationalism

HuffPost showed the company a racist, fear-mongering video by Faith Goldy. Not a problem, a spokesperson said.

**By [Andy Campbell](#)**

Facebook vowed last week to curb hateful content on its platform by extending its policies against white supremacy to cover posts that praise white nationalism and separatism.

Now it's unclear what that new policy actually means, if anything. On Tuesday, HuffPost showed a Facebook spokesperson a video on Facebook in which prominent Canadian white nationalist Faith Goldy laments white "replacement" and demands that Jews and people of color repay the white European countries they've "invaded."

The spokesperson said that no policy had been broken, not even the social media giant's new policy banning the promotion or praise of white nationalism.

17.     Plaintiff lived in Providence, RI before moving to the West Coast in 2013 and maintains close friendships and ties to media there.  They report that the Providence Journal and Rep. David Cicilline (RI – 1) are not impressed:

> Democratic Rep. David Cicilline of Rhode Island grilled the Facebook and Google executives about their companies' responsibility for the spread of white supremacist views, pushing them to acknowledge they have played a role, even if it was unintentional. Potts and Walden conceded the companies have a duty to try to curb hate.
>
> But the challenges became clear as Cicilline pushed Potts to answer why Facebook did not immediately remove far-right commentator Faith Goldy last week, after announcing a ban on white nationalism on the social network.[2]

18.     But Defendant is quick to suspend blacks and critics even when it is patently clear that no ToS violations have occurred. As Plaintiff recently noted on Defendant's own "platform:"

> Nigger is my word Mark not yours. Some of the worst elements of white people have foisted that word on my ancestors and me while they were also busy murdering my Cherokee ancestors, fact.
>
> And I have a right to use my word in my way as long as I am not degrading someone and I never once used it in that capacity.
>
> I used it to complain about racism including YOURS according to Mark S Luckie and many, many others.

19.     Meanwhile as will be detailed subsequently in this Complaint, seventy-nine (79) different Civil Rights and media and law groups joined together to twice protest unfair Facebook censorship concerns, to wit:

> It is critical that Facebook be a platform that supports the protection of human rights above all else and does not discriminately apply its policies on the basis of race, creed, national origin, gender, and/or sexual orientation. When the most vulnerable members of society turn to your platform to document and share experiences of injustice, Facebook is morally obligated to protect that speech.

20.     To prove the point, in December of 2018 Facebook Diversity VP Mark S. Luckie resigned and noted in a heartfelt editorial "Facebook is failing its black employees and its black users" on 27 November 2018 at a time proximate to his resignation from the company.

---

[2]  Representative Cicilline shares Plaintiff's concerns that Facebook is indeed a monopolistic, culturally hegemonic enterprise. In March, 2019 he authored a NYTimes Editorial:

**The Case for Investigating Facebook**

*Why I am calling on the Federal Trade Commission to investigate Facebook for violating antitrust laws.*

21.     Facebook's initial response was to remove the post – even though it is clearly not hate speech but is rather an intelligent, independent black man voicing a concern about corporate racism.

https://www.facebook.com/notes/mark-s-luckie/facebook-is-failing-its-black-employees-and-its-black-users/1931075116975013/

> "Facebook's disenfranchisement of black people on the platform mirrors the marginalization of its black employees," he wrote.
>
> "Too many black employees can recount stories of being aggressively accosted by campus security beyond what was necessary." And it raises questions as to how frequently moderation mistakes might occur when non-high-profile users discuss sensitive subjects, those who don't have the company or media connections to seek recourse. In the original memo, Luckie had said that black users appeared to be unfairly targeted by Facebook's moderation efforts, writing:
>
> "Black people are finding that their attempts to create 'safe spaces' on Facebook for conversation among themselves are being derailed by the platform itself. Non-black people are reporting what are meant to be positive efforts as hate speech, despite them often not violating Facebook's terms of service. Their content is removed without notice. Accounts are suspended indefinitely."

22.     Plaintiff hosts several blogs, a YouTube Channel with +5,000 subscribers and a Roku TV show "Corruption Meets Camera."

23. Plaintiff claimed racial and retaliatory disparity in 30-day or longer Facebook bans on one of his Roku TV show segments several months ago. The twenty-one minute segment may also be seen here:

http://christopher-king.blogspot.com/2018/05/kingcast-presents-lights-camera- action_7.html
https://www.youtube.com/watch?v=Svzs-Bpr0bI

24. Plaintiff concurs with this brilliant piece by Jillian York/EFF about how "Getting Banned From Facebook Can Have Devastating Consequences."

https://qz.com/651001/getting-banned-from-facebook-can-have-unexpected-and- professionally-devastating-consequences/

> I believe that this problem stems from a lack of diversity at Facebook. Seventy- three percent of Facebook's US leadership is white. Globally, 77% of the company's leadership are men. Women make up just 32% of the company's global staff, and only 2% of the US staff is black, a number far disproportionate to the actual black American population.

25.     In Plaintiff's own City of Seattle the Seattle Stranger noted that blacks pay the price for complaining about racism:

https://www.thestranger.com/slog/2017/08/11/25345304/is-facebook-silencing-black- activists-with-racist-bots

In a story dated 11 August 2017 "Is Facebook Silencing Black Activists with Racist Bots?" the paper noted that Natasha Marin was silenced for an alleged violation of community standards for complaining about racism. She was running a "Shrine of Asshats" page when she got the Hook.

26.     Seattle Globalist noted the problem immediately in its 28 July 2016 story, "Shrine of Asshats: Seattle Reparations Project Slays the Trolls."

http://www.seattleglobalist.com/2016/07/28/seattle-reparations-project-slays-trolls/54411

> These trolls are our neighbors, coworkers, people we see at the grocery store. You might be walking past this person on your way home today and have no idea the kind of hatred they are harboring. It's not like all racists tattoo themselves with swastikas. They wear business suits, go to church, and have jobs just like the rest of us. Let this forever shatter any illusion some of you might have that we somehow live in a post-racism society.

27.     However, on information and belief, Facebook continues to punish black activists and other critics in violation of the Stated ToS. Plaintiff is both black and a critic so Facebook has two-fer right there:

> Facebook also recently temporarily banned and then later apologized to Ijeoma Oluo for posting screenshots of racist comments people were hurling at her.

> According to Devin Coldeway over at Tech Crunch, there have been several other similar instances: We talked with another activist recently, Leslie Mac, who like Oluo spoke out on racism using the platform, and like Oluo was suspended from it. It happened to Shaun King, too, after he posted a racist email he received.

28.     Defendant has removed or blocked Plaintiff's content several times in 2018 for reasons it falsely labels as violations of Terms of Service and Defendant knew the content did not violate ToS and Defendant removed and blocked the content in Bad Faith after its fraudulent practices led Plaintiff to place reasonable reliance on promises of fairness and prompt and thorough review of any Facebook content bans or "Facebook Jail" sentences. Some of the examples are highlighted below:

29.     Defendant banned Plaintiff in spring, 2018 for complaining about how white establishment lawyer Mark Rattan traversed an entire room to grab Plaintiff's camera in defiance of a Court Order allowing such cameras at a lawyer discipline hearing in Wisconsin. Plaintiff's point was that he, as a black man, feels like he is being treated like a nigger and cannot fight back physically or he will be at fault.



Wells Fargo Attorney Mark W Rattan attacks journalist to cover up forgery and foreclosure fraud
3,994 views                                                        👍 84   👎 4   ↗

30.     Facebook again banned Plaintiff on or about 2 November in a case in which a white man got in his face and dropped 5 F-Bombs, but when the Sheriff came to "investigate" he ignored all of that and made Plaintiff into the aggressor. Plaintiff put up a picture of an official document and drew parentheses around the races of the witnesses (all white) and juxtaposed those with his (black). He stated "Now I know why the report was biased." Incredibly, Facebook banned him from that and after his appeal, still has not told him how such post purportedly violated ToS:

31. Each and every contested Facebook suspension in this case (Discovery will reveal 4-5 bans) was executed without any objective basis, in Complete Bad Faith and sustained fraudulently and with actual malice in outright willful and targeted violations of ToS by Defendant as part of a larger corporate scheme of power, control and corporate hegemony.

