UNITED STATES DISTRICT FEDERAL COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CHRISTOPHER KING, JD<br>A/K/A KingCast,_ | ) | CASE NO. 19-CV-1987 |
| | ) | |
| Plaintiff, | | |
| | ) | JUDGE WILLIAM ORRICK |
| vs. | | |
| | ) | |
| FACEBOOK, INC.,<br>and | ) | |
| DOES UNKNOWN, | | |
| | ) | JURY DEMAND |
| Defendants. | | |

**COMPLAINT**

NOW COMES PLAINTIFF, CHRISTOPHER KING, J.D. to bring this Action to help hold Facebook accountable to its Terms of Service Contractual arrangements, on an objective basis, free from racism and cultural hegemony.

PROLOGUE AND CONTEXT

This case is dedicated to Plaintiff's Mother, Betty J. King, who moved on from this Earth during a wrongful suspension against Plaintiff, such that he could not freely communicate with his 1,900 friends about the subject.

This Action sounds in Bad Faith, Fraudulent and Retaliatory Breach of Contract, Racism per 42 U.S.C. §1981 and False and Deceptive Business Practices that violate the Covenant of Good Faith and Fair Dealing as countenanced by both Washington and California Law. The facts will reveal that Defendant's misconduct this case, and likely in many others is a Fraudulent Breach of your ToS and Defendant's own Learned Amicus Counsel David K. Lukmire concurs with Plaintiff in that:

> The case for restricting the subject matter of section 230 immunity is equally strong...... One thing is for certain: unless courts narrow their interpretations of section 230, deserving plaintiffs will be without redress.

> As discussed, the statute should be interpreted in light of its language, which clearly sounds in defamation law. Allowing certain claims that are close to textbook defamation will help clear up whether the plaintiff has artfully pleaded garden variety tort claims in order to evade the proper boundaries of section 230. **Courts should almost never dismiss other claims, such as allegations under civil rights laws or breach of contract claims, on section 230 grounds, for they are much too far removed from the tort of defamation.** If those claims are meritless, they should be dismissed on the merits instead of by application of the statute. (emphasis added).

1

The day after Plaintiff directly referenced this NYU Law School Learned Treatise by Attorney Lukmire in Open Court…. it disappeared from the Internet and one may no longer read his seminal work, "Can the Courts Tame the Communications Decency Act?  The Reverberations of Zearn v. America Online."  Note the following thumbnails showing what used to be there, and what now appears in its place:  "This site can't be reached."





As Defendant tries to explain why it initially failed to censor the white separatist/supremacist hate speech of one Faith Goldy after claiming to ban white nationalism and separatism…… Plaintiff recently noted on Defendant's own "platform:"

> Nigger is my word Mark not yours. Some of the worst elements of white people have foisted that word on my ancestors and me while they were also busy murdering my Cherokee ancestors, fact.

And I have a right to use my word in my way as long as I am not degrading someone and I never once used it in that capacity.

> I used it to complain about racism including YOURS according to Mark S Luckie and many, many others.

> Meanwhile as will be detailed subsequently in this Complaint, seventy-nine (79) different Civil Rights and media and law groups joined together to twice protest unfair Facebook censorship concerns, to wit:

> It is critical that Facebook be a platform that supports the protection of human rights above all else and does not discriminately apply its policies on the basis of race, creed, national origin, gender, and/or sexual orientation. When the most vulnerable members of society turn to your platform to document and share experiences of injustice, Facebook is morally obligated to protect that speech. (Appendix B)

Moreover, In December of 2018 Facebook Diversity VP Mark S. Luckie resigned and noted:

> "Facebook's disenfranchisement of black people on the platform mirrors the marginalization of its black employees," he wrote. More on this later.

Defendant Zuckerberg acknowledges negligent and/or reckless misconduct:

> "If you're building a product that people love you can make a lot of mistakes."[1]

> The Facebook Dilemma Part One, PBS Frontline Part One Oct. '18.
> https://www.pbs.org/wgbh/frontline/film/facebookdilemma/?fbclid=IwAR3ueCowWV6eANhkMmh Pksh4zpmdyQgkmiIGgGfW_v11dbDSguY6nLiF4GM

### JURISDICTION, PARTIES, AND VENUE

1.      This court has subject-matter jurisdiction over this action.

2.      Plaintiff CHRISTOPHER KING resides in Seattle, King County.

3.      Defendant(s) Doe(s) reside in unknown location(s), most likely in the Continental United States.

---

[1] The Court may of course take Unofficial Judicial Notice that not everyone loves Facebook anymore.

4.      Defendant Facebook, (hereinafter "Defendant" or "Nation State Facebook") is a multimedia news and entertainment community-sharing platform with far-reaching vertical and horizontal monopolies doing substantial business in the forum State. It is without question the largest single platform in existence for social media and the marketplace of ideas.

5.      Defendant has an adhesion or click-wrap clause in its Terms of Service that requires Plaintiffs to sue in Northern California Courts even though Canada Courts have soundly rejected this mandate. See *Douez v Facebook, Inc*, 2017 SCC 33 (2017).

6.      This court has personal jurisdiction over all named defendants.

7.      Venue is proper.


## THE PARTIES

8      Plaintiff joined Facebook in or about 2010.

9.      Plaintiff is a professionally-trained journalist who has edited and written in weekly and large daily newspapers including but not limited to the Ohio Call and Post (editor) and the Indianapolis Star (reporter).  He has also co-hosted a radio show that led to a First Amendment-related Jury Verdict in a Defamation case for $570,000.00 after he secured Counsel for the Plaintiff he had interviewed.

10.      He is also a former Civil Rights Attorney who has won several First Amendment Jury Trials and otherwise enhanced his clients' positions in State and Federal Court. While working for Ohio Attorney General Lee Fisher and Cleveland Civil Rights Lawyer Terry H. Gilbert in 1992 he hosted a Hate Crimes forum at Case Western Reserve University School of Law (Gund Hall School of Law).

## FACTS

11.      With 2.27 Billion – that's with a capital 'B' -- Defendant **is the World's largest single alleged protector of Public Speech Rights the World has ever seen.**

12.      Defendant Facebook founded itself publicly "to make the world more open and connected" on the oft-quoted notion of CEO Mark Zuckerberg. In 2017 that Mission was changed to ""Give people the power to build community and bring the world closer together."

13.      In reality Facebook had an underlying mission all along to create a "Nation State: according to Tim Sparapani, Esq.  As the first Facebook Director of Public Policy he went on record in an October 2018 PBS Frontline news feature as stating that Facebook was creating its own "Nation State."

14.      The purpose of that "Nation State" was to crush all competition according to the New York Times in its December 6, 2018 Feature:

*https://www.nytimes.com/2018/12/05/technology/facebook-emails-privacy-data.html*
***Facebook Emails Show Its Real Mission: Making Money and Crushing Competition***

15.     Facebook has a contractual, adhesion set of Terms of Service for its users. Included in the Terms of Service are provisions that clearly indicate that minorities in a protected class are permitted to use otherwise derogatory terms in a "self-referential" or in an "empowering way." Facebook quidelines lain down by their information czar also make it clear that context is paramount. (Appendix A).

16.     Interesting as of this writing GLBTi are mentioned in the hate speech terms of service but blacks are not directly mentioned.  (*Id*).

17.     Defendant pays lip service to appease critics while their real policies typically belie the promises set forth.  For example Defendant initially failed to censor the white separatist/supremacist hate speech of one Faith Goldy after claiming to ban white nationalism and separatism…… until public outcry and publicity commanded a policy shift.

*POLITICS*
04/02/2019 08:19 pm ET

# Facebook Says White Nationalist Video Doesn't Break New Policy Against White Nationalism

HuffPost showed the company a racist, fear-mongering video by Faith Goldy. Not a problem, a spokesperson said.

By **Andy Campbell**

Facebook vowed last week to curb hateful content on its platform by extending its policies against white supremacy to cover posts that praise white nationalism and separatism.

Now it's unclear what that new policy actually means, if anything. On Tuesday, HuffPost showed a Facebook spokesperson a video on Facebook in which prominent Canadian white nationalist Faith Goldy laments white "replacement" and demands that Jews and people of color repay the white European countries they've "invaded."

The spokesperson said that no policy had been broken, not even the social media giant's new policy banning the promotion or praise of white nationalism.

5

18.     Plaintiff lived in Providence, RI before moving to the West Coast in 2013 and maintains close friendships and ties to media there.  They report that the Providence Journal and Rep. David Cicilline (RI – 1) are not impressed:

> Democratic Rep. David Cicilline of Rhode Island grilled the Facebook and Google executives about their companies' responsibility for the spread of white supremacist views, pushing them to acknowledge they have played a role, even if it was unintentional. Potts and Walden conceded the companies have a duty to try to curb hate.
>
> But the challenges became clear as Cicilline pushed Potts to answer why Facebook did not immediately remove far-right commentator Faith Goldy last week, after announcing a ban on white nationalism on the social network.[2]

19.     But Defendant is quick to suspend blacks and critics even when it is patently clear that no ToS violations have occurred. As Plaintiff recently noted on Defendant's own "platform:"

> Nigger is my word Mark not yours. Some of the worst elements of white people have foisted that word on my ancestors and me while they were also busy murdering my Cherokee ancestors, fact.
>
> And I have a right to use my word in my way as long as I am not degrading someone and I never once used it in that capacity.
>
> I used it to complain about racism including YOURS according to Mark S Luckie and many, many others.

20.     Meanwhile as will be detailed subsequently in this Complaint, seventy-nine (79) different Civil Rights and media and law groups joined together to twice protest unfair Facebook censorship concerns, to wit:

> It is critical that Facebook be a platform that supports the protection of human rights above all else and does not discriminately apply its policies on the basis of race, creed, national origin, gender, and/or sexual orientation. When the most vulnerable members of society turn to your platform to document and share experiences of injustice, Facebook is morally obligated to protect that speech.

---

[2]  Representative Cicilline shares Plaintiff's concerns that Facebook is indeed a monopolistic, culturally hegemonic enterprise. In March, 2019 he authored a NYTimes Editorial:

## The Case for Investigating Facebook

*Why I am calling on the Federal Trade Commission to investigate Facebook for violating antitrust laws.*

21.     To prove the point, in December of 2018 Facebook Diversity VP Mark S. Luckie resigned and noted in a heartfelt editorial "Facebook is failing its black employees and its black users" on 27 November 2018 at a time proximate to his resignation from the company.

22.     Facebook's initial response was to remove the post – even though it is clearly not hate speech but is rather an intelligent, independent black man voicing a concern about corporate racism.

https://www.facebook.com/notes/mark-s-luckie/facebook-is-failing-its-black-employees-and-its-black-users/1931075116975013/

> "Facebook's disenfranchisement of black people on the platform mirrors the marginalization of its black employees," he wrote. (Appendix C).
>
> "Too many black employees can recount stories of being aggressively accosted by campus security beyond what was necessary." And it raises questions as to how frequently moderation mistakes might occur when non-high-profile users discuss sensitive subjects, those who don't have the company or media connections to seek recourse. In the original memo, Luckie had said that black users appeared to be unfairly targeted by Facebook's moderation efforts, writing:
>
> "Black people are finding that their attempts to create 'safe spaces' on Facebook for conversation among themselves are being derailed by the platform itself. Non-black people are reporting what are meant to be positive efforts as hate speech, despite them often not violating Facebook's terms of service. Their content is removed without notice. Accounts are suspended indefinitely."

23.     Plaintiff hosts several blogs, a YouTube Channel with +5,000 subscribers and a Roku TV show "Corruption Meets Camera."

24. Plaintiff claimed racial and retaliatory disparity in 30-day or longer Facebook bans on one of his Roku TV show segments several months ago. The twenty-one minute segment may also be seen here:

http://christopher-king.blogspot.com/2018/05/kingcast-presents-lights-camera- action_7.html
https://www.youtube.com/watch?v=Svzs-Bpr0bI

25. Plaintiff concurs with this brilliant piece by Jillian York/EFF about how "Getting Banned From Facebook Can Have Devastating Consequences."

https://qz.com/651001/getting-banned-from-facebook-can-have-unexpected-and- professionally-devastating-consequences/

> I believe that this problem stems from a lack of diversity at Facebook. Seventy- three percent of Facebook's US leadership is white. Globally, 77% of the company's leadership are men. Women make up just 32% of the company's global staff, and only 2% of the US staff is black, a number far disproportionate to the actual black American population.

26.     In Plaintiff's own City of Seattle the Seattle Stranger noted that blacks pay the price for complaining about racism:

https://www.thestranger.com/slog/2017/08/11/25345304/is-facebook-silencing-black- activists-with-racist-bots

In a story dated 11 August 2017 "Is Facebook Silencing Black Activists with Racist Bots?" the paper noted that Natasha Marin was silenced for an alleged violation of community standards for complaining about racism. She was running a "Shrine of Asshats" page when she got the Hook.

27.     Seattle Globalist noted the problem immediately in its 28 July 2016 story, "Shrine of Asshats: Seattle Reparations Project Slays the Trolls."

http://www.seattleglobalist.com/2016/07/28/seattle-reparations-project-slays-trolls/54411

> These trolls are our neighbors, coworkers, people we see at the grocery store. You might be walking past this person on your way home today and have no idea the kind of hatred they are harboring. It's not like all racists tattoo themselves with swastikas. They wear business suits, go to church, and have jobs just like the rest of us. Let this forever shatter any illusion some of you might have that we somehow live in a post-racism society.

28.     However, on information and belief, Facebook continues to punish black activists and other critics in violation of the Stated ToS. Plaintiff is both black and a critic so Facebook has two-fer right there:

> Facebook also recently temporarily banned and then later apologized to Ijeoma Oluo for posting screenshots of racist comments people were hurling at her.

> According to Devin Coldeway over at Tech Crunch, there have been several other similar instances: We talked with another activist recently, Leslie Mac, who like Oluo spoke out on racism using the platform, and like Oluo was suspended from it. It happened to Shaun King, too, after he posted a racist email he received.

8

29.     Defendant has removed or blocked Plaintiff's content several times in 2018 for reasons it falsely labels as violations of Terms of Service and Defendant knew the content did not violate ToS and Defendant removed and blocked the content in Bad Faith after its fraudulent practices led Plaintiff to place reasonable reliance on promises of fairness and prompt and thorough review of any Facebook content bans or "Facebook Jail" sentences. Some of the examples are highlighted below:

30.     Defendant banned Plaintiff in spring, 2018 for complaining about how white establishment lawyer Mark Rattan traversed an entire room to grab Plaintiff's camera in defiance of a Court Order allowing such cameras at a lawyer discipline hearing in Wisconsin. Plaintiff's point was that he, as a black man, feels like he is being treated like a nigger and cannot fight back physically or he will be at fault.



Wells Fargo Attorney Mark W Rattan attacks journalist to cover up forgery and foreclosure fraud
3,994 views



31.     Facebook again banned Plaintiff on or about 2 November in a case in which a white man got in his face and dropped 5 F-Bombs, but when the Sheriff came to "investigate" he ignored all of that and made Plaintiff into the aggressor. Plaintiff put up a picture of an official document and drew parentheses around the races of the witnesses (all white) and juxtaposed those with his (black). He stated "Now I know why the report was biased." Incredibly, Facebook banned him from that and after his appeal, still has not told him how such post purportedly violated ToS:

9

32.  Each and every contested Facebook suspension in this case (Discovery will reveal 4-5 bans) was executed without any objective basis, in Complete Bad Faith and sustained fraudulently and with actual malice in outright willful and targeted violations of ToS by Defendant as part of a larger corporate scheme of power, control and corporate hegemony.

33.  Then, while Plaintiff was awaiting an explanation on that point, Facebook went and took another screen shot of his involving the same incident and is now claiming that such photo violates ToS and thereby banning him for that that photo as well. The problem is, the screen shot depicts a white male in his face and Plaintiff discussing ***how he feels during the experience:***

> Nigger, Nigger, Nigger.... How dare you challenge me. I am a white male of some sort of privilege. I can basically spit in your face and drop 5 F-Bombs And the local Sheriff will find a way to ignore it. You stupid nigger.[1]



34.  Plaintiff was wrongfully banned during his birthday and Facebook knew about it and continued to ban him in violation of its own ToS.

35.      Plaintiff was wrongfully banned as his mother moved on from this Earth from complications related to Dementia last fall and Facebook knew about it and continued to ban him in violation of its own ToS.

36.      Plaintiff was wrongfully banned after he critiqued Facebook's banning of politically progressive rapper Lil B the BASEGOD: Plaintiff and Lil' B are both members of the same Protected Class, i.e. black men, or niggers.  Nonetheless Defendant banned Plaintiff yet again after he wrote two posts within 2 minutes of each other that read: "Facebook gunned down another nigger…" and "we're dropping like flies around here."

37.      Plaintiff attempted to post to a Civil Rights Facebook forum in the UK but the moderator informed him that he could not fully see the post for some undisclosed reason. Plaintiff inquired of Facebook as to why his post was not visible and Facebook declined to answer.

38.      A Facebook page run largely by Donald Trump supporters has a few members who have indicated support for Plaintiff and this litigation. The same day that someone on that forum decided to share Plaintiff's page entitled "How to Sue Facebook" (https://howtosuefacebook.blogspot.com/) Defendant determined that no one could post any links to that page publicly nor is anyone entitled to even share it in Facebook Messenger.

39.      The stated reason for the ban is yet again pretextual in the sense that Defendant falsely claims that it "Violates Community Standards." without specificity whatsoever.

40.      Defendant is well aware that such blog had been up for 3+ months and had been seen in Open Court for weeks before Defendant issued the bogus and Fraudulent Bad Faith rationale that the site violated Community Standards.



**You can't share this link**

howtosuefacebook.blogspot.com

Your content couldn't be shared, because this link goes against our Community Standards
If you think this doesn't go against our Community Standards let us know.

Close



Yeah they did one better I tried to continue sharing that link and they put some sort of a block on it can't share it anymore I can go to it but I can't share it not off of you or from the actual site

41.     Meanwhile seventy-nine (79) different Civil Rights and media and law groups joined together to twice protest unfair Facebook censorship concerns on its "platform," to wit:

> above all else and does not discriminately apply its policies on the basis of race, creed, national origin, gender, and/or sexual orientation. When the most vulnerable members of society turn to your platform to document and share experiences of injustice, Facebook is morally obligated to protect that speech.

> Letter #2 18 January 2017 -- This pattern of censorship represents a double standard, one that seems to be addressed only through direct activist intervention or significant media attention. We believe more can be done to ensure every Facebook user has the ability to engage on the platform without harassment or undue censorship. Letter #3 18 December 2018. Equally troubling are your claims over the years that problems with the platform or the company's approach have been inadvertent, and that, per a statement quoted in the article, "our entire management team has been focused on tackling the issues we face." What is now clear, however, is direct evidence of malicious and calculated campaigns to undermine Facebook's critics.

42.     May the Record reflect that Plaintiff is definitely a Facebook critic, and he has been treated unfairly and in violation of stated Terms of Service that constitute a Contract.[3]

43.     In late 2018 Plaintiff asked for a review of yet another Facebook ban.  Defendant sat on the review for two solid weeks until Plaintiff pointed it out to the Court; within 24 hours of that exposure Defendant upheld the ban.  This failure to review is a Bad Faith gesture that further violates the express and implied Terms of Service for disputes and it is Fraudulent because platform users are led to believe the material misrepresentations that they will receive a timely and meaningful review as Defendant has openly promised. See the large thumbnail on the following page:

---

[3] Lest we forget, Facebook is more than happy to remind potential litigants that they – we – are indeed bound by Contract because we impliedly signed on to the Terms of Service, ahem. See generally *Goose v. Gander*, citation omitted.



44.     Many writers believe that Facebook "Hates Black People."

https://medium.com/@thedididelgado/mark-zuckerberg-hates-black-people-ae65426e3d2a?fbclid=IwAR0MOAPYC_tf92JbtSgMhzaWd2OVxmCcSBQsSQSfgd8PRyClY8ZI6gKcinI

# Mark Zuckerberg Hates Black People
Black Facebook users are having their accounts banned for speaking out against racism.



The DiDi Delgado
May 17, 2017 · 8 min read

As I write this, I'm currently serving two simultaneous Facebook bans. I, like many Black organizers, have taken to maintaining two accounts—a primary and a backup. It's infuriating and tedious, but I chalk it up to the Black tax. Since Black organizers are more likely to have their content flagged and removed for "violating community standards," we've had to find workarounds to sustain our online presence and engagement. Currently, my primary and backup accounts are both banned for "promoting hate speech." That means bigoted trolls lurked my page reporting anything and everything, hoping I'd be in violation of the vague "standards" imposed by Facebook. It's kinda like how white people reflexively call the cops whenever they see a Black person outside. Except in this case it's not my physical presence they find threatening, it's my digital one.

During a Facebook ban, a user's account retains all functionality in terms of reading and navigating the site, but posting of any kind is prohibited. You can see content; you just can't communicate. This conveniently prevents users from informing their followers they've been unfairly banned, essentially halting us from raising awareness around the issue. I find this doubly insulting because it's reminiscent of early slave codes, which often made it permissible for enslaved people to *read*, but illegal for them to *write* (a potential catalyst for "insurrection and rebellion"). It seems the intent behind silencing outspoken Black folks hasn't changed in the last few hundred years. And while Mark Zuckerberg hasn't yet sentenced me to "thirty nine lashes on [my] bare back," I can't say for certain that penalty isn't hidden somewhere in Facebook's ridiculous terms of service.

14

45.      Regarding the Civil Rights Audit contemplated by para. 19, *supra*, Facebook has been
tagged for racially discriminatory housing matters. Plaintiff is rightfully concerned about this as
his parents were unlawfully steered in 1970 when Plaintiff was 5 years old and they became
testers in the landmark case of *Heights Community Congress v. Hilltop Realty*, 774 F.2d 135
(1985)  His friend's father Don Barclay, Esq. was Cleveland Heights' City Attorney on the case
and that is part of what motivated Plaintiff to become a Civil Rights lawyer and investigative
journalist. https://newsroom.fb.com/news/2018/12/civil-rights-audit/

https://openjurist.org/774/f2d/135/heights-community-congress-v-hilltop-realty-inc

December 18, 2018

## An Update on Our Civil Rights Audit

facebook

46.      Regarding the Civil Rights Audit contemplated by para. 19, *supra*, Facebook has still not
released the results of any inquiry as to whether they unfairly ban blacks or critics of Facebook
for speaking out against racism.

47.      Facebook has allowed whites to say the same thing that blacks have been banned for:
From the Reveal News story *How activists of color lose battles against Facebook's moderator
army* by Aaron Sankin, 17 August 2017:



How activists of color lose battles against
Facebook's moderator army

Mary Canty Merrill was fed up. So she turned to Facebook:

"Dear White People: The terminology we use to define a problem determines how we attempt to solve it," she wrote in an April 4 Facebook post. "You are so accustomed to defining racism as people of color being the problem that you want to fix us, patronize us, save us and heal us. You rarely perceive yourselves as the problem (which is where its root lies). Thus, your interventions are most often ill-informed, misdirected and yield no meaningful or sustainable results."

She logged in the next day to find her post removed and profile suspended for a week. A number of her older posts, which also used the "Dear white people" formulation, had been similarly erased.

Perhaps most Facebook users would've simply waited out the weeklong ban. But Merrill, a psychologist who advises corporations on how to avoid racial bias, wondered whether she was targeted because she is African American. So she asked some white friends to conduct an experiment:

They copied what she had written word for word and had others report it as inappropriate content. In most cases, Facebook allowed the content to remain active. None of their profiles were suspended.[4]
https://www.revealnews.org/article/how-activists-of-color-lose-battles-against-facebooks-moderator-army/

48.     Dr. Boyce Watkins has noted that "Facebook appears to be purging black people on a systemic basis."

http://financialjuneteenth.com/dr-boyce-watkins-facebook-appears-purging-black-people-systematic-basis/
9 January 2017.

But last week, I became confused when the popular social media platform began what appeared to be a systematic purge of nearly all of my African American friends for sharing or posting even the most harmless content.  I've had friends get their accounts suspended for posting links to articles, quoting racist statements in American history or sharing controversial news stories.  I even know someone who was suspended for reciting a poem.

It started when I received a 30-day ban for posting an article about a black historical incident.
The article told the **story about the game "Hit the Coon,"** that was played at state fairs when whites would throw baseballs at the heads of black children to make them fall into water.   Yes, these were the sick things that have been historically done to black people in this country for entertainment.

Apparently, the Facebook bots found the word "Coon" to be in violation of their highly ambiguous community standards, which caused me to receive the ban.

---

[4] Plaintiff is aware of many many more black activists who have had, and who continue to have, substantial problems with Facebook.

I've seen people post naked pictures on Facebook without being warned, suspended, banned or reprimanded.

I've seen people cuss up a storm, talk about someone's mother, threaten to murder their homeboys in a rival gang, provide genital pics, get shot on film, and show suicide videos. I even saw someone share a video of a woman having sex with a dog.  Yet, despite all of this craziness, my black friends are being banned for sharing black history articles that are factually verified by numerous sources.

Apparently, Facebook has decided that outspoken Americans are no longer wanted on their platform.  Based on what I am seeing, any form of assertive dialogue, mild controversy or ethnically-oriented information dissemination will have the platform treating you like both a child and a criminal.

It's hard not to imagine government involvement, since there are quite a few experts who **are already concerned about whether or not government agencies are using Facebook** to spy on billions of people at one time.  In fact, several countries are starting to squash the use of Americanized social media giants out of fear that our government is using these companies to spy on America's enemies…..

…..But for black people, this is a clear clarion call for us to do what we probably should have done many years ago:  Start supporting social media platforms that are owned by black people.  You can keep your Facebook login if you'd like, but it's time to also support other platforms that won't ban you for mentioning Harriet Tubman.

49.     Meanwhile, Facebook has no problem with posts that, when taken "in context" clearly advocate violence against people joined to protest years of systemic oppression in Charlottesville, VA:

South Dakota Republican State Rep. Lynne Hix-DiSanto, who also worked as a licensed real estate agent, has been fired from Keller Williams Realty Black Hills over a Sept. 7 Facebook post of a meme that depicted protestors being hit by a car.

The meme, which began circulating online after the Charlottesville protests in August, included the text: "All Lives Splatter. Nobody cares about your protest and keep your (expletive) out of the road." Above the meme, Hix-DiSanto wrote: "I think this is a movement we can all support."
https://www.inman.com/2017/09/20/keller-williams-branch-fires-agent-over-controversial-facebook-post/

*Keller Williams branch fires agent over controversial Facebook post State Rep. and real estate agent Lynne Hix-DiSanto published a meme that read 'All Lives Splatter'*
20 September 2017
by Marian McPherson

Note:   Paralegal Heather Heyer was MURDERED in that instance and we are now awaiting sentencing of one James Alex Fields for her MURDER.



**********

50.     Facebook is an insidious virtual monopoly by design and intent and in practice:   Black activists on Facebook know that ToS have been, and continues to be, disingenuously applied in a manner that restricts our speech in the World's largest portal, or "Nation State" if you will.[5] This is crucial because Facebook has no true competitor. Again, Lindsey Graham as quoted by Plaintiff at 15:26 at his Roku TV Show "Corruption Meets Camera: Facebook While Black S1 Ep2"  https://www.youtube.com/watch?v=f-TK3BxOsl8



**Zuckerberg struggles to name a single Facebook competitor**
**Sen. Lindsey Graham:** Who's your biggest competitor?

---

[5] Tim Sparapani, Esq. is the very first Facebook Director of Public Policy. He has gone on record in an October PBS Frontline news feature as stating that Facebook was creating its own "Nation State."  See "The Facebook Dilemma" https://www.pbs.org/wgbh/frontline/film/facebook-dilemma/ (2018).

**Mark Zuckerberg:** Uh, senator, we have a lot of competitors.

**LG:** Who's your biggest?

**MZ:** The categories… do you want just one? I am not sure I can give one but can I give a bunch? There are three categories that I would focus on. One are the other tech platforms: Google, Apple, Amazon, Microsoft, we overlap with them in different ways.

**LG:** Do they provide the same service you provide?

**MZ:** In different ways.

**LG:** Let me put it this way. If I buy a Ford, and it doesn't work well, and I don't like it, I can buy a Chevy. If I'm upset with Facebook, what's the equivalent product I can go sign up for?

**MZ:** Well, the second category I was going to talk about…

**LG:** I'm not talking about categories. I'm talking about real competition you face. 'Cause car companies face a lot of competition. They make a defective car, it gets out in the world, people stop buying that car, they buy another one. Is there an alternative to Facebook in the private sector?

**MZ:** The average American uses eight different apps to communicate with their friends and stay in touch with people ranging from text to email—

**LG:** Which is the same service you provide?

**MZ:** Well, we provide a number of different services.

**LG:** Is Twitter the same as what you do?

**MZ:** It overlaps with a portion of what we do.

**LG:** You don't think you have a monopoly?

**MZ:** It certainly doesn't feel like that to me.

*[laughter]*

**LG:** Instagram. So you bought Instagram. Why did you buy Instagram?

**MZ:** Because they were very talented app developers who are making good use of our platform and understood our values…

**LG:** Is a good business decision. My point is: one way to regulate a company is through competition, through government regulation. Here's my question, what do we tell our constituents, given what's happened here, why we should let you self-regulate? What would you tell people in South Carolina, given all that's happened here, why it would be a good idea for us to let you regulate your own business practices?

**MZ:** … well, Senator, my position is not that there should be no regulation…. I think the internet is becoming —

**LG:** Do you embrace regulation?

**MZ:** I think the real question, as the internet becomes more important in people's lives, is what is the right regulation —

**LG:** Do you as a company welcome regulation?

**MZ:** If it's the right regulation, yes.

https://www.theverge.com/2018/4/10/17220934/facebook-monopoly-competitor-mark-zuckerberg-senate-hearing-lindsey-graham
April 10, 2018
Sara Jeong at The Verge

This did then cause Plaintiff to issue the Zuckerberg Monopoly Man parody button and stickers:



51.    Plaintiff continues to lecture on the perils of Facebook at local college classrooms and
brought the message to Facebook investor Roger McNamee, who gave Plaintiff a thumbs-up at a
Seattle Forum in March, 2019 at his "Zucked" tour stop:





https://www.youtube.com/watch?v=QXDbqkLhsgQ

52    Defendant presents a set of Terms of Service, most specifically regarding Hate Speech,
backed up by FB Public Policy VP Richard Allan (as filed in this Case) that purport to
take context and intent into evaluation of hate speech.

53.    The Representation is material to the thousands of people who rely on some form of
consistency and measurable standard before posting about issues of public concern on
racism and hate. The 79 Civil Rights and Media Groups demand for a Civil Rights Audit
is proof of this.

54.     Facebook's Policy-in-Fact is to slam people who condemn white racism against minorities and people of color.

55.     Facebook is well aware of the material falsity and continues to perpetuate it; resigned VP of Diversity Mark Luckie will testify to his belief and a Jury is entitled to determine all of this.

56.     Defendant obviously publishes a phony set of standards so that it can appear to be reputable so that people will continue to use Facebook so that Facebook can continue to data mine them and make Billions.

57.     The Plaintiff and the 79 Civil Rights and Media Groups noted in this case were indeed ignorant of all of this until it started becoming patently clear in the past two years.

58.     Obviously Plaintiff relied on the false promises, much to his detriment because twice in the past year he was not allowed to make posts on a monopolistic platform during his Birthday and at his Mother's Death.

59.     Terms of Service (ToS) are tantamount to a Contract as Defendant selectively proclaims on its own behalf when it suits them so Plaintiff has a Right to believe in them.

60.     Plaintiff is indeed damaged by losing the Benefit of the Bargain, including contact with his 1,871 Friends on Facebook. Moreover, in the due course of litigation Plaintiff's mental health professionals will be issuing Expert Reports so that threshold is more than met.

61.     Plaintiff summarized the Defendant's violations in a prior Court hearing in which the Court declined to overrule the Forum Selection Clause as the Canadian Court had done in *Douez v Facebook, Inc*, 2017 SCC 33 (2017).

https://www.youtube.com/watch?v=4SDYEUOnHH0



62.     Defamation on the platform is actionable. See generally *Zerlie Charles v. Vickie D. Vest*, Indiana Ct. App. No. 72A01-1706-SC-01252 (October 24, 2017) and *Dial v. Hammond* 15-CV-05383 N. Carolina Buncombe Superior (2015). Case settled for $500,000.00.

63.     Plaintiff  has notified Facebook Counsel that he will be filing a First Amended Complaint Monday, 22 April 2019 and a Motion for Limited Injunctive Relief this week for Defamation and Invasion of Privacy.

64.     From Vest Plaintiff Counsel:

> "I'm glad the Court of Appeals recognized that" and chose to reclassify its memorandum decision as a published opinion, Spencer said in a phone interview. While Spencer said he doesn't use Facebook, he said he believes "defamations occur on Facebook all the time." He said he hopes the COA's ruling and the subsequent award of damages in Charles' favor sends a message that "you can't just say anything you want on Facebook and get personal and make statements about other people that aren't true without running the possibility of getting sued. "A lay person probably feels they have a First Amendment right to say whatever they want to, but that's definitely not the case if you're harming people with what you're saying," Spencer said. Even though the case was tried before a small claims court where pleading standards are less stringent, Dattilo said he believes he had a winning case in any forum. He said the circumstances of this case made small claims the proper venue. "I still think the facts of this case could have held up anywhere," he said. "When you get a reversal and a remand for … a damages hearing, you've got something on all fours. … You really appreciate having a fact pattern like this that becomes precedent and will probably help the middle class substantially."

65.     Coincidentally perhaps, prior to the dawn of the Internet, Plaintiff wrote for the Indianapolis Star immediately prior to admission to, and graduation from, a then top-50 law school, i.e. Case Western Reserve University, where he earned an "A" in Constitutional Law when he studied, under, and clerked for, one Professor Edward Mearns, (RIPower)

66.     In spite of all of this, Defendant allowed Defamatory remarks to be published to Plaintiff's last girlfriend "MH" in 2018 without recourse from Facebook User "Troy." When Plaintiff asked Defendant for the identity of the poster Facebook directed the attention away to Plaintiff's girlfriend.

67.     In 2019 Defendant and Counsel in this case again allowed such Defamatory remarks to be leveled against Plaintiff towards his current girlfriend "SW" by two Facebook accounts "Facebook User" and "Lisa Marie"[6]

---

[6] Plaintiff has since discovered that his girlfriend "MM" -- prior to "MH" – received similar correspondence, however she had deleted it not knowing it would be an ongoing pattern of abuse, Internet bullying, stalking and Invasion of Privacy. She will testify to it if necessary.

68.     The comments in 2018 and in 2019 all indicate, with certainty devoid of any speculation, that Plaintiff "cheats on all of his women" and "Every single woman that he as dated he has used and mentally abused."…. and goes on to state that Plaintiff seeks out white women as gullible, to use for money etc. etc. ad nauseam, basically every negative racist stereotype of black men in this Fine Country.  (See Appendix D).

69.     Plaintiff and "SW" attempted to exhaust all administrative appeals within the Platform structure and Facebook continued to ignore Plaintiff's Defamation issue and offered a link for "SW" to use that was, and is, nonfunctional.

70.     As such, Plaintiff responded:

You are playing stupid.

Again: I have a VALID CLAIM FOR DEFAMATION ON MY OWN. So you need to give me that goddamn information right now.

Further: As I told you, the offending Party -- who will be sued -- removed the content so it is no longer available [to my girlfriend to follow their instructions]

And the link that you just sent me it not available, see attached.
https://www.facebook.com/help/contact/597132477126770/?ref=cr

So really there is no channel for either my past or current girlfriend to complain anyway. Please advise. And I have sent this content directly to your lawyers too.

71.     Plaintiff notified Counsel for Facebook thusly, and received no response so he wrote FB Counsel:

72.     18 April 2019

Re:     *Ongoing Issues of Defamation on the Facebook "Platform."*
        *Vis a vis Christopher King A/K/A KingCast v. Facebook, Inc. 19-CV-1987*

Dear Attorneys Hicks and Thole:

For reasons noted in today's communication with the Facebook "Help Desk" I will be adding this information to the pending Federal Complaint against your client, who previously IGNORED my concerns about the exact same sort of Defamation last year.

This year [I] can promise you that any and all of the last three (3) girlfriends in my life who were allegedly warned about me by this poster will come forward to state that they were alarmed by this Defamatory Rhetoric and that it did initially have the intended impact:

It made them leery of me and more accurately feeling vulnerable for prior breaches of trust by OTHER MEN for periods of time ranging from weeks to days to hours.

The Rhetoric employed continually references my purportedly predatory acts toward white women, so that is completely racist as well as Defamatory.  If you do not deliver to me by Close of Business tomorrow 19 April, 2019 a promise to divulge the identifying information on the perpetrators by month's end I will be folding this matter into the Case at Bar and moving for immediate Injunctive Relief.

No one should have to live under this type of racist, defamatory abuse and I will not… nor will any of my past girlfriends or present girlfriend  It's complete shit.  In fact, she will send a complaint to Facebook within the next 24 hours and will reply on this email chain immediately to confirm her complete agreement that she is harassed and finds the communication to be Defamatory towards me. And you will note that I am not holding your client responsible for the Defamation as that would of course be ***outside*** the purview of 47 USC §230, unlike my pending Claims in the case.

Now that I have made myself clear, I look forward to hearing from you in the next 24 hours.

Very Truly Yours,

_____

Christopher King, J.D.

73.     Defendant Counsel has now agreed to Permissive Joinder to allow Plaintiff to pursue his Defamation Claims within this litigation while clearly delineating any potential liability for such claims lies with Defendant(s) Doe.

74.    This case is brought in honor of Betty Jean King, who told Plaintiff twenty (20) years

ago:  "Son you need to get yourself a blog….."

https://www.youtube.com/watch?v=IYdgFL28WNI
https://www.youtube.com/watch?v=6vLJ742WAVs&t=102s





CLAIMS[7]

1.      Breach of Contract

2.      Promissory Estoppel

3.      Violation of 42 U.S.C. §1981

4.      Fraud (Fraudulent Inducement, Fraud in the Factum)

5.      Breach of the Covenant of Good Faith and Fair Dealing

6.      False and Deceptive Business Practices pursuant to CA Bus & Prof Code § 17203

7.      Defamation, Internet Stalking, Cyber-Bullying and Invasion of Privacy (Defendant(s) Does only).

FACEBOOK DEMANDS

Plaintiff has been materially harmed by the egregious Breach of Contract, Fraudulent practices and the ongoing pernicious effects of Institutionalized Racism in this case. Wherefore he seeks the following:

1.      Compensatory Damages in excess of $75,000 in an amount to be determined by a Jury;

2.      Punitive Damages in an amount to be determined by a Jury;

3.      Injunctive Relief with a specific Court Order and Finding of Fact and Conclusion of Law that Plaintiff has not used the term "nigger" in a way that violates Defendant's Terms of Service;

4.      A Public Apology;

5.      Costs of Suit with pre and/or post Judgment Interest as contemplated by applicable Governing Law.

---

[7] Claims 1 through 6, inclusively, apply to Defendant Facebook, Inc. Again, with the caveat that Facebook Amicus Counsel has expressly stated that Contractual and Civil Rights cases should never be dismissed without full Discovery and Trial.   This Notion is supported by Darnaa, LLC v. Google, Inc. et al even though Plaintiff in that case could not meet the requisite thresholds. Plaintiff can meet and surpass those thresholds in the Case at Bar. Claim 7 applies to Defendant(s) Doe only.

DEFENDANT DOE(S) DEMANDS

1.      Compensatory Damages in an amount to be determined by a Jury;

2.      Punitive Damages in an amount to be determined by a Jury;

3.      A Public Apology;

4.      Permanent Declaratory and Injunctive Relief  against any further publications;

5.      Costs of Suit with pre and/or post Judgment Interest as contemplated by applicable
        Governing Law.


Respectfully submitted in Good Faith and subject to the Pains and Penalties of Perjury as to all

factual allegations,

_____
Christopher King, J.D.



JURY DEMAND
Plaintiff hereby Demands this Cause to be heard by a duly-empaneled Jury.

_____
CHRISTOPHER KING, J.D.

CERTIFICATE OF SERVICE

I the undersigned swear that a true and accurate copy of the foregoing was submitted to ECF
And was delivered via email to Counsel for Defendant at:

Keker Van Nest & Peters,

PAVEN MALHOTRA - # 258429
pmalhotra@keker.com

MATAN SHACHAM - # 262348
mshacham@keker.com

WILLIAM S. HICKS - # 256095
whicks@keker.com

this 23rd Day of May, 2019

_____
CHRISTOPHER KING, J.D.