UNITED STATES DISTRICT FEDERAL COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CHRISTOPHER KING, JD<br>A/K/A KingCast,_ | ) | CASE NO. 19-CV-1987 |
| Plaintiff, | ) | |
| vs. | ) | JUDGE WILLIAM ORRICK |
| FACEBOOK, INC., | ) | |
| Defendant. | ) | |

**SURREPLY MEMORANDUM OF PLAINTIFF CHRISTOPHER KING, J.D.
IN OPPOSITION TO DEFENDANT'S 12(b)(6) MOTION TO DISMISS**

NOW COMES PLAINTIFF to respectfully request that the Court GRANT his Motion to file a short Surreply as the Defendant continues to attempt to discuss irrelevant matter and to misconstrue Plaintiff's position in this matter even as IBM's Director of Public Policy Ryan Hagemann argues squarely in favor of Plaintiff. Appendix A.

I.   Background and General Liability.

To wit, right out of the box, Defendant drew the reader into an analysis of the four (4) legal cases involving Plaintiff and former NeoCon one-Term U.S. Senator Kelly Ayotte, three (3) of which Plaintiff prevailed in. As plaintiff noted in his Memorandum in Opposition Plaintiff prevailed in *KingCast v. Ayotte and Town of Franconia* Grafton 07-268 E and in the media access case he lost (*King v. Friends of Kelly Ayotte*, 860 F. Supp. 2d 118, 128 (D.N.H. 2012)) he lost because his opposing Counsel was recently the boss of both Defendant Ayotte and Judge Landya B. McCafferty, and no one told Plaintiff any of this so the fix was in. Little did Plaintiff know that the "Friends of Kelly Ayotte" were actually sitting on the Bench. See the Organizational chart provided at Appendix B. Ethically everyone knows that information should have been offered up to Plaintiff King but it was not. Once Plaintiff found out McCaffferty recused herself but the Damage was already done and the Court rubber-stamped the Denial of the TRO. Defendant does not do itself well to cite the THAT case whatsoever because of its completely underhanded nature. Plaintiff rightfully alleged that he was the only black reporter there and that he was wrongfully ejected as a rebuttable presumption of racism. Perfectly logical.

1

But since Defendant wanted to go there it is worth noting that Ayotte brought a series of vindictive and bogus criminal and Unlicensed Practice of Law cases against Plaintiff that were soundly defeated and/or dismissed after Plaintiff sat through voir dire and was ready to go to Trial for "Attempted Felony Extortion" for merely stating that the NAACP would sue a police chief and go to the media about a case in which three drawn service pistols were placed to the face of a young black man for loitering.  The young man also faced a visual body cavity search on that occasion so a little background was in Order.[1]

Defendant misstates Plaintiff's position by stating that Plaintiff is only relying on Facebook's Amicus Counsel David P. Lukmire's Law Review.  That's False. There is Lukmire, JP Dyer and *Darnaa* all arguing for an objective standard, and that is why Defendant tries so hard to ignore *Darnaa* and Dyer but they can't ignore their own Amicus lawyer so they mention him. Again, *Darnaa, LLC v. Google, Inc. Case No. 15-cv-03221-RMW (N.D. Cal 2016)*

> Plaintiff's claim for breach of the implied covenant of good faith and fair dealing, however, is not precluded by § 230(c)(1) because it seeks to hold defendants liable for breach of defendants' good faith contractual obligation to plaintiff, rather than defendants' publisher status. Even though the claim is based on the same factual allegations as plaintiff's intentional interference claim, the source of defendants' alleged liability is different.

Accord JP Dyer:
*The Communication Decency Act Gone Wild: A Case for Renewing the Presumption Against Preemption* (2014 Seattle University JD Candidate Ryan JP Dyer).
https://digitalcommons.law.seattleu.edu/cgi/viewcontent.cgi?article=2223&context=sulr

> The Terms of Service contain, as do all contracts, a covenant of good faith and fair dealing that defendants would not do anything to unfairly interfere with plaintiff's right to recover the benefits of the contract. Therefore, the court denies defendants' motion to dismiss plaintiff's implied covenant claim on the basis of § 230(c)(1). This court does not, however, need to reach the question of whether deliberately inflated view counts are "objectionable." Plaintiff has alleged sufficient facts to support its claim that defendants did not act in good faith, which is a requirement under § 230(c)(2) immunity. As acknowledged by defendants, "[r]emovals must still be 'in good faith,' so the provider must actually believe that the material is objectionable for the reasons it gives." Dkt. 34 at 13 n.4.

---

[1] Also, there were three other cases noted by Defendant including KingCast v. Town of Quincy, KingCast v. City of Seattle and KingCast v. Academy of Canine Behavior.  Plaintiff won all of these cases without having to go through a Motion to Dismiss because Plaintiff's Claims were so valid that they settled. The first two were for public records requests and the AOCB case was a request for the private records held by the Academy for Plaintiff's own dogs over the years after his current dog Pepper showed up looking drugged after a boarding stay there. After a staffer was seen being trained to strike dogs with whiffle ball bats employees befriended Plaintiff and told him he has good reason for his concerns – and it turns out that a former AOCB staffer killed Plaintiff's last dog, Livi the Wonderdog. That case is part of this case because of how AOCB called 911 and lied about Plaintiff being dangerous or combative when it was clearly that white male yelling at Plaintiff and telling him to **"Get the Fuck out"** 5x times who was the **only** combative person that day. But King is black, let's sully him up. Same old same old. Appendix C.

2

Turning the tide against a lawless no-man's-land on the Internet starts with a reexamination of Congress's intended scope of immunity and the implicit preemptive effect of section 230. Beginning with the presumption that Congress did not intend to preempt an entire field of traditional state police power, and after closely examining the textual components of section 230 as well as the legislative history, it soon becomes apparent that immunity is only applicable in a specific set of circumstances. In applying this analysis, courts could incorporate some form of objective bad faith determination to distinguish between websites that are furthering the purposes of section 230, as opposed to those that are merely posing as good Samaritans.

Accord Facebook Amicus Counsel David P. Lukmire:

>  *Can the Courts Tame the Communications Decency Act? The Reverberations of Zeran v. America Online*.   Attorney Lukmire has written *Amici* Briefs alongside and in support of Facebook and Microsoft: He is an Industry expert:

http://migration.nyulaw.me/sites/default/files/upload_documents/NYU-Annual-Survey-66-2-Lukmire.pdf

> Second, before deciding whether an online entity is immune because of the type of entity it is or the type of role it played in disseminating illegal content, courts should consider whether section 230 should apply based on the theory of liability advanced by the plaintiff.
>
> The case for restricting the subject matter of section 230 immunity is equally strong...... **One thing is for certain: unless courts narrow their interpretations of section 230, deserving plaintiffs will be without redress.** As discussed, the statute should be interpreted in light of its language, which clearly sounds in defamation law. Allowing certain claims that are close to textbook defamation will help clear up whether the plaintiff has artfully pleaded garden variety tort claims in order to evade the proper boundaries of section 230. **Courts should almost never dismiss other claims, such as allegations under civil rights laws or breach of contract claims, on section 230 grounds, for they are much too far removed from the tort of defamation.** (emphasis added)

Morever, we have two fairly recent developments. One extremely recent and one from a year agao.

First of all:

> Ryan Hagemann, an IBM government and regulatory affairs technology policy executive, said in a blog post that internet companies shouldn't automatically have legal protection for what third parties post on their platforms. Instead, their liability exemption -- part of Section 230 of the Communications Decency Act -- should be based on the condition they take action to curb harmful uses of their services, he said. "A measure designed nearly a quarter-century ago to foster an infant internet needs to keep pace with the enormous social, economic, and even political power that the online world today commands," Hagemann wrote.  Appendix A.

Second, the case of *Hassell v. Bird*, S235968 (Cal. July 2, 2018) is instructive because it involves the very sort of material that the Statute was designed to address per Attorney Lukmire: Defamation. Defendant's defense in this case sounds directly as a protector under the Good Samaritan clause whereas Hassell lies directly in Defamation. The Hassell Court noted:

> "[w]here, as here, an Internet intermediary's relevant conduct in a defamation case goes no further than the mere act of publication—including a refusal to depublish upon demand, after a subsequent finding that the published content is libelous—section 230 prohibits this kind of directive."

Precisely. We are dealing with the Good Samaritan Exclusion here as seen in the following section:

II.     <u>Plaintiff's Civil Rights Claims Under 42 U.S.C. §1981 are Valid and Not Conclusory</u>.[2]

First of all, Defendant would do well to recognize the fact that WE ARE AT A 12(b)(6) Motion. As such, the use of a Diversity Director's direct observations about the impact of Racism on Campus and on the Platform are as direct a thing as anyone could hope to have AT THIS JUNCTURE. It's as if Defendant expected someone to find a memo in Mark Zuckerberg's desk that said "Let's discriminate."

Defendant calls Plaintiff's arguments "generalized bias" even when there were concrete examples of blacks and whites saying the exact same thing and blacks being banned. This is compelling information at any stage of litigation, much less a Motion to Dismiss.

Turning to Defendant's recently-cited case of *Ebeid v. Facebook, Inc.*, 2019 WL 2059662 (N.D. Cal. May 9, 2019) in which Plaintiff's Opposing Counsel participated the Court noted:

> Plaintiff has failed to state a Title II claim for multiple reasons. First, plaintiff has not adequately alleged that Facebook's conduct was based on plaintiff's "race, color, religion, or national origin." While the complaint alleges plaintiff's national origin, Compl. ¶ 10, other than a conclusory allegation that mirrors the language of § 2000a(a), the FAC does nothing to connect that national origin to Facebook's alleged conduct. The same goes for allegations about plaintiff's use of Arabic on the Facebook platform…..
>
> Plaintiff has failed to state a UCRA claim for at least two reasons. First, as discussed above, plaintiff has not adequately alleged that Facebook's conduct was animated by discriminatory intent. And plaintiff's contention that Facebook's actions were "arbitrary" undermines, rather than supports, his UCRA claim—no inference of discrimination arises from assertions of arbitrariness.

But that is not the case here. In this case we have a Vice President of Diversity who issued an open letter to the World about racism against blacks at Facebook. We have 77 Civil Rights and media Organizations who complained of same and similar. Plaintiff has provided the Court with evaluative tools to bring the ruling in this case squarely within the true intent of the Statute.

---

[2] As to Mr. Ebeid's First Amendment Arguments, Plaintiff makes no such argument in this case. Furthermore, as to the Dismissal with Prejudice in the State Venue, it is of no moment in this case whatsoever. A Dismissal with Prejudice in a State Venue applies to any subsequent litigation IN THAT VENUE. It is of no moment in this venue whatsoever. That would be a denial of Due Process.

Plaintiff has read all of the briefing in the Ebeid case and it did not make the same arguments that Plaintiff makes herein nor did the Plaintiffs in Defendant's other celebrated case of Sikhs for Justice "SFJ", Inc. v. Facebook, Inc., 144 F. Supp. 3d 1088 (N.D. Cal. 2015), affirmed sub nom, Sikhs for Justice, Inc. v. Facebook, Inc., 697 F. App'x 526 (9th Cir. 2017).  Ebeid was correct on this point however at p. 6 of Plaintiff's Memorandum in Opposition to Summary Judgment:

> The CDA Immunity statute was enacted in response to an unpublished state court decision in Stratton Oakmont v. Prodigy Servs. Co., in which the Court held the defendant liable for a libelous message posted by a third party on one of defendant's financial message boards. Fair Hous. Council v. Roommates.com, LLC, 521 F.3d 1157, 1163 (9th Cir. 2008). The Stratton Oakmont decision was against public policy because it would hold online service providers who voluntarily filtered objectionable messages liable for all messages transmitted by third parties, while allowing providers who decided to bury their heads in the sand and ignore problematic posts altogether to escape liability. Id. By enacting the CDA Immunity Statute, "Congress sought to spare interactive computer services this grim choice by allowing them to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete." Id. Accordingly, CDA Immunity requires dismissal of the complaint where (i) the defendant is a provider or user of an interactive computer service, (ii) the information for which the plaintiff seeks to hold the defendant liable was information provided by another information content provider, and (iii) the complaint seeks to hold the defendant liable as the
> publisher or speaker of that information.
>
> Klayman v.Zuckerberg, 410 U.S. App. D.C. 187, 190 (2014) (emphasis added). Plaintiff does not dispute that Facebook is a provider or user of an interactive computer service. However, although the information discussed in the Complaint was provided by the Plaintiff, the Plaintiff is not seeking to hold Facebook liable for the information, nor is the Plaintiff attempting to hold Facebook liable as the publisher or speaker of the information. Instead, the Complaint seeks to hold Facebook liable for discrimination against the Plaintiff based on language, national origin, and political view. See Complaint ¶¶ 10, 30, 32, 34. Accordingly, CDA Immunity does not apply to the present matter……
>
> Unlike in Zeran, the Plaintiff in the present matter is not attempting to hold Facebook liable for some defamatory or unlawful statement made by another on Facebook's public forum. This key distinction distinguishes the present matter from the majority of authority relied upon by Facebook in which the plaintiff's cause of action arose from defamatory or unlawful information authored by a third party. In Zeran, the plaintiff was seeking to hold the defendant liable for messages posted by an unidentified person on defendant's online bulletin board, advertising tasteless slogans related to the bombing of the Alfred P. Murrah Federal Building in Oklahoma City. Id. at 329.
>
> In Fair Hous. Council, the plaintiff was seeking to hold the defendant liable for discriminatory and unlawful statements posted by third parties in the "Additional Comments" section of defendant's website. 521 F.3d. at 1173.

In Barnes v. Yahoo!, Inc., the defendant's liability as alleged was based on defendant's promise to remove an indecent profile containing disparaging statements and nude photographs of the plaintiff, created by the plaintiff's ex-boyfriend. 570 F.3d 1096, 1098-1099 (9th Cir. 2009). In Klayman v. Zuckerberg, the plaintiff's complaint alleged that due to defendant's failure to remove a page containing antiSemitic messages, defendant should be held liable as furthering such messages. 410 U.S. App. D.C. 187, 191 (2014). Finally, in Riggs v. MySpace, Inc. the plaintiff who had her own unlawful fake celebrity page removed, attempted to hold the defendant liable for not removing other fake celebrity pages. 444 F. App'x 986, 987 (9th Cir. 2011).

The courts' decisions in all of the above cases were consistent with the policy behind the CDA Immunity Statute, as in all of these cases the plaintiffs were attempting to hold the defendants liable for unlawful information provided by a third party, similar to allegations in Stratton Oakmont which prompted Congress' decision to enact the CDA Immunity Statute. However, the present matter does not arise from the content of information provided by a third party. There is no original culpable party providing unlawful information on Facebook's public platform. In fact, the Plaintiff believes that the posts removed by Facebook for discriminatory reasons were not objectionable in any manner, as he himself authored many of them. See Complaint ¶¶ 18, 29-32. Accordingly, although Facebook is a provider or user of an interactive computer service, the Plaintiff is not seeking to hold Facebook liable as the publisher of some unlawful information provide by a third party, and thus the CDA Immunity does not shield Facebook from liability.

Just because Courts have been getting it wrong for years does not mean that this Court must blindly continue in that vein, as noted in *Darnaa, supra.,* the case that Defendant loves to ignore.

III.   <u>Legislative History Shows that Courts Have Been Erring in Application of the Law</u>.

More from Attorney Lukmire:

PART I A. Senator Exon's Communications Decency Act To better understand section 230, it is worth exploring the origins of the CDA as a whole. Television ratings, the V-chip, and especially online pornography were high on the agenda for Congress in the mid-1990s17 and were generating significant public interest.18 The CDA was a product of a particular historical and political moment: explosive growth occurred in the telecommunications industry, including the growth of cable television, cellular phone technology, and the Internet,19 just as the Republican Revolution of 1994 pursued an ambitious agenda in Congress.20 The CDA's legislative history illustrates this collision of technological advances and resurgent social conservatism. Senator John Exon introduced the CDA as an amendment to the already-pending Telecommunications Reform Act.21 The unveiling of his infamous "blue book," which was available for inspection to lawmakers who were "not familiar with what is going on the Internet today," solidified support for the amendment.22 The blue book was a blue folder located on the Senator's desk containing pornographic downloads from the Internet.23 Senators cited the "blue book" frequently in debate in support of the CDA, and some contend it was a principal factor in winning passage of the amendment.24

> Senator Exon also delivered a prayer on the Senate floor seeking help in controlling obscene and indecent material, leaving little doubt that morality inspired the legislation. Senator Exon's proposal most notably criminalized knowing transmission of "obscene or indecent" material to minors.25 Notwithstanding strong opposition from Senator Patrick Leahy and House Speaker Newt Gingrich, who presciently objected to these provisions on free-speech grounds,26 Senator Exon's proposal passed into law.27 The genesis of the CDA as a piece of social-minded legislation with goals having little to do with defamation law reveals a chasm between the original, focused intent of section 230 and the "judicial oak" it has become.

As noted, it is not only Facebook Amicus Counsel who agrees with Plaintiff. In addition to Darnaa, IBM and Attorney Dyer there is the excellent Hastings Law Review piece that shows how the Court's position has turned the whole intent upside down.  Plaintiff is supposed to be able to call himself a nigger when discussing racial discrimination because that facilitates the flow of vigorous discourse.  See "The Overexpansion of the Communications Decency Act Safe Harbor" by Joey Ou, Hastings Communications and Entertainment Law Journal Volume 35 Number 3 January 1 2013.

> IV. Broad Expansion of the CDA and Lack of Liability for Tort Claims By granting websites broad immunity, courts have deviated from Congress's objective of encouraging websites to self-regulate.3 6 Courts have relied upon the "anti-regulatory, pro-market findings" of the statute to develop an expansive interpretation of section 230." This has relieved ISPs and websites of any incentive to self monitor because "websites and ISPs know that ... complaints from aggrieved parties will be to no avail, even after notice."38 Therefore, "courts have given these provisions outsized significance, distorting rather than furthering section 230's original purpose."3 9
>
> VI. The Aftermath The lack of liability for websites and ISPs is now threatening long established civil rights statutes and is intruding upon constitutionally protected rights." Section 230 has immunized ISPs and websites from racially discriminatory comments and discrimination in housing." By allowing discriminatory housing advertisements, the court in Fair Housing Council of San Fernando Valley undermined the spirit of section 3604(c) of the FHA, and consequently gave websites and ISPs a monopoly in discriminatory advertisements. Section 230 has gone completely against its original intent and is now discouraging self policing by taking away any incentive to self-monitor, since monitoring could lead to waiver of section 230 immunity, and created a safe haven for inappropriate content.
>
> D. Bad Faith Exception
>
> One commentator recommended a "Judicially-Created Objective Bad Faith Exception."'o The proposal asserts that courts should bar ISPs and websites from using the section 230 immunity if "they acted unreasonably in either posting or failing to remove defamatory content."
> The author argues that judicial action would be easier to implement than an amendment to the CDA, and by focusing on apparent awareness of offending materials, courts can apply a flexible standard based on the totality of circumstances. 7

CONCLUSION

These are compelling reasons for the acceptance of this Surreply. The Law is becoming modified to reflect the realities of the Modern Era: An era in which the Internet is no longer a fledgling enterprise that needs government protection.

**Mark Zuckerberg is worth $82 Billion dollars. He and his company do not need protection by the government**. No, quite to the contrary as Facebook's own co-founder Chris Hedges noted the People now protection from Facebook, a scourge that "threatens our Democracy."

Today is literally the first day of a New Moon. This is perhaps no coincidence. The facts of this case, along with the roadmaps drawn above, provide the Court with ample opportunity to navigate a path of Justice without engaging in unwarranted Judicial Activism.

Respectfully submitted,

_____
Christopher King, J.D.

8

CERTIFICATE OF SERVICE

I the undersigned swear that a true and accurate copy of the foregoing was submitted to ECF And was delivered via email to Counsel for Defendant at:

Keker Van Nest & Peters,

PAVEN MALHOTRA - # 258429
pmalhotra@keker.com

MATAN SHACHAM - # 262348
mshacham@keker.com

WILLIAM S. HICKS - # 256095
whicks@keker.com

this 12th Day of July 2019

_____
CHRISTOPHER KING, J.D.