32. Then, while Plaintiff was awaiting an explanation on that point, Facebook went and took another screen shot of his involving the same incident and is now claiming that such photo violates ToS and thereby banning him for that that photo as well. The problem is, the screen shot depicts a white male in his face and Plaintiff discussing *how he feels during the experience:*

9

Nigger, Nigger, Nigger.... How dare you challenge me. I am a white male of some sort of privilege. I can basically spit in your face and drop 5 F-Bombs And the local Sheriff will find a way to ignore it. You stupid nigger.[1]



33.   Plaintiff was wrongfully banned during his birthday and Facebook knew about it and continued to ban him in violation of its own ToS.

34.   Plaintiff was wrongfully banned as his mother moved on from this Earth from complications related to Dementia last fall and Facebook knew about it and continued to ban him in violation of its own ToS.

35.   Plaintiff was wrongfully banned after he critiqued Facebook's banning of politically progressive rapper Lil B the BASEGOD: Plaintiff and Lil' B are both members of the same Protected Class, i.e. black men, or niggers.  Nonetheless Defendant banned Plaintiff yet again after he wrote two posts within 2 minutes of each other that read: "Facebook gunned down another nigger…" and "we're dropping like flies around here."

36.     Plaintiff attempted to post to a Civil Rights Facebook forum in the UK but the moderator

informed him that he could not fully see the post for some undisclosed reason. Plaintiff inquired

of Facebook as to why his post was not visible and Facebook declined to answer.

37.     A Facebook page run largely by Donald Trump supporters has a few members who have

indicated support for Plaintiff and this litigation. The same day that someone on that forum

decided to share Plaintiff's page entitled "How to Sue Facebook"

(https://howtosuefacebook.blogspot.com/) Defendant determined that no one could post any links

to that page publicly nor is anyone entitled to even share it in Facebook Messenger.

38.     The stated reason for the ban is yet again pretextual in the sense that Defendant falsely

claims that it "Violates Community Standards." without specificity whatsoever.

39.     Defendant is well aware that such blog had been up for 3+ months and had been seen in

Open Court for weeks before Defendant issued the bogus and Fraudulent Bad Faith rationale that

the site violated Community Standards.

---

**You can't share this link**

howtosuefacebook.blogspot.com

Your content couldn't be shared, because this link goes against our Community Standards

If you think this doesn't go against our Community Standards let us know.

Close

---


Yeah they did one better I tried to continue sharing that link
and they put some sort of a block on it can't share it anymore I
can go to it but I can't share it not off of you or from the actual
site

40.     Meanwhile seventy-nine (79) different Civil Rights and media and law groups joined together to twice protest unfair Facebook censorship concerns on its "platform," to wit:

> above all else and does not discriminately apply its policies on the basis of race, creed, national origin, gender, and/or sexual orientation. When the most vulnerable members of society turn to your platform to document and share experiences of injustice, Facebook is morally obligated to protect that speech.
>
> Letter #2 18 January 2017 -- This pattern of censorship represents a double standard, one that seems to be addressed only through direct activist intervention or significant media attention. We believe more can be done to ensure every Facebook user has the ability to engage on the platform without harassment or undue censorship. Letter #3 18 December 2018. Equally troubling are your claims over the years that problems with the platform or the company's approach have been inadvertent, and that, per a statement quoted in the article, "our entire management team has been focused on tackling the issues we face." What is now clear, however, is direct evidence of malicious and calculated campaigns to undermine Facebook's critics.

41.     May the Record reflect that Plaintiff is definitely a Facebook critic, and he has been treated unfairly and in violation of stated Terms of Service that constitute a Contract.[3]

42.     In late 2018 Plaintiff asked for a review of yet another Facebook ban. Defendant sat on the review for two solid weeks until Plaintiff pointed it out to the Court; within 24 hours of that exposure Defendant upheld the ban. This failure to review is a Bad Faith gesture that further violates the express and implied Terms of Service for disputes and it is Fraudulent because platform users are led to believe the material misrepresentations that they will receive a timely and meaningful review as Defendant has openly promised. See the large thumbnail on the following page:

---

[3] Lest we forget, Facebook is more than happy to remind potential litigants that they – we – are indeed bound by Contract because we impliedly signed on to the Terms of Service, ahem. See generally *Goose v. Gander*, citation omitted.



Search

Christopher King

News Feed

Messenger

Watch

Marketplace

Shortcuts

Classic Sport Bik... 2

Fight Safeguard ... 17

Watchdog for Dog 16

Pepper Underfo... 20+

German Shortha... 20+

See More...

Explore

Events 20+

Groups

Pages

Memories 20+

Fundraisers 1

See More...

Create

Ad · Page · Group · Event ·
Fundraiser

**It is now 27 December 2018
Still reviewing huh?
Nice meaningful good faith process.**

**Your reply**
Dec 13
You let us know you don't think your post should be
deleted.

**We're reviewing your post**
Dec 13
Someone will be taking another look at this post.

**Update on your post**
Dec 13

We reviewed your post again and it doesn't follow our
Community Standards.

**Your reply**
Dec 14
As clearly noted in materials I have filed in KingCast v.
Facebook, Inc, King County CASE NO. 18-2-28075-3SEA
Facebook's own public materials on Hate Speech and the
"Hard Questions" memo by By Richard Allan, VP EMEA
Public Policy clearly indicate that context and intent is
crucial and that people in a protected class can use words
that might be considered derogatory to others. In this post
it is unequivocally clear that I am complaining about
Facebook racism even if a reviewer did not know about this
case that much would still be obvious by looking at my
page for any context clues whatsoever. Please reinstate my
privileges immediately or it will only further damage your
position in Court as being overly eager to shut down black
activists as I had just finished detailing in this Brandeis
Brief:
https://www.scribd.com/document/392343705/Facebook-
Faces-Lawsuit-on-Community-Guidelines-Terms-of-
Service-ToS-and-Racism-per-42-U-S-C-1981 I need this
escalated to Monika Bickert or Richard Allan IMMEDIATELY.
Very Truly Yours, Christopher King, J.D.
https://howtosuefacebook.blogspot.com/ 617.543.8085

**We're reviewing your post**
Dec 14

We'll send an update once our review team has taken
another look.

43.     Many writers believe that Facebook "Hates Black People."

https://medium.com/@thedididelgado/mark-zuckerberg-hates-black-people-
ae65426e3d2a?fbclid=IwAR0MOAPYC_tf92JbtSgMhzaWd2OVxmCcSBQsSQSfgd8PRyClY8ZI6gKcinI

# Mark Zuckerberg Hates Black People

Black Facebook users are having their accounts banned for
speaking out against racism.

 The DiDi Delgado
May 17, 2017 · 8 min read

As I write this, I'm currently serving two simultaneous Facebook bans. I, like many Black
organizers, have taken to maintaining two accounts—a primary and a backup. It's
infuriating and tedious, but I chalk it up to the Black tax. Since Black organizers are more
likely to have their content flagged and removed for "violating community standards,"
we've had to find workarounds to sustain our online presence and engagement. Currently,
my primary and backup accounts are both banned for "promoting hate speech." That
means bigoted trolls lurked my page reporting anything and everything, hoping I'd be in
violation of the vague "standards" imposed by Facebook. It's kinda like how white
people reflexively call the cops whenever they see a Black person outside. Except in this
case it's not my physical presence they find threatening, it's my digital one.

During a Facebook ban, a user's account retains all functionality in terms of reading and
navigating the site, but posting of any kind is prohibited. You can see content; you just
can't communicate. This conveniently prevents users from informing their followers
they've been unfairly banned, essentially halting us from raising awareness around the
issue. I find this doubly insulting because it's reminiscent of early slave codes, which
often made it permissible for enslaved people to *read*, but illegal for them to *write* (a
potential catalyst for "insurrection and rebellion"). It seems the intent behind silencing
outspoken Black folks hasn't changed in the last few hundred years. And while Mark
Zuckerberg hasn't yet sentenced me to "thirty nine lashes on [my] bare back," I can't say
for certain that penalty isn't hidden somewhere in Facebook's ridiculous terms of service.

44.     Regarding the Civil Rights Audit contemplated by para. 19, *supra*, Facebook has been
tagged for racially discriminatory housing matters. Plaintiff is rightfully concerned about this as
his parents were unlawfully steered in 1970 when Plaintiff was 5 years old and they became
testers in the landmark case of *Heights Community Congress v. Hilltop Realty*, 774 F.2d 135
(1985)  His friend's father Don Barclay, Esq. was Cleveland Heights' City Attorney on the case
and that is part of what motivated Plaintiff to become a Civil Rights lawyer and investigative
journalist. https://newsroom.fb.com/news/2018/12/civil-rights-audit/
https://openjurist.org/774/f2d/135/heights-community-congress-v-hilltop-realty-inc

December 18, 2018

## An Update on Our Civil Rights Audit



45.     Regarding the Civil Rights Audit contemplated by para. 19, *supra*, Facebook has still not
released the results of any inquiry as to whether they unfairly ban blacks or critics of Facebook
for speaking out against racism.

46.     Facebook has allowed whites to say the same thing that blacks have been banned for:
From the Reveal News story *How activists of color lose battles against Facebook's moderator
army* by Aaron Sankin, 17 August 2017:



How activists of color lose battles against
Facebook's moderator army

Mary Canty Merrill was fed up. So she turned to Facebook:

15

"Dear White People: The terminology we use to define a problem determines how we attempt to solve it," she wrote in an April 4 Facebook post. "You are so accustomed to defining racism as people of color being the problem that you want to fix us, patronize us, save us and heal us. You rarely perceive yourselves as the problem (which is where its root lies). Thus, your interventions are most often ill-informed, misdirected and yield no meaningful or sustainable results."

She logged in the next day to find her post removed and profile suspended for a week. A number of her older posts, which also used the "Dear white people" formulation, had been similarly erased.

Perhaps most Facebook users would've simply waited out the weeklong ban. But Merrill, a psychologist who advises corporations on how to avoid racial bias, wondered whether she was targeted because she is African American. So she asked some white friends to conduct an experiment:

They copied what she had written word for word and had others report it as inappropriate content. In most cases, Facebook allowed the content to remain active. None of their profiles were suspended.[4]
https://www.revealnews.org/article/how-activists-of-color-lose-battles-against-facebooks-moderator-army/

47.    Dr. Boyce Watkins has noted that "Facebook appears to be purging black people on a systemic basis."

http://financialjuneteenth.com/dr-boyce-watkins-facebook-appears-purging-black-people-systematic-basis/
9 January 2017.

But last week, I became confused when the popular social media platform began what appeared to be a systematic purge of nearly all of my African American friends for sharing or posting even the most harmless content.  I've had friends get their accounts suspended for posting links to articles, quoting racist statements in American history or sharing controversial news stories.  I even know someone who was suspended for reciting a poem.

It started when I received a 30-day ban for posting an article about a black historical incident.
The article told the **story about the game "Hit the Coon,"** that was played at state fairs when whites would throw baseballs at the heads of black children to make them fall into water.  Yes, these were the sick things that have been historically done to black people in this country for entertainment.

Apparently, the Facebook bots found the word "Coon" to be in violation of their highly ambiguous community standards, which caused me to receive the ban.

---

[4] Plaintiff is aware of many many more black activists who have had, and who continue to have, substantial problems with Facebook.

I've seen people post naked pictures on Facebook without being warned, suspended, banned or reprimanded.

I've seen people cuss up a storm, talk about someone's mother, threaten to murder their homeboys in a rival gang, provide genital pics, get shot on film, and show suicide videos. I even saw someone share a video of a woman having sex with a dog. Yet, despite all of this craziness, my black friends are being banned for sharing black history articles that are factually verified by numerous sources.

Apparently, Facebook has decided that outspoken Americans are no longer wanted on their platform. Based on what I am seeing, any form of assertive dialogue, mild controversy or ethnically-oriented information dissemination will have the platform treating you like both a child and a criminal.

It's hard not to imagine government involvement, since there are quite a few experts who **are already concerned about whether or not government agencies are using Facebook** to spy on billions of people at one time. In fact, several countries are starting to squash the use of Americanized social media giants out of fear that our government is using these companies to spy on America's enemies…..

…..But for black people, this is a clear clarion call for us to do what we probably should have done many years ago: Start supporting social media platforms that are owned by black people. You can keep your Facebook login if you'd like, but it's time to also support other platforms that won't ban you for mentioning Harriet Tubman.

48.    Meanwhile, Facebook has no problem with posts that, when taken "in context" clearly advocate violence against people joined to protest years of systemic oppression in Charlottesville, VA:

South Dakota Republican State Rep. Lynne Hix-DiSanto, who also worked as a licensed real estate agent, has been fired from Keller Williams Realty Black Hills over a Sept. 7 Facebook post of a meme that depicted protestors being hit by a car.

The meme, which began circulating online after the Charlottesville protests in August, included the text: "All Lives Splatter. Nobody cares about your protest and keep your (expletive) out of the road." Above the meme, Hix-DiSanto wrote: "I think this is a movement we can all support."
https://www.inman.com/2017/09/20/keller-williams-branch-fires-agent-over-controversial-facebook-post/

*Keller Williams branch fires agent over controversial Facebook post State Rep. and real estate agent Lynne Hix-DiSanto published a meme that read 'All Lives Splatter'*
20 September 2017
by Marian McPherson

Note:   Paralegal Heather Heyer was MURDERED in that instance and we are now awaiting sentencing of one James Alex Fields for her MURDER.



\*\*\*\*\*\*\*\*\*\*\*

49.      Facebook is an insidious virtual monopoly by design and intent and in practice:   Black activists on Facebook know that ToS have been, and continues to be, disingenuously applied in a manner that restricts our speech in the World's largest portal, or "Nation State" if you will.[5] This is crucial because Facebook has no true competitor. Again, Lindsey Graham as quoted by Plaintiff at 15:26 at his Roku TV Show "Corruption Meets Camera: Facebook While Black S1 Ep2"  https://www.youtube.com/watch?v=f-TK3BxOsl8



**Zuckerberg struggles to name a single Facebook competitor**
**Sen. Lindsey Graham:** Who's your biggest competitor?

---

[5] Tim Sparapani, Esq. is the very first Facebook Director of Public Policy. He has gone on record in an October PBS Frontline news feature as stating that Facebook was creating its own "Nation State."  See "The Facebook Dilemma" https://www.pbs.org/wgbh/frontline/film/facebook-dilemma/ (2018).

**Mark Zuckerberg:** Uh, senator, we have a lot of competitors.

**LG:** Who's your biggest?

**MZ:** The categories… do you want just one? I am not sure I can give one but can I give a bunch? There are three categories that I would focus on. One are the other tech platforms: Google, Apple, Amazon, Microsoft, we overlap with them in different ways.

**LG:** Do they provide the same service you provide?

**MZ:** In different ways.

**LG:** Let me put it this way. If I buy a Ford, and it doesn't work well, and I don't like it, I can buy a Chevy. If I'm upset with Facebook, what's the equivalent product I can go sign up for?

**MZ:** Well, the second category I was going to talk about…

**LG:** I'm not talking about categories. I'm talking about real competition you face. 'Cause car companies face a lot of competition. They make a defective car, it gets out in the world, people stop buying that car, they buy another one. Is there an alternative to Facebook in the private sector?

**MZ:** The average American uses eight different apps to communicate with their friends and stay in touch with people ranging from text to email—

**LG:** Which is the same service you provide?

**MZ:** Well, we provide a number of different services.

**LG:** Is Twitter the same as what you do?

**MZ:** It overlaps with a portion of what we do.

**LG:** You don't think you have a monopoly?

**MZ:** It certainly doesn't feel like that to me.

*[laughter]*

**LG:** Instagram. So you bought Instagram. Why did you buy Instagram?

**MZ:** Because they were very talented app developers who are making good use of our platform and understood our values…

**LG:** Is a good business decision. My point is: one way to regulate a company is through competition, through government regulation. Here's my question, what do we tell our constituents, given what's happened here, why we should let you self-regulate? What would you tell people in South Carolina, given all that's happened here, why it would be a good idea for us to let you regulate your own business practices?

**MZ:** … well, Senator, my position is not that there should be no regulation…. I think the internet is becoming —

**LG:** Do you embrace regulation?

**MZ:** I think the real question, as the internet becomes more important in people's lives, is what is the right regulation —

**LG:** Do you as a company welcome regulation?

**MZ:** If it's the right regulation, yes.

https://www.theverge.com/2018/4/10/17220934/facebook-monopoly-competitor-mark-zuckerberg-senate-hearing-lindsey-graham
April 10, 2018
Sara Jeong at The Verge

This did then cause Plaintiff to issue the Zuckerberg Monopoly Man parody button and stickers:



50.     Plaintiff continues to lecture on the perils of Facebook at local college classrooms and brought the message to Facebook investor Roger McNamee, who gave Plaintiff a thumbs-up at a Seattle Forum in March, 2019 at his "Zucked" tour stop:





https://www.youtube.com/watch?v=QXDbqkLhsgQ

51      Defendant presents a set of Terms of Service, most specifically regarding Hate Speech, backed up by FB Public Policy VP Richard Allan (as filed in this Case) that purport to take context and intent into evaluation of hate speech.

52.     The Representation is material to the thousands of people who rely on some form of consistency and measurable standard before posting about issues of public concern on racism and hate. The 79 Civil Rights and Media Groups demand for a Civil Rights Audit is proof of this.

53.   Facebook's Policy-in-Fact is to slam people who condemn white racism against minorities and people of color.

54.   Facebook is well aware of the material falsity and continues to perpetuate it; resigned VP of Diversity Mark Luckie will testify to his belief and a Jury is entitled to determine all of this.

55.   Defendant obviously publishes a phony set of standards so that it can appear to be reputable so that people will continue to use Facebook so that Facebook can continue to data mine them and make Billions.

56.   The Plaintiff and the 79 Civil Rights and Media Groups noted in this case were indeed ignorant of all of this until it started becoming patently clear in the past two years.

57.   Obviously Plaintiff relied on the false promises, much to his detriment because twice in the past year he was not allowed to make posts on a monopolistic platform during his Birthday and at his Mother's Death.

58.   Terms of Service (ToS) are tantamount to a Contract as Defendant selectively proclaims on its own behalf when it suits them so Plaintiff has a Right to believe in them.

59.   Plaintiff is indeed damaged by losing the Benefit of the Bargain, including contact with his 1,871 Friends on Facebook. Moreover, in the due course of litigation Plaintiff's mental health professionals will be issuing Expert Reports so that threshold is more than met.

60.   Plaintiff summarized the Defendant's violations in a prior Court hearing in which the Court declined to overrule the Forum Selection Clause as the Canadian Court had done in *Douez v Facebook, Inc*, 2017 SCC 33 (2017).

https://www.youtube.com/watch?v=4SDYEUOnHH0



61.     This case is brought in honor of Betty Jean King, who told Plaintiff twenty (20)

years ago:  "Son you need to get yourself a blog….."

https://www.youtube.com/watch?v=IYdgFL28WNI
https://www.youtube.com/watch?v=6vLJ742WAVs&t=102s





CLAIMS[6]

1.    Breach of Contract

2.    Promissory Estoppel

3.    Violation of 42 U.S.C. §1981

4.    Fraud (Fraudulent Inducement, Fraud in the Factum)

5.    Breach of the Covenant of Good Faith and Fair Dealing

6.    False and Deceptive Business Practices pursuant to CA Bus & Prof Code § 17203

DEMANDS

Plaintiff has been materially harmed by the egregious Breach of Contract, Fraudulent practices and the ongoing pernicious effects of Institutionalized Racism in this case. Wherefore he seeks the following:

1.    Compensatory Damages in excess of $75,000 in an amount to be determined by a Jury;

2.    Punitive Damages in an amount to be determined by a Jury;

3.    Injunctive Relief with a specific Court Order and Finding of Fact and Conclusion of Law that Plaintiff has not used the term "nigger" in a way that violates Defendant's Terms of Service;

4.    A Public Apology;

5.    Costs of Suit with pre and/or post Judgment Interest as contemplated by applicable Governing Law.

Respectfully submitted in Good Faith and subject to the Pains and Penalties of Perjury as to all factual allegations,

Christopher King, J.D.


JURY DEMAND

Plaintiff hereby Demands this Cause to be heard by a duly-empaneled Jury.

CHRISTOPHER KING, J.D.

---

[6] Again, with the caveat that Facebook Amicus Counsel has expressly stated that Contractual and Civil Rights cases should never be dismissed without full Discovery and Trial.  This Notion is supported by Darnaa, LLC v. Google, Inc. et al even though Plaintiff in that case could not meet the requisite thresholds. Plaintiff can meet and surpass those thresholds in the Case at Bar.

## 12. Hate Speech

We do not allow hate speech on Facebook because it creates an environment of intimidation and exclusion and in some cases may promote real-world violence. We define hate speech as a direct attack on people based on what we call protected characteristics — race, ethnicity, national origin, religious affiliation, sexual orientation, caste, sex, gender, gender identity, and serious disease or disability. We also provide some protections for immigration status. We define attack as violent or dehumanizing speech, statements of inferiority, or calls for exclusion or segregation. We separate attacks into three tiers of severity, as described below.

Sometimes people share content containing someone else's hate speech for the purpose of raising awareness or educating others. Similarly, in some cases, words or terms that might otherwise violate our standards are used self-referentially or in an empowering way. When this is the case, we allow the content, but we expect people to clearly indicate their intent, which helps us better understand why they shared it. Where the intention is unclear, we may remove the content.

We allow humor and social commentary related to these topics. In addition, we believe that people are more responsible when they share this kind of commentary using their authentic identity.

Plaintiff submits that Facebook is clearly breaching its own drafted contract right here. "words or terms are used self-refentially or in an empowering way…."

Bingo. Plaintiff was directly referring to himself during two of his 2018 bans, and stating how racist treatments made him feel, and noting that he was not going to suffer it and that he was going to rise above it… until Facebook put him down, that is. And that is why we are in Court today, because Facebook is not to be trusted.

13

# ALLOWED: Mocking the use of slurs



Caption: "Super ultra nigger 9000, a modern machine for a modern racist."

Joke in caption is about about the use of the word "nigger" and it's history with racism.

*Note: This is a really tricky area and we don't have many examples of people using slurs this way.*

*Absent the caption, this photo violates.*

Dear Mark Zuckerberg,

In recent years, live media and social video have been instrumental in exposing injustice occurring all over the world. With the onset of Facebook Live, your company is taking on an increasingly central role in controlling media that circulates through the public sphere. News is not just getting shared on Facebook: it's getting broken there.

We the undersigned 79 organizations are deeply concerned with the recent cases of Facebook censoring human rights documentation, particularly content that depicts police violence. This includes but is not limited to: the deactivation of Korryn Gaines' account, the removal of iconic photographs, reports of suppression of indigenous resistance, continued reports of Black activists' content being removed, and the disabling of Palestinian journalists' accounts following your meeting with the Israeli Prime Minister.

It is critical that Facebook be a platform that supports the protection of human rights above all else and does not discriminately apply its policies on the basis of race, creed, national origin, gender, and/or sexual orientation. When the most vulnerable members of society turn to your platform to document and share experiences of injustice, Facebook is morally obligated to protect that speech.

When Facebook unilaterally censors user content that depicts police brutality at the request of the authorities, it sets a dangerous precedent that further hurts and silences marginalized communities, particularly communities of color. With the safety check-in feature, profile solidarity filters, and in countless speeches, you and others in your company present Facebook's value of human life at the center of its public-facing image. However, Facebook's repeated silencing of marginalized communities that attempt to make their stories and struggles known proves otherwise.

**That is why we, the undersigned organizations, request that Facebook clarify its policy on removing video and other content, especially human rights documentation, at the request of government actors.**

Specifically, we urge Facebook to:

1. **Make policies about how Facebook makes decisions to censor content clear and accessible to the public** : whether those requests are from third party agencies or through its algorithm-- especially with respect to live broadcasting and journalistic content.
    1. *This includes providing the operating details of the law enforcement request portal, including the standards for assessing each request.*
    2. *To better understand this, Facebook should release to the public basic data on all user censorship (either to remove content, hide from the public, or turn over content) which includes, but is not limited to, the number of censorship requests by government actors (police departments, military agencies, intelligence agencies) across the globe, the geographic breakdown of said requests, reasons for removal, etc.*

**Create a public appeals platform** where users can appeal content censored by Facebook.
**Undergo an external audit** on the equity and human rights outcomes of your Facebook Live and content censorship and data sharing policies.[1] Then institute a task force for implementing the recommendations of the audit.

Dear Mark Zuckerberg,

In recent years, live media and social video have been instrumental in exposing injustice occurring all over the world. With the onset of Facebook Live, your company is taking on an increasingly central role in controlling media that circulates through the public sphere. News is not just getting shared on Facebook: it's getting broken there.

We the undersigned 79 organizations are deeply concerned with the recent cases of Facebook censoring human rights documentation, particularly content that depicts police violence. This includes but is not limited to: the deactivation of Korryn Gaines' account, the removal of iconic photographs, reports of suppression of indigenous resistance, continued reports of Black activists' content being removed, and the disabling of Palestinian journalists' accounts following your meeting with the Israeli Prime Minister.

It is critical that Facebook be a platform that supports the protection of human rights above all else and does not discriminately apply its policies on the basis of race, creed, national origin, gender, and/or sexual orientation. When the most vulnerable members of society turn to your platform to document and share experiences of injustice, Facebook is morally obligated to protect that speech.

When Facebook unilaterally censors user content that depicts police brutality at the request of the authorities, it sets a dangerous precedent that further hurts and silences marginalized communities, particularly communities of color. With the safety check-in feature, profile solidarity filters, and in countless speeches, you and others in your company present Facebook's value of human life at the center of its public-facing image. However, Facebook's repeated silencing of marginalized communities that attempt to make their stories and struggles known proves otherwise.

**That is why we, the undersigned organizations, request that Facebook clarify its policy on removing video and other content, especially human rights documentation, at the request of government actors.**
Specifically, we urge Facebook to:
1. **Make policies about how Facebook makes decisions to censor content clear and accessible to the public** : whether those requests are from third party agencies or through its algorithm--especially with respect to live broadcasting and journalistic content.
    1. *This includes providing the operating details of the law enforcement request portal, including the standards for assessing each request.*
    2. *To better understand this, Facebook should release to the public basic data on all user censorship (either to remove content, hide from the public, or turn over content) which includes, but is not limited to, the number of censorship requests by government actors (police departments, military agencies, intelligence agencies) across the globe, the geographic breakdown of said requests, reasons for removal, etc.*
**Create a public appeals platform** where users can appeal content censored by Facebook.
**Undergo an external audit** on the equity and human rights outcomes of your Facebook Live and content censorship and data sharing policies.[1] Then institute a task force for implementing the recommendations of the audit.

**Refuse to disclose customer content and data** t o third party agencies unless required to by law. **a.** *In addition, Facebook must ensure that the circumstances for **content deletion** meet a much higher threshold than for **content and data disclosure**, as customers 1) have an expectation of being able to share protected forms of speech and 2) the public will be deprived of the opportunity to view that speech if the speech is removed.*

We know that Facebook draws purpose from its ability to bring global citizens together, and in a speech before the UN, you said "internet access is an important enabler of human rights." We know that you, Mr. Zuckerberg, have made symbolic gestures in support of Black lives and against police brutality.

However Facebook's actions thus far have indicated that it is taking an unfortunate side in the national debate around police accountability. At a time when Alfred Olango becomes the 217th Black person killed by police in 2016, we must ask -- which Facebook do you represent? Is it the Facebook with a "Black Lives Matter" banner outside its headquarters, or the one that removed the footage of Korryn Gaines and Philando Castile being shot by police?

Since Facebook strives to be an all-encompassing platform that lifts up everyday narratives from everyday people across the globe, we believe that taking urgent action to increase transparency and protect users is the first step to reaching our shared vision of the world. It is important not only for the integrity of its platform and the trust of its community of users, but also for the future of our media. Because the stories that don't get shared are as important as the ones that do. Sincerely,

[1] We share AirBNB efforts as one example of a corporate audit, but request that any auditing agency used by Facebook in this matter be independent and vetted by a panel of independent organizations representing impacted communities, or resulting from recommendations from that panel. See: Laura W. Murphy's Report "Airbnb's Work to Fight Discrimination and Build Inclusion" http://blog.airbnb.com/wp-content/uploads/2016/09/REPORT_Airbnbs-Work-to-Fight-Discrimination-and-Buil d-Inclusion.pdf

SumOfUs
Color of Change
Center for Media Justice
Daily Kos
18MillionRising
350.org
Akcja Demokracja
ActionStation
All Out
American Civil Liberties Union
American Muslims for Palestine
Appalshop
Arab American Institute
Asian Americans Advancing Justice – Asian Law Caucus
Bill of Rights Defense Committee/Defending Dissent Foundation
Black Lives Matter --Vancouver, BC
Black Alliance for Just Immigration

Civic Hall
Common Frequency
Corporate Accountability International
Council on American Islamic Relations- San Francisco Bay Area Chapter Council on American Islamic Relations- Los Angeles Area Chapter Council on American Islamic Relations- Sacramento Valley
Council on American Islamic Relations- San Diego Area
Courage Campaign
CREDO
Demand Progress
Democracy for America
Dream Defenders
Ella Baker Center for Human Rights
Fight for the Future
Fission Strategy
FREE! Families Rally for Emancipation and Empowerment
Free Press
Friends of Sabeel -North America
Generation Justice
Global Action Project
Government Accountability Project
Honor the Earth
IfNotNow
Indigenous Environmental Network
Jewish Voice for Peace
May First/People Link
Mark Ruffalo
Media Alliance
Media Mobilizing Project
Mijente
Muslim Student Association
MPower Change
Oakland Privacy
Open Media Canada
Palestine Legal
People Demanding Action
People's Action
Presente.org
Race Forward
Restore The Fourth
Sierra Club
Skiftet
The Southside Media Project
Students for Justice in Palestine- Boston University
Students for Justice in Palestine -NYU
Students for Justice in Palestine-West
Students for Justice in Palestine- Sacramento State
Students for Justice in Palestine- Santa Clara University
Students for Justice in Palestine- UC Davis
Students for Justice in Palestine- California State University Fullerton Students for Justice in Palestine- UC Berkeley

Students for Justice in Palestine- UC Irvine
Students for Justice in Palestine- UC Santa Barbara
Students for Justice in Palestine- UC Riverside
Students United for Palestinian Equal Rights - University of Washington The People's Press
Project
UltraViolet
United Methodist Kairos Response
Urbana Champaign Independent Media Center
US Campaign for Palestinian Rights
Women, Action, and the Media

**January 18th, 2017**

**To: Joel Kaplan, Facebook Director of Global Policy**
**Cc: Mark Zuckerberg, Facebook CEO**

Thank you for your December 29th response to our coalition's letter. We understand that Facebook must operate in many different social, cultural, and geographic contexts, so finding a policy that fits the globe is challenging to say the least. We appreciate your willingness to engage in dialogue, and we look forward to working together towards a more equitable solution to the specific issues our coalition raised.

However, your recent response inadequately addresses our concerns about the consistent and disproportionate censorship of Facebook users of color or Facebook's interactions with law enforcement. Instead, your response merely explains current, publicly available Facebook policies and fails to address the modest solutions to racially biased censorship we presented in earlier letters and meetings,including a) a streamlined widely publicized appeals process, b) increased transparency about censorship on the Facebook platform, and c) an external audit to assess the human rights outcomes of Facebook's censorship and data sharing practices.

In your letter, you state that "sometimes people share content that can be abusive or harmful to the rest of the community," which Facebook responds to by applying its Community Standards when automated or user reports raise a concern. Unfortunately, members from our organizations have experienced firsthand the uneven application of Facebook's Community Standards and the drawbacks of relying on its users to report abusive content. Indeed, even as activists have been censored for political speech and for posting images critical of government actors--including police officers-- Facebook's third party complaint process has failed to prevent the spread of violent threats and harassment by white supremacist hate groups on your platform.

Activists in the Movement for Black Lives have routinely reported the takedown of images discussing racism and during protests, with the justification that it violates Facebook's Community Standards.  At the same time, harassment and threats directed at activists based on their race, religion, and sexual orientation is thriving on Facebook. Many of these activists have reported such harassment and threats by users and pages on Facebook only to be told that they don't violate Facebook's Community Standards. Similar experiences have been reported by Facebook users from a variety of communities, yet your recent response indicates you are adequately addressing the problem. We disagree.

This pattern of censorship represents a double standard, one that seems to be addressed only through direct activist intervention or significant media attention. We believe more can be done to ensure every Facebook user has the ability to engage on the platform without harassment or undue censorship.

***Make Appeals Transparent***

The current appeals process as it stands is insufficient and ineffective, and we believe it could be strengthened in a few key ways.

- Currently, the appeals process applies *only to profiles or pages that have been removed.* We urge **Facebook to update its appeal process to cover individual posts, photos and videos that have been removed.** This will ensure that users have a proper vehicle to challenge the take down of posts and contest the unequal and unfair application of Facebook's Community Standards.
- Second, when individual posts and photos are removed, any appeals process must also communicate to users a **written explanation and cite which guideline a post or account has violated.**
- Third, though the Community Operations Team apparently works around the clock to review content, it does not apply Facebook policies and procedures evenly across all users. Reports reveal that content from Movement for Black Lives, Palestinian and Native American activist users on Facebook has been removed without evidence of any violation, while obviously racist and hateful content has been allowed to remain. **The Community Operations Team and all content reviewers need additional training focused on understanding racial discrimination and racism in the U.S. context.**
- Lastly, we reiterate the need for Facebook to **produce a public report that lays out basic data on user censorship.** While we are encouraged to hear that Facebook has completed an audit of your Human Rights compliance, we do not find this audit to be sufficiently independent, nor does the audit make any specific recommendations for change. We believe a censorship report would provide users transparency in the way Facebook is applying its Community Standards. This is different than the Government Request Report cited in your response letter to us, which only covers instances where law enforcement requests data on users and the percentage of when that data was turned over. It does not cover content censorship by Facebook. We believe this report could share statistics like:
    - Number of times Facebook removed content from a user's feed.
    - Percentage of content that was removed because it violated its Community Standards around Hate Speech.
    - Number of times Facebook shut down a user account, the number of times content was removed from Facebook's platform, number of requests by law enforcement to remove accounts and content and number of times Facebook complied.

***Next Steps***

Our coalition represents 77 social and racial justice organizations urging changes to Facebook's censorship policies and practices. In a time when democracy is under great threat, we strongly urge you to reconsider our recommendations and take these immediate and simple steps to protect the free speech and human rights of Facebook's most vulnerable users. We hope to hear that change is underway, during an in-person meeting in late January or early February 2017, at Facebook's Menlo Park headquarters.

Sincerely,

SumOfUs.org
Center for Media Justice
ColorOfChange.org
Daily Kos
18MillionRising

350.org
Akcja Demokracja
ActionStation
All Out
American Civil Liberties Union
American Muslims for Palestine
Appalshop
Arab American Institute
Asian Americans Advancing Justice – Asian Law Caucus
Bill of Rights Defense Committee/Defending Dissent Foundation
Black Lives Matter --Vancouver, BC
Black Alliance for Just Immigration
Civic Hall
Common Frequency
Corporate Accountability International
Council on American Islamic Relations- San Francisco Bay Area
Council on American Islamic Relations- Los Angeles Area
Council on American Islamic Relations- Sacramento Valley
Council on American Islamic Relations- San Diego Area
Courage Campaign
CREDO
Demand Progress
Democracy for America
Dream Defenders
Ella Baker Center for Human Rights
Fight for the Future
Fission Strategy
FREE! Families Rally for Emancipation and Empowerment
Free Press
Friends of Sabeel -North America
Generation Justice
Global Action Project
Government Accountability Project
Honor the Earth
IfNotNow
Indigenous Environmental Network
Jewish Voice for Peace
May First/People Link
Mark Ruffalo
Media Alliance
Media Mobilizing Project
Mijente
Muslim Student Association
MPower Change
Oakland Privacy
Open Media Canada
Palestine Legal
People Demanding Action
People's Action
Presente.org
Race Forward

Restore The Fourth
Skiftet
The Southside Media Project
Students for Justice in Palestine- Boston University
Students for Justice in Palestine -NYU
Students for Justice in Palestine-West
Students for Justice in Palestine- Sacramento State
Students for Justice in Palestine- Santa Clara University
Students for Justice in Palestine- UC Davis
Students for Justice in Palestine- California State University Fullerton
Students for Justice in Palestine- UC Berkeley
Students for Justice in Palestine- UC Irvine
Students for Justice in Palestine- UC Santa Barbara
Students for Justice in Palestine- UC Riverside
Students United for Palestinian Equal Rights - University of Washington
The People's Press Project
UltraViolet
United Methodist Kairos Response
Urbana Champaign Independent Media Center
US Campaign for Palestinian Rights
Women, Action, and the Media

Mark Zuckerberg
Chairman and Chief Executive Officer Facebook
1 Hacker Way
Menlo Park, CA 94025
Dear Mr. Zuckerberg:

December 18, 2018

We write to express our profound disappointment regarding Facebook's role in generating bigotry and hatred towards vulnerable communities and civil rights organizations. For years, many of us have engaged directly with your company in good faith, seeking change from within the company that we hoped would address a range of civil rights, privacy, and safety problems resulting from abuse and mismanagement of the platform, including engaging in an on-going audit of the civil rights impact of your policies and programs, as well as how the platform has been used by hate groups, political entities, and others to stoke racial or religious resentment or violence. In particular, we asked you to take immediate action to stop abuse of the platform. Recent news demonstrates, however, that Facebook was not only looking the other way in response to our concerns, but also has been actively working to undermine efforts by those who seek to hold the company responsible for abuses on the platform.

As you know, a recent investigation by the *New York Times*[1] details information about Facebook's responses to a series of crises - including crises around how the company manages and responds to hateful content. In the face of clear evidence that Facebook was being used to broadcast viral propaganda and inspire deadly bigoted campaigns, the company's leadership consistently either looked the other way, or actively worked to lobby against meaningful regulation, shifted public opinion against its allies, and personally attacked its critics.

Though Facebook has had significant time, opportunity and the benefit of input from experts and advocacy groups to address the problems on the platform, your company chose to target civil rights groups and our allies instead of changing the way you do business. Compounding this mistake, you retained the services of Definers Public Affairs to investigate, undermine and attack our allies, mimicking the tactics of the worst, disreputable political operatives and hate groups. Out of your need to treat those leveling legitimate critiques against Facebook as your enemies, you jeopardized the safety and security of people who have dedicated their lives to the common good. This decision crossed all lines of common decency.

[1] "Delay, Deny and Deflect: How Facebook's Leaders Fought Through Crisis," *The New York Times*, November 14, 2018.

Furthermore, it's an absolute disgrace that Facebook sought to deflect criticism and discredit advocates by exploiting anti-Semitic campaigns against philanthropist George Soros. A research document circulated by Definers wrongfully identified Mr. Soros as the force behind a broad anti-Facebook movement.
According to the *Times,* Definers urged reporters to explore the financial connections between Mr. Soros's family or philanthropy and progressive groups hoping to somehow use this information to undercut advocates pursuing accountability for bigotry on the platform. Unbelievably, Facebook sought to have their cake and eat it too; while you weaponized anti-Semitism directed at Mr. Soros, you attacked legitimate criticism of the company as anti-Semitic.

Equally troubling are your claims over the years that problems with the platform or the company's approach have been inadvertent, and that, per a statement quoted in the article, "our entire management team has been focused on tackling the issues we face." What is now clear, however, is direct evidence of malicious and calculated campaigns to undermine Facebook's critics.

Your response as the company's chairman and CEO was also disconcerting. You plead ignorance, that you had no idea that this was happening. But the public has given your company the benefit of the doubt for far too long and ignorance is no longer an excuse. It's become abundantly clear that, as currently constituted, your leadership team is unable to adequately address the valid concerns of the civil rights community. It is now time for significant changes in, not only your policies, but also your leadership structure. At this time, we demand that Facebook immediately:

1. Reorganize Facebook's board in order to enable greater accountability of the leadership team and to allow more diverse voices at the decision-making table. Specifically:

    1. You, Mr. Zuckerberg, should step down as chairman of the board as long as you serve as the Chief Executive Officer to allow the board to provide independent oversight and guidance for the management team.
    2. Sheryl Sandberg should step down from the board of directors as long as she serves as Chief Operating Officer in order to allow the board to provide independent oversight and guidance for the management team.
    3. Facebook should expand its board of directors by at least three members to diversify the board; these new members should reflect the diversity of your global community of users.
    4. The board should appoint an independent and permanent civil rights ombudsman to conduct consistent and ongoing reviews of the civil rights implications of Facebook's policies and practices; this ombudsman shall also serve as a member of the board of directors.

    5. Publicly identify and apologize to all organizations targeted by Definers Public Affairs. In the spirit of transparency, release all internal documents pertaining to opposition research generated by Definers, including all research on civil rights and advocacy organizations.
    6. Remove Facebook's Vice President of Global Public Policy, Joel Kaplan, from his position.
    7. Make public all findings and recommendations of the civil rights audit without revisions or redactions by January 31, 2019.

Thank you in advance for your consideration. We would like to meet with you to discuss our concerns and recommendations. Please contact Naheed Qureshi of Muslim Advocates at naheed@muslimadvocates.org with any questions and to coordinate a meeting.

Sincerely,

Muslim Advocates
Arab American Institute
Asian Americans Advancing Justice – Atlanta Bend the Arc Jewish Action
Center for Human Technology
Center for Media Justice
Community Responders Network
CreaTV San Jose
CREDO
Emgage
Equality Labs
Freedom From Facebook
HOPE not hate
Interfaith Center on Corporate Responsibility MCN – Muslim Community Network
Media Matters for America
Million Hoodies Movement for Justice MomsRising
MoveOn
MPower Change
Muslim Youth Collective
3
NAACP
National LGBTQ Task Force
National Network for Arab American Communities / The Campaign to TAKE ON HATE South Asian Americans Leading Together (SAALT)
Southern Poverty Law Center
The Sikh Coalition
UltraViolet
United We Dream
Urbana-Champaign Independent Media Center
Voting Rights Forward
Women's Alliance for Theology, Ethics, and Ritual (WATER)
cc: Sheryl Sandberg Marc Andreessen
Erskine B. Bowles Kenneth I. Chenault
Susan Desmond-Hellmann Reed Hastings
Peter A. Thiel
Jeffrey Zients



https://www.facebook.com/notes/mark-s-luckie/facebook-is-failing-its-black-employees-and-its-black-users/1931075116975013/

Facebook is failing its black employees and its black users

MARK S LUCKIE·TUESDAY, NOVEMBER 27, 2018

*The following memo was written and circulated by me to all of Facebook's employees around the world. It was sent November 8, 2018, shortly before my final day at the company.*

Facebook has a black people problem.

One of the platform's most engaged demographics and an unmatched cultural trendsetter is having their community divided by the actions and inaction of the company. This loss is a direct reflection of the staffing and treatment of many of its black employees.

In my role as Strategic Partner Manager for Global Influencers focused on Underrepresented Voices, I've been uniquely exposed to the issues surrounding the internal and external representation of black people here. Through formal meetings, backchannel conversations, and casual chats over coffee, some common themes have emerged:

### Black people on Facebook

### Black people are one of the most engaged demographics on Facebook...

Black people are far outpacing other groups on the platform in a slew of engagement metrics. African Americans are more likely to use Facebook to communicate with family and friends daily, according to research commissioned by Facebook. 63% use Facebook to communicate with family, and 60% use Facebook to communicate with friends at least once a day, compared to 53% and 54% of the total population, respectively. 70% of black U.S. adults use Facebook and 43% use Instagram, according to the Pew Research Center. 55% of black millennials report spending at least one hour a day on social networking sites, 6% higher than all millennials, while 29% say they spend at least three hours a day, 9% higher than all millennials, Nielsen surveys found. Black people are driving the kind of meaningful social interactions Facebook is striving to facilitate.

### ...but their experiences are sometimes far from positive.

Black people are finding that their attempts to create "safe spaces" on Facebook for conversation among themselves are being derailed by the platform itself. Non-black people are reporting what are meant to be positive efforts as hate speech, despite them often not violating Facebook's terms of service. Their content is removed without notice. Accounts are suspended indefinitely.

When these rulings are upheld with little recourse, it upends the communities of color Facebook claims to be supporting. It decreases the likelihood that people will continue to engage at the same level on our platform. Even high-profile figures who are plagued with these issues sometimes have to wait until it's a major press story for it to be addressed.

There is a prevailing theory among many black users that their content is more likely to be taken down on the platform than any other group. Even though the theories are mostly anecdotal, Facebook does little to dissuade people from this idea. Black people continue to use the platform because for many it is still their best way to connect directly with the causes they care about. Our communities should be able to trust that we have their best interests at heart.

### Underrepresented groups are being systematically excluded from communication.

Facebook is a company built on data. When determining where to allocate resources, ranking data such as followers, greatest number of likes and shares, or yearly revenue are employed to scale features and products. The problem with this approach is Facebook teams are effectively giving more resources to the people who already have them. In doing so, Facebook is increasing the disparity of access between legacy individuals/brands and minority communities.

You can see this reflected in everything from the guest lists of Facebook's external programs, the industry events the company has historically sponsored, the creators and influencers who appear in Explore tabs on Instagram, the power users who are verified on the platforms, and more. So many positive advancements have been made in recruiting and in engineering with formal programs that are inclusive of or specifically uplift communities of color. We need that same lens at all areas of the company, particularly those that are external facing.

Black employees are commonly told "I didn't know black people worked at Facebook." Though relatively small in number, we are here. What this translates to is the black people who invest so much time into us want their opinions to matter and they're not seeing that reflected externally.

### Diverse communities represent new ideas and opportunities for growth.

We are continually missing opportunities to engage with groups whose use of our family of products is fundamentally different than the general population. Rather than focusing on the most global household names and brands for whom Facebook only moves the needle slightly, we should invest more in partners who are household names in their own

communities. These partners are often delighted to have any kind of interaction with Facebook and are more than willing to experiment with us. Many teams have found successes with this approach – more diversity in content partnerships, higher engagement numbers in previously untapped segments, feedback that can be cycled back into a general best practices, and so on.

### Teams that require diverse perspectives should hire diverse people.

Black employees at Facebook are frequently asked publicly and privately to volunteer their input for projects that involve race in some way. Questions like "What do black people think about…", "Is this racist?", or "Is this graphic culturally appropriate?" are common. Black employees often do these things gladly (and within reason) because someone has to. Otherwise, these issues would go untouched by people of color. However, this one-off approach isn't sustainable. If your team's work affects particular communities, it is far more effective to hire people from those communities who have the context of your team's processes and goals. This allows more room for black people who would otherwise be obligated to volunteer to be more productive in their own roles.

### Hiring diversity-focused employees isn't a cure-all.

There is a top-down emphasis on diversity with pledges from the M-team [executive leadership] to address the systematic issues the company faces. And on the surface, it's working. There has been a wave of hiring in the last two years of employees specifically focused on representing the voices of diverse communities.

However, what's been missing in many cases is a plan of action for how their work will roll up into the greater team goals. According to shared feedback, these employees sometimes find their resources for carrying out diversity initiatives are deprioritized in favor of team-wide efforts that impact broader communities. For some, their work devolves into serving as an address book to add a few names of color to projects. Efforts that promote inclusion, not just diversity, are being halted at the managerial level.

Inclusion should be a team effort. It is not enough to simply hire people to focus on diversity. Everyone on teams whose work focuses on varied cultural backgrounds should be responsible for ensuring the outcome of their work is representative of those groups. The people who focus specifically on diversity should be given agency to carry out not only their fundamental goals but to keep their team accountable as well through measurable impact.

### Black Employees at Facebook

For any tech company, it is important to have staff that reflects the communities the platform seeks to empower if it intends to be successful. A huge congrats to the teams who have helped increase the number of black employees from 2 percent of the workforce in 2016 to 4 percent in 2018.

Major kudos to the Diversity team, Facebook employee resource groups, and the clusters of volunteers who have created internal support systems for employees from shared backgrounds. When you interact with people who look like you, it drives retention, forges relationships and increases loyalty to the company. And it's good for business. This makes the work of the Diversity team and the teams that touch these issues so important.

Although incremental changes are being made, the fact remains that the population of Facebook employees doesn't reflect its most engaged user base. There is often more diversity in Keynote presentations than the teams who present them. In some buildings, there are more "Black Lives Matter" posters than there are actual black people. Facebook can't claim that it is connecting communities if those communities aren't represented proportionately in its staffing.

### Racial discrimination at Facebook is real.

Facebook's disenfranchisement of black people on the platform mirrors the marginalization of its black employees. In my time at the company, I've heard far too many stories from black employees of a colleague or manager calling them "hostile" or "aggressive" for simply sharing their thoughts in a manner not dissimilar from their non-Black team members. A few black employees have reported being specifically dissuaded by their managers from becoming active in the [internal] Black@ group or doing "Black stuff," even if it happens outside of work hours. Too many black employees can recount stories of being aggressively accosted by campus security beyond what was necessary.

On a personal note, at least two or three times a day, every day, a colleague at MPK [Facebook headquarters in Menlo Park] will look directly at me and tap or hold their wallet or shove their hands down their pocket to clutch it tightly until I pass. The frequency is even higher when walking through Classic campus or Building 20. To feel like an oddity at your own place of employment because of the color of your skin while passing posters reminding you to be your authentic self feels in itself inauthentic.

### HR is often a dead end.

Black employees will sometimes to turn to HR in search of a resolution, as employees from all backgrounds do. We often find, however, that our experiences are rationalized away or we're made to believe these disheartening patterns are a figment of our imagination. That our eyes and ears are deceiving us and we're simply not being a team player. It becomes clear that the conversations with HR are more often than not meant to protect the manager and the status quo of Facebook, not support the employee.

Black staffers at Facebook know that by raising our voices we risk jeopardizing our professional relationships and our career advancement. As much as we'd like to convince ourselves these are minor inconveniences, they continue to eat away at us and affect our work. It's only when talking to other black employees experiencing the same issues that we come to accept that it is a pattern of behavior deeply connected to the culture at Facebook.

And so we talk amongst ourselves, in small groups or one on one, finding ways to cope with the additional stress that comes with being a person of color at this company.

Certainly, these aren't the experiences of all black employees. But these issues are so widespread that they should be an ongoing cause for concern.

### Low morale leads to low production.

We need black employees, women, and people of color to feel good about working at this company. Numerous studies have shown that biased treatment in the workplace greatly impacts employee productivity and the desire to advance in the company. Facebook has a number of perks — from food to health benefits to spa services — that are meant to boost productivity and morale. A discrimination-free workplace should be a perk as well.

We can assume good intent. We can also assert that there is a pervasive problem at the company that needs to be addressed promptly in order to stem the tide of apathy. "We're thinking about it" can only hold us over for so long. Facebook can't engender the trust of its black users if it can't maintain the trust of its black employees.

I care deeply for this company and I've been blessed to be able to work closely with so many teams on building everything from arena-sized activations to campus Q&As with diverse influencers to programs dedicated to strengthening the retention of employees of color.

Being stationed at Facebook headquarters has required a great deal of sacrifice — being cut off from family, friends, and my now former fiancé, compromising my health and my sense of security. I've done all this willingly because I strongly believe in this company and its ability to positively impact the world. But to continue to witness and be in the center of the systematic disenfranchisement of underrepresented voices, however unintentional, is more than I'm willing to sacrifice personally. I've lost the will and the desire to advocate on behalf of Facebook.

Because of these reasons and other issues related to my role, I've decided to leave the company. After my departure, I'll be focusing on rebuilding my life and the further development of my recently launched sci-fi drama podcast. I'll seek to rebuild the confidence and optimism that brought me to Facebook.

It's been an honor and a pleasure to collaborate with partners who represent some of the most vibrant communities on Facebook and Instagram. I am deeply appreciative of the people of color and allies whose work has advanced the representation of diverse groups throughout the company.

### Recommendations

It will take an effort at all levels for Facebook to improve its relationship with diverse communities. The future of the platform depends on it. Based on conversations with teams across the company in the last year, here are my recommendations:

- For any team that has one or more people dedicated specifically to diversity, require a strategic plan for how that work will be incorporated into larger goals for the team. Create metrics for other team members to incorporate into their goals as well that ensure representation is everyone's responsibility.

- Implement data-driven goals to ensure partnerships, product testing, and client support is reflective of the demographics of Facebook.

- Level up cultural competency training for Operations teams that review reported infractions on Facebook and Instagram. Whenever possible, avoid relying solely on algorithms or AI to triage these problems.

- Create internal systems for employees to anonymously report microaggressions. This includes using coded language like "lowering the bar" or "hostile," disproportionately giving lower performance review scores to women and people of color, or discouraging employees from engaging in cultural activities outside of their agreed upon work schedule. If these reported infractions surface a pattern, require the manager and/or team to attend sensitivity training to amend the behavior.

- Support emerging talent and brands by creating a pipeline of communication and scaled support that allows them to further build with the platform.

- Establish more regularly-scheduled focus groups with underrepresented communities, particularly the Black and Latino users who over-engage on Facebook and Instagram. Use these conversations to gain insight on how to grow the platform.

- Be deliberate about demographic representation of attendees at external events. Do not relegate invitations to partners of color to "diversity" events.

- Work toward surfacing more case studies that originate from within ethnically diverse communities, not just geographically diverse. Showcase these examples more frequently in internal and external presentations and opportunities like campus newsletters.

- Continue efforts to recruit and hire for roles in offices outside of MPK. Expand the staffing beyond the teams that already have a significant presence there.

- After the conclusion of the diversity audit, create a plan that includes action items on the manager and employee level. Ensure that the incoming Head of Diversity Integration sets goals for teams that they are kept accountable for and roll up into overall company goals.

At a company whose family of products directly affects the lives of 2.5 billion people worldwide, representation and inclusion should be of the greatest importance to everyone. Diversity defines our external image and relationships. It is therefore important that inclusion is methodically woven into the fabric of the company.

In leading by example internally, we show that being your authentic self, within Facebook's terms of service, extends to everyone on our platform.

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| Christopher King, J.D. A/K/A KingCast | ) |
| *Plaintiff* | ) |
| v. | ) |
| Facebook, Inc. | ) |
| *Defendant* | ) |

Civil Action

**CV 19 - 1987 WHO**

## WAIVER OF THE SERVICE OF SUMMONS

To: Christopher King, J.D.
*(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____4/12/2019_____, the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: ___12 April 2019___

_____
*Signature of the attorney or unrepresented party*

Christopher King
*Printed name*

_____
*Printed name of party waiving service of summons*

12048 Greenwood Ave North
*Address*

suefacebook007@gmail.com
*E-mail address*

617.543.8085
*Telephone number*

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.