**Christopher King, J.D.**
**12048 Greenwood Ave N**
**Seattle, WA 98133**
**617.543.8085 p**
**206.299.9333f**
**suefacebook007@gmail.com**

## UNITED STATES DISTRICT FEDERAL COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHRISTOPHER KING, JD      )    CASE NO 19-CV-1987
A/K/A KingCast,_

                                    )

Plaintiff,

                                    )    JUDGE WILLIAM ORRICK

vs.

                                    )

FACEBOOK, INC.
JENNIFER MARIE MALONE       )
JANE AND JOHN DOES,

                                    )

Defendant.

### POST JUDGMENT AMENDED COMPLAINT OF PLAINTIFF

        This case arrives back in Court pursuant to the Court Order of September 5, 2019 in which Leave was specifically granted to Defendant to file a Complaint for Retaliatory Breach of Contract for actions that Facebook took as Plaintiff began and continued to criticize the Platform.  Plaintiff attempted to resolve things through extrajudicial settlement, however Defendant took an entire week to reject Plaintiff's Two-Tiered Settlement Demand without any explanation whatsoever as to whether the rejection was monetary or based on non-monetary terms. When asked for clarification Defendant still provided nothing. Nothing. At. All.

        On the heels of that continued disrespect, Plaintiff hereby adds a provisional First Amendment Claim as the case of *Freedom Forum/Laura Loomer v. Facebook* is proceeding in the District of Columbia Court of Appeals as Case No. 19-7030 (nee 1:18-CV-02030-TNM)(August 20, 2019). See Fn 4, *infra*. The Court noted that summary affirmance of a Lower Court ORDER was inappropriate as pertaining to Plaintiff's First Amendment, Sherman Act and Stateside Discrimination claims. This as Facebook CEO Mark Zuckerberg makes the Party Admission that Facebook is "More like a government in a lot of ways."

        As such, now comes Plaintiff, as if on Oath and subject to the Pains of Perjury to move forward with the following allegations:

PREAMBLE.

First of all, despite Defendant's numerous ramblings, Plaintiff has indeed won Civil Rights trials and settled numerous Civil Rights cases. Plaintiff only has one of his Jury Trials on videotape, but in that case – and on this issue -- he was 100% correct, twenty (20) years ago, when he told the Court that it was unlawful to deny a lawyer the right to run video in a Courtroom and to take it home the same day for review.

Sure enough Plaintiff will absolutely guarantee this Honorable Court and Defendants that he will be proved correct once again. Be it through Judicial Orders, Congressional action, or a combination of the two, it is only a matter of time.

Now then, turning to the facts at hand….

THE PARTIES

1.      Plaintiff is a former daily news reporter for the Indianapolis Star. Prior to that he was an editor for the Ohio Call and Post, one of the only black-owned newspapers in the entire Country. He is also a former Assistant Attorney General for the State of Ohio. He won many cases in that capacity before winning Jury trials and settling Civil and Criminal matters in his own private practices.  Suspended for one year nearly two decades ago, he looks forward to rejoining the Bar in the next year at his discretion.

2.      Defendant Facebook has a Principal place of business in California. It owns and manages the World's largest single platform for public speech that the World has ever known. At the outset its first public policy director openly stated that the mission was to create a "Nation State." Defendant is headquartered in California.

3.      Defendant Jennifer Marie Malone is a resident of Massachusetts. She has a design, pattern and practice of writing to Plaintiff's girlfriends over the past several years to tell communicate materially false and defamatory accusations regarding Plaintiff on multiple occasions, when single incidents of such conduct have resulted in settlements of up to $.5Million when white women have been similarly victimized on the Platform.[1]

---

[1] The Court's ORDER Granting Defendant Facebook's 12(b)(6) Motion to Dismiss did not specifically address Defendant "Jane Doe" who has since been identified as Jennifer Marie Malone in at least one instance.

JURISDICTION AND VENUE

4.      Defendant mandates by way of an adhesion click wrap clause that all cases against Facebook be brought in Northern California Courts and prides itself on only losing a Candian case on that matter, *Douez v. Facebook*, 2017 SCC 33.

5.      Defendants Malone and Does may either reside in California or have willingly partaken in repeated conduct on the Facebook Platform to an extent that provides minimum contacts with the Forum State to confer Personal Jurisdiction.

THE FACTS

6.      Defendant intentionally operates a public forum for dissemination of ideas. It has lauded itself on being "A platform of ideas" according to Facebook Founder and CEO Mark Zuckerberg.

7.      As noted in Freedom Forum/Laura Loomer v. Google, Facebook et al, up on Appeal at U.S. Ct. App. DC 19-730 (August 20, 2019):

> 98. Defendants created, operate, and control public platforms that are for public use and public benefit and invite the public to utilize their platforms as a forum for free speech.

> 99. Defendants act as quasi-state actors because they regulate their public platforms, thereby regulating free speech within their public forums, Google/YouTube, Facebook, and Twitter, Apple, Instagram as well as the other social media companies or entities.

8.      The District of Columbia Court of Appeals has rejected the lower Court 12(b)(6) dismissal of First Amendment and Sherman Act Claims in *Freedom Watch & Loomer v. Google et al.*, U.S. Ct. App. DC 19-730 (August 20, 2019), reasonably prompting Plaintiff to publicly query:

Saturday, September 14, 2019
Facebook First Amendment Liability: If it's Good Enough for a Conservative White Girl it's Good Enough for a Rank-and-File Nigger Like me.
https://howtosuefacebook.blogspot.com/2019/09/facebook-first-amendment-liability-if.html



9.      Determined to continue is own brand of cultural hegemony as the Worlds largest provider of speech platforms (Facebook and Instagram) Defendant picks and chooses which viewpoints it will allow on its vaunted platform and willfully and intentionally failed to provide meaningful review of posts written by Plaintiff and otherwise retaliated against him once it became known that he is an outspoken advocate against the corporate behemoth.[2]

---

[2] As of 20 September 2019 Facebook's Net Worth/Market Cap is estimated to be greater than $500B.

10.     Harvard Attorney David French – A National Review and Time writer – opined this year:

SCIENCE & TECH
### The First Rule of Social-Media Censorship Is That There Are No Rules
**By** David French
May 7, 2019 2:04pm

I have long argued that social-media companies should voluntarily adopt First Amendment–based speech policies. A First Amendment analysis does not mean "anything goes," but it does mean that rules and regulations restricting speech must be viewpoint-neutral. Harassment, incitement, invasion of privacy, and intentional infliction of emotional distress are speech limitations with viewpoint-neutral definitions, and one of the fastest ways to violate the First Amendment is with selective enforcement even of viewpoint-neutral rules.

The great value of viewpoint neutrality is that it comports with our sense of fundamental fairness. It hearkens back to the image of the blindfolded Lady Justice, holding her scales, indifferent to the power or privilege of her petitioners. Twitter and Facebook have removed the blindfold, thrown away the scales, and chosen to wield only the sword. It's the weapon of social justice, and when it's wielded against a lone, brave woman on a Philadelphia sidewalk, it's an instrument of bias, abuse, and hate.

11.     Facebook has intentionally created a vertically and horizontally-based monopoly as designed by its initial public policy director Tim Sparapani who stated that Facebook was in the business of creating "A Nation State."[3] Well it has indeed done so, without the burdens of any accountability whatsoever, thereby making the Law -- if it should suppose that Facebook's hegemonic misconduct is acceptable…. An ass.[4]

Mark Zuckerberg himself made the Party Admission as noted in Vox
https://www.vox.com/the-big-idea/2018/4/9/17214752/zuckerberg-facebook-power-regulation-data-privacy-control-political-theory-data-breach-king
**Mark Zuckerberg runs a nation-state, and he's the king**
Thanks to decades of research on political economy, we know how hard it is to check the powers of a king.
By Henry Farrell, Margaret Levi, and Tim O'Reilly   Updated Apr 10, 2018, 7:44am EDT

**"In a lot of ways Facebook is more like a government than a traditional company,"** Facebook CEO Mark Zuckerberg has said.

---

[3] PBS Frontline, October 2018. https://www.pbs.org/wgbh/frontline/film/facebook-dilemma/
[4] See Generally Charles Dickens, "Oliver Twist" (1837):  The First Amendment & Sherman Act Appeal in Freedom Forum occurred AFTER Oral Argument in the Case at Bar. As such, Plaintiff – always wary of Sanctions attempts by an aggressive Defense Bar – did not have a colorable argument for the extension, reversal or modification of existing Law under FRCP Rule 11. It is now however, Plaintiff's duty to argue in favor of it because failure to do so would obviously constitute Legal Malpractice against himself.



VOX.COM
Mark Zuckerberg runs a nation-state, and he's the king

12.     Moreover, the Corporate hubris has been exalted by him so that that it is ok to "Move Fast and Break Things," and further that "It is OK to make mistakes when everyone loves you."[5]

13.     Notwithstanding that rather cavalier approach to legality, a recent ABA Journal story waits in support of Plaintiff KingCast:

https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/the-ongoing-challenge-to-define-free-speech/in-the-age-of-socia-media-first-amendment/

HUMAN RIGHTS

## In the Age of Social Media, Expand the Reach of the First Amendment

by David L. Hudson, Jr.

> Speaking of speech, two key justifications for robust protection of the First Amendment right to freedom of expression are the marketplace of ideas and individual self-fulfillment. These justifications don't require governmental presence. Powerful private actors can infringe on free expression rights just as much as public actors.

14.     Facebook's purported raison d'etre during all relevant times to this litigation was, according to Mark Zuckerberg to be a "Platform of ideas."

https://wjla.com/news/nation-world/zuckerberg-insists-facebook-is-platform-for-all-ideas-but-republicans-disagree

## Zuckerberg insists Facebook is 'platform for all ideas,'

## but Republicans disagree

by Stephen Loiaconi
Thursday, April 12th 2018
Courtesy WJLA

---

[5] Query, is the converse now true given that everyone hates Facebook and views it as a necessary evil?



But everyone today knows that not to be True. And by everyone, we mean the Conservatives. We mean the Neo-Cons. We mean the Negroes who were interviewed in the USA Today's feature, "Facebook While Black,"
https://www.usatoday.com/story/news/2019/04/24/facebook-while-black-zucked-users-say-they-get-blocked-racism-discussion/2859593002/

15.     Plaintiff has operated a blog "Chris King's First Amendment Page" since 2005. He has continually linked various postings from such blog on Facebook since he joined the Internet Juggernaut in or about 2009. On 3 March 2009 he first posted a link to his personal blog "Chris King's First Amendment Page."

16.     Until Plaintiff threatened to sue, and did in fact Facebook over repeated 30-day suspensions (commonly known as "Facebook Jail") this page never was found to be in violation of any policies at Facebook, including terms and conditions or the so-called "community standards."

17.     Over the Course of the past year Facebook has been continually putting Plaintiff in Facebook Jail for alleged violations of their Hate Speech policy, however any objective review of the policy clearly holds that Plaintiff has not violated the Hate Speech policy by referring *to himself* and other black kicked off of Facebook as folks who have been treated like a nigger.[6]

---

[6] Facebook's Hate Speech policy clearly permits people in a protected class to use otherwise derogatory terms when doing so out of protest or in an empowering and self-referential way. See Appendix A.

18.     Moreover, as Plaintiff continued vocalizing his contempt for Facebook policies and its owner and CEO Mark Zuckerberg, Facebook initiated and continued a series of attacks against Plaintiff including, but not limited to:

a)   Repeated Facebook Jailings over items critical of Facebook policy implementation
b)   Denial of any review of his complaints for two weeks straight out of a four-week Facebook Jail sentence.[7]
c)   Hiding his posts in the U.K. on a forum about racism even when his posts were not deemed improper by Facebook
d)   Classifying his blog "How to Sue Facebook" as in violation of Community Standards while the exact same material in Chris King's First Amendment page was not.
e)   Rendering it impossible for people to like certain of his posts on the Platform *even though these posts were not the subject of any disciplinary action by Facebook.*
f)   Further, Defendant locked accounts of Trump supporters at another Facebook page the minute that they started sharing Plaintiff's posts on his "How to Sue Facebook" blog https://howtosuefacebook.blogspot.com/ when such content was and is, identical to the posts he shared on his personal blog, "Chris King's First Amendment Page."  https://christopher-king.blogspot.com, although the posts in question were not in violation of community standards as Facebook allowed posts from . Defendant made up a complete lie and stated that there was some sort of "security precaution."

The aforesaid actions were all taken out of retaliatory animus to frustrate Plaintiff's enjoyment even terms of a contract in which Defendant would agree that Plaintiff had not violated! But alas, this is typical privileged white male behavior, accuse a black man with a mind of his own of being "threatening" or "dangerous." See generally *King and Crnilovic v. American Tower Corp*, DMass 2003 10904 RCL (voluntary dismissal and settlement) Exactly where do Facebook's rights end? Next can they just walk into Plaintiff's bedroom, tell him what he can say to his girlfriend and then shoot his dog? After all, Plaintiff is, you know, "A Safety Precaution" after all. Can't be too careful with these dangerous pesky negroes, especially when they start working on Hollywood movies.

---

[7] In point of fact, it likely would have been longer than two weeks had Plaintiff not notified Facebook Counsel and the Courts about the ongoing travesty of Facebook user "Justice." The day after Plaintiff put that information public he received yet another terse denial based on Community Standards.  Appendix B.



Holy crap dude now look what they're doing I can't even share the link



g)      Lastly, two friends of Plaintiff suffered consequences on their Instagram accounts shortly after they posted about the T-Shirts they had designed for Plaintiff in anticipation of a State Court hearing: They could not access their accounts. Neither of them had the problem on any prior occasion for any reason and neither of them had actually posted Plaintiff's links but they still suffered the wrath of the corporate godhead in a move that is at once an unlawful retaliatory breach against Plaintiff and an unlawful Chilling of Plaintiff's First Amendment Rights on the open public forum that Facebook provides per *NAACP v. Thompson*, 648 F.Supp. 195 D.Md.,(1986), *Pruneyard v. Robbins*, 447 U.S. 74 (1980). *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972), Fashion Valley Mall, LLC v. National Labor Relations Bd Cal. Sup. Ct. No. S144753 (December 24, 2007) a nice Christmas present for the First Amendment *in the Forum State.* (Appendix C).

19.     Facebook owns Instagram as part of its vertical and horizontal monopoly.

20.     This is not a content-based banning that would arguably afford Defendant immunity under the Act. *The content was not at issue relative to the published guidelines* because Facebook was allowing the ***same exact content*** from Chris King's First Amendment Page so this takes Defendant's actions beyond the traditional purview of immunity under the act.

21.     In point of fact, the two women who made the T-Shirts didn't even post Plaintiff's content; they merely suggested that folks attend the scheduled Court Hearing so as such, Facebook and all of its media cronies, toadies and apologists like Eric Goldman are just flat wrong; this is a dangerous enterprise that must be reigned in not only by Judicial review but in Congress as well as Congress can begin to codify the Judicial Orders that change our course of First Amendment history for the better. Regarding Eric Goldman:

https://www.youtube.com/watch?v=FGyy8P8k3Vs

# Public Debate Demand: Eric Goldman on CDA 230, Yellow Journalism & White Boys who run the Internet



22.     Facebook and Instagram are both of course sitting on a First Amendment and Sherman Act hot seat in *Freedom Forum/Laura Loomer v. Google, Facebook et al*, *supra* as the District of Columbia Court of Appeals has determined to hear First Amendment and Sherman Act arguments against Facebook that were initially rejected in the Lower Court.

23.     Facebook's protections under the Communications Decency Act do not give this abusive corporate behemoth the unfettered right to just trounce on the direct user's speech rights nor does it give it the right to then reach out to secondary users and to punish them for items that facebook dislikes because the items are critical of Facebook. We have truly entered the Realm of the Absurd; the Twilight Zone.

24.     Facebook Co-Founder Chris Hughes stated in a 9 May 2019 NYTimes Op-Ed feature "It's time to break up Facebook, that "Facebook is a threat to our economy and democracy." "I feel a sense of anger and responsibility."

25.     Facebook has no problem violating its users inherent rights. Prior to Loomer, note the ongoing Cambridge Analytica litigation and even before that we had *McCall v. Facebook, Inc*., 10-16380/*Lane et al. v. Facebook et al*., No. C 08-3845 RS in No. Cal District Court in which Facebook's Beacon Program publicly disseminated information about their online activities without permission.

26.     And as Plaintiff aptly noted by way of a Party Admission by Facebook VP of
Diversity Mark S. Luckie, Facebook has a history of retaliating against black folks both
on the Campus and on the Platform.[8]

https://www.cnbc.com/2018/11/27/facebook-has-black-people-problem-mark-luckie-former-employee.html

https://www.facebook.com/notes/mark-s-luckie/facebook-is-failing-its-black-employees-and-its-black-users/1931075116975013/

**TECH**

**Facebook has a 'black people problem,' says former employee
who quit this month**

PUBLISHED TUE, NOV 27 2018  12:21 PM EST
UPDATED TUE, NOV 27 2018  7:03 PM EST’

27.     Seventy-Seven (77) Media and Civil Rights groups including the Center for
Media Justice lobbied Facebook for its encroachment against speech rights.

28.     The USA Today ran a feature about similar encroachment:

**Facebook while black: Users call it getting 'Zucked,' say
talking about racism is censored as hate speech**

Jessica Guynn, **USA TODAY** Published 7:26 a.m. ET April 24, 2019 | **Updated 2:23
p.m. ET April 30, 2019**

29.     Nobody – except the Eric Goldmans of the World -- Trusts Facebook.
Fortunately, Facebook apologist and industry monkey man Eric Goldman is not the only
lecturer, although he certainly is propped up by a LOT of corporate money and interests:
The classroom reaction at Plaintiff's classroom lecture series on Law, Media and Video
opened with a rather telling question and response:

---

[8] The Court indicated that Plaintiff did not address his Dismissal with Prejudice of his race claim in the
State Court. As Plaintiff noted in Memorandum in Opposition to Defendant's Motion to Dismiss, such
dismissal never was meant to be a prophylactic dismissal in perpetuity but was rather directed at the State
Court proceedings such that Plaintiff could run courtroom video rather than having the case immediately
removed to Federal Court and beyond the purview of Plaintiff's pesky cameras.

[9] The thing is, he was not an "employee." He was a Vice President when he made those statements, thereby
rendering them as a party admission.

"Who here trusts Facebook….."
https://www.youtube.com/watch?v=YjjzXzZL5rQ



30.    Public sentiment demands change: From a local Seattle scientist who was moved
to personally write the Court and opposing Counsel:

Dear Court and Counsel:

I am a Seattle-based scientist working on noninvasive molecular diagnostics for
cancer. I have been following the 2019 case of King v. Facebook -- number 1987
-- and am writing to express my opinion, as it seems very timely and important.

As I understand it, unlike a majority of companies in America, Facebook is
currently empowered to violate its own contracts and terms of service with its
users at its sole discretion, while enjoying significant immunity from law suits
intended to seek redress. In 2019, Facebook is one of the largest and most
powerful companies ever to exist, and its capacity to wield influence is enormous.
Allowing it to continue to receive the special protections that were granted in the
1990's by the Communications Decency Act (CDA) when the internet was a
fledgling industry, in the face of arguments like that of Mr. King, seems to be an
indefensible position. That Mr. King's postings on the Facebook platform have
been selectively removed only when titled "How to Sue Facebook," however
tasteful or not, resembles retaliation, seems like censorship of his First
Amendment rights, and is not supported by Facebook's own terms of service.

It sets a bad precedent to leave Facebook's broad immunity under the CDA the in-
tact, and I urge you to consider revoking it.

13

31.     Professionals in the Industry demand change: From Facebook Amicus Counsel

David P. Lukmire, author of "Can the Courts Tame the Communications Decency Act?"

Courts should first assess the nature of the harm the plaintiff alleges she suffered, and evaluate whether she claims defamation-type harms, like injury to reputation, invasion of privacy, and emotional distress.

As discussed, the statute should be interpreted in light of its language, which clearly sounds in defamation law. Allowing certain claims that are close to textbook defamation will help clear up whether the plaintiff has artfully pleaded garden variety tort claims in order to evade the proper boundaries of section 230. **Courts should almost never dismiss other claims, such as allegations under civil rights laws or breach of contract claims, on section 230 grounds, for they are much too far removed from the tort of defamation.** If those claims are meritless, they should be dismissed on the merits instead of by application of the statute.

        See also *The Overexpansion of the Communications Decency Act Safe Harbor* Hastings Note Vol 35 #3, January 1, 2013 by Joey Ou

32.     Facebook's actions in this case violate the Covenant of Good Faith and Fair

Dealing because its actions constitute a Willful Retaliatory Breach of Contract and also

violate the First Amendment to the United States Constitution.

33.    Defendants Malone and Doe meanwhile, have been haunting Plaintiff for the past two years, writing extremely Defamatory messages to three (3) of Plaintiff's girlfriends falsely indicating mental and emotional abuse, infidelity and other conduct of moral turpitude and deceit as noted at Appendix D.

34.    These actions were committed out of unlawful malice and were issued with the clear-cut intent to harm Plaintiff, and Plaintiff, the third Party girlfriends and their relationships were all tangibly harmed according to Plan.

CLAIMS

1. Retaliatory Breach of Contract in violation of California's Covenant of Good Faith and Fair Dealing (Defendant Facebook).

2. Unlawful Cancelling of, and Chilling of Free Speech Rights as contrary to the First Amendment of the United States Constitution (Defendant Facebook).

3. Defamation (Defendants Malone and Does).

**JURY DEMAND**

**Now comes Plaintiff to respectfully request that this matter be heard
by a duly-empaneled Jury of appropriate size and composition**

_____

**CHRISTOPHER KING, J.D.**

DEMANDS

Plaintiff has been materially harmed by the egregious Retaliatory Breach of Contract and First Amendment Violations. As such he DEMANDS:

1.     Compensatory Damages in excess of $75,000 against each Defendant Severally in an amount to be determined by a Jury;

2.     Punitive Damages in an amount to be determined by a Jury;

3.     Injunctive Relief against all Defendants, with a further specific Court Order and Finding of Fact and Conclusion of Law that Plaintiff has not used the term "nigger" or criticized Defendant in a way that violates Defendant's Terms of Service or Community Standards;

4.     A Public Apology;

5.     Costs of Suit with pre and/or post Judgment Interest as contemplated by applicable Governing Law.

Respectfully submitted,

_____
Christopher King, J.D.
A/K/A KingCast

## APPENDIX A

### 12. Hate Speech

Policy Rationale

We do not allow hate speech on Facebook because it creates an environment of intimidation and exclusion and in some cases may promote real-world violence.

We define hate speech as a direct attack on people based on what we call protected characteristics — race, ethnicity, national origin, religious affiliation, sexual orientation, caste, sex, gender, gender identity, and serious disease or disability. We also provide some protections for immigration status. We define attack as violent or dehumanizing speech, statements of inferiority, or calls for exclusion or segregation. We separate attacks into three tiers of severity, as described below. Sometimes people share content containing someone else's hate speech for the purpose of raising awareness or educating others. In some cases, words or terms that might otherwise violate our standards are used self-referentially or in an empowering way.

People sometimes express contempt in the context of a romantic break-up. Other times, they use gender-exclusive language to control membership in a health or positive support group, such as a breastfeeding group for women only. In all of these cases, we allow the content but expect people to clearly indicate their intent, which helps us better understand why they shared it. Where the intention is unclear, we may remove the content.

We allow humor and social commentary related to these topics. In addition, we believe that people are more responsible when they share this kind of commentary using their authentic identity.

17

June 27, 2017

**Hard Questions: Who Should Decide What Is Hate Speech in an Online**

**Global Community?**
By *Richard Allan*, *VP EMEA Public Policy*
As more and more communication takes place in digital form, the full range of public conversations are moving online — in groups and broadcasts, in text and video, even with emoji. These discussions reflect the diversity of human experience: some are enlightening and informative, others are humorous and entertaining, and others still are political or religious. Some can also be hateful and ugly. Most responsible communications platforms and systems are now working hard to restrict this kind of hateful content.

Facebook is no exception. We are an open platform for all ideas, a place where we want to encourage self-expression, connection and sharing. At the same time, when people come to Facebook, we always want them to feel welcome and safe. That's why we have rules against bullying, harassing and threatening someone.
But what happens when someone expresses a hateful idea online without naming a specific person? A post that calls all people of a certain race "violent animals" or describes people of a certain sexual orientation as "disgusting" can feel very personal and, depending on someone's experiences, could even feel dangerous.

In many countries around the world, those kinds of attacks are known as hate speech. We are opposed to hate speech in all its forms, and don't allow it on our platform. In this post we want to explain how we define hate speech and approach removing it — as well as some of the complexities that arise when it comes to setting limits on speech at a global scale, in dozens of languages, across many cultures. Our approach, like those of other platforms, has evolved over time and continues to change as we learn from our community, from experts in the field, and as technology provides us new tools to operate more quickly, more accurately and precisely at scale.

**Defining Hate Speech**
The first challenge in stopping hate speech is defining its boundaries. People come to Facebook to share their experiences and opinions, and topics like gender, nationality, ethnicity and other personal characteristics are often a part of that discussion. People might disagree about the wisdom of a country's foreign policy or the morality of certain religious

teachings, and we want them to be able to debate those issues on
Facebook. But when does something cross the line into hate speech?
Our current definition of hate speech is anything that directly attacks
people based on what are known as their "protected characteristics" —
race, ethnicity, national origin, religious affiliation, sexual orientation,
sex, gender, gender identity, or serious disability or disease.

There is no universally accepted answer for when something crosses the
line. Although a number of countries have laws against hate speech, their
definitions of it vary significantly.
In Germany, for example, laws forbid incitement to hatred; you could find
yourself the subject of a police raid if you post such content online. In the
US, on the other hand, even the most vile kinds of speech are legally
protected under the US Constitution.

People who live in the same country — or next door — often have
different levels of tolerance for speech about protected characteristics. To
some, crude humor about a religious leader can be considered both
blasphemy and hate speech against all followers of that faith. To others,
a battle of gender-based insults may be a mutually enjoyable way of
sharing a laugh. Is it OK for a person to post negative things about
people of a certain nationality as long as they share that same nationality?
What if a young person who refers to an ethnic group using a racial slur is
quoting from lyrics of a song?

There is very important academic work in this area that we follow closely.
Timothy Garton Ash, for example, has created the Free Speech Debate to
look at these issues on a cross-cultural basis. Susan Benesch established
the Dangerous Speech Project, which investigates the connection between
speech and violence. These projects show how much work is left to be
done in defining the boundaries of speech online, which is why we'll keep
participating in this work to help inform our policies at Facebook.

## Enforcement
We're committed to removing hate speech any time we become aware of
it. Over the last two months, on average, we deleted around 66,000 posts
reported as hate speech per week — that's around 288,000 posts a
month globally. (This includes posts that may have been reported for
hate speech but deleted for other reasons, although it doesn't include
posts reported for other reasons but deleted for hate speech.*)
But it's clear we're not perfect when it comes to enforcing our policy.
Often there are close calls — and too often we get it wrong.

Sometimes, it's obvious that something is hate speech and should be removed – because it includes the direct incitement of violence against protected characteristics, or degrades or dehumanizes people. If we identify credible threats of imminent violence against anyone, including threats based on a protected characteristic, we also escalate that to local law enforcement.

But sometimes, there isn't a clear consensus — because the words themselves are ambiguous, the intent behind them is unknown or the context around them is unclear. Language also continues to evolve, and a word that was not a slur yesterday may become one today.
Here are some of the things we take into consideration when deciding what to leave on the site and what to remove.

**Context**
What does the statement "burn flags not fags" mean? While this is clearly a provocative statement on its face, should it be considered hate speech? For example, is it an attack on gay people, or an attempt to "reclaim" the slur? Is it an incitement of political protest through flag burning? Or, if the speaker or audience is British, is it an effort to discourage people from smoking cigarettes (fag being a common British term for cigarette)? To know whether it's a hate speech violation, more context is needed. Often the most difficult edge cases involve language that seems designed to provoke strong feelings, making the discussion even more heated — and a dispassionate look at the context (like country of speaker or audience) more important. Regional and linguistic context is often critical, as is the need to take geopolitical events into account.

In Myanmar, for example, the word "kalar" has benign historic roots, and is still used innocuously across many related Burmese words. The term can however also be used as an inflammatory slur, including as an attack by Buddhist nationalists against Muslims. We looked at the way the word's use was evolving, and decided our policy should be to remove it as hate speech when used to attack a person or group, but not in the other harmless use cases. We've had trouble enforcing this policy correctly recently, mainly due to the challenges of understanding the context; after further examination, we've been able to get it right. But we expect this to be a long–term challenge.

In Russia and Ukraine, we faced a similar issue around the use of slang words the two groups have long used to describe each other. Ukrainians call Russians "moskal," literally "Muscovites," and Russians call Ukrainians "khokhol," literally "topknot." After conflict started in the region in 2014, people in both countries started to report the words used by the other side as hate speech. We did an internal review and concluded that they were right. We began taking both terms down, a decision that was initially unpopular on both sides because it seemed restrictive, but in the context of the conflict felt important to us.

Often a policy debate becomes a debate over hate speech, as two sides adopt inflammatory language. This is often the case with the immigration debate, whether it's about the Rohingya in South East Asia, the refugee influx in Europe or immigration in the US. This presents a unique dilemma: on the one hand, we don't want to stifle important policy conversations about how countries decide who can and can't cross their borders. At the same time, we know that the discussion is often hurtful and insulting.

When the influx of migrants arriving in Germany increased in recent years, we received feedback that some posts on Facebook were directly threatening refugees or migrants. We investigated how this material appeared globally and decided to develop new guidelines to remove calls for violence against migrants or dehumanizing references to them — such as comparisons to animals, to filth or to trash. But we have left in place the ability for people to express their views on immigration itself. And we are deeply committed to making sure Facebook remains a place for legitimate debate.

**Intent**
People's posts on Facebook exist in the larger context of their social relationships with friends. When a post is flagged for violating our policies on hate speech, we don't have that context, so we can only judge it based on the specific text or images shared. But the context can indicate a person's intent, which can come into play when something is reported as hate speech.

There are times someone might share something that would otherwise be considered hate speech but for non-hateful reasons, such as making a self-deprecating joke or quoting lyrics from a song. People often use satire and comedy to make a point about hate speech.

Or they speak out against hatred by condemning someone else's use of offensive language, which requires repeating the original offense. This is something we allow, even though it might seem questionable since it means some people may encounter material disturbing to them. But it also gives our community the chance to speak out against hateful ideas. We revised our Community Standards to encourage people to make it clear when they're sharing something to condemn it, but sometimes their intent isn't clear, and anti-hatred posts get removed in error.

On other occasions, people may reclaim offensive terms that were used to attack them. When someone uses an offensive term in a self-referential way, it can feel very different from when the same term is used to attack them. For example, the use of the word "dyke" may be considered hate speech when directed as an attack on someone on the basis of the fact that they are gay. However, if someone posted a photo of themselves with #dyke, it would be allowed. Another example is the word "faggot." This word could be considered hate speech when directed at a person, but, in Italy, among other places, "frocio" ("faggot") is used by LGBT activists to denounce homophobia and reclaim the word. In these cases, removing the content would mean restricting someone's ability to express themselves on Facebook.

**Mistakes**
If we fail to remove content that you report because you think it is hate speech, it feels like we're not living up to the values in our Community Standards. When we remove something you posted and believe is a reasonable political view, it can feel like censorship. We know how strongly people feel when we make such mistakes, and we're constantly working to improve our processes and explain things more fully.
Our mistakes have caused a great deal of concern in a number of communities, including among groups who feel we act — or fail to act — out of bias. We are deeply committed to addressing and confronting bias anywhere it may exist. At the same time, we work to fix our mistakes quickly when they happen.

Last year, Shaun King, a prominent African-American activist, posted hate mail he had received that included vulgar slurs. We took down Mr. King's post in error — not recognizing at first that it was shared to condemn the attack. When we were alerted to the mistake, we restored the post and apologized. Still, we know that these kinds of mistakes are deeply upsetting for the people involved and cut against the grain of everything we are trying to achieve at Facebook.

**Continuing To Improve**

People often ask: can't artificial intelligence solve this? Technology will continue to be an important part of how we try to improve. We are, for example, experimenting with ways to filter the most obviously toxic language in comments so they are hidden from posts. But while we're continuing to invest in these promising advances, we're a long way from being able to rely on machine learning and AI to handle the complexity involved in assessing hate speech.

That's why we rely so heavily on our community to identify and report potential hate speech. With billions of posts on our platform — and with the need for context in order to assess the meaning and intent of reported posts — there's not yet a perfect tool or system that can reliably find and distinguish posts that cross the line from expressive opinion into unacceptable hate speech. Our model builds on the eyes and ears of everyone on platform — the people who vigilantly report millions of posts to us each week for all sorts of potential violations. We then have our teams of reviewers, who have broad language expertise and work 24 hours a day across time zones, to apply our hate speech policies.

We're building up these teams that deal with reported content: over the next year, we'll add 3,000 people to our community operations team around the world, on top of the 4,500 we have today. We'll keep learning more about local context and changing language. And, because measurement and reporting are an important part of our response to hate speech, we're working on better ways to capture and share meaningful data with the public.

Managing a global community in this manner has never been done before, and we know we have a lot more work to do. We are committed to improving — not just when it comes to individual posts, but how we approach discussing and explaining our choices and policies entirely. *Read more about our new blog series Hard Questions.*

*\*What's in the numbers:*
- *These numbers represent an average from April and May 2017.*
- *These numbers reflect content that was reported for hate speech and subsequently deleted, whatever the reason.*
- *The numbers are specific to reports on individual posts on Facebook.*
- *These numbers do not include hate speech deleted from Instagram.*
- *These numbers do not include hate speech that was deleted because an entire page, group or profile was taken down or disabled. This means we could be drastically undercounting because a hateful group may contain many individual items of hate speech.*
- *These numbers do not include hate speech that was reported for other reasons.*

- *For example, outrageous statements can be used to get people to click on spam links and with our current definitions if this was reported for spam we do not track it as hate speech.*
- *For example, if a post was reported for nudity or bullying, but deleted for hate speech, it would not be counted in these numbers.*
- *These numbers might include content that was reported for hate, but deleted for other reasons.*
- *For example, if a post was reported for hate speech, but deleted for nudity or bullying, it would be counted in these numbers.*
- *These numbers also contain instances when we may have taken down content mistakenly.*

    *The numbers vary dramatically over time due to offline events (like the aftermath of a terror attack) or online events (like a spam attack).*

    *We are exploring a better process by which to log our reports and removals, for more meaningful and accurate data.*

**APPENDIX B**





## APPENDIX C



APPENDIX D



 **You contacted Facebook: Report a Threatening Message**
CLOSED Case #10213003519142270

**ACTIVITY**

 **What you submitted**
Sep 18, 2018

**Who is threatening you?**

100021875000533

**Tell us what happened in your own words**

See above.

I cannot copy and paste because I am writing this on behalf of my girlfriend. She feels threatened because this rando misogynist who hates me has sought her out on FB and claiming to be her savior with respect to me when really anyone who reads the scattered idiocy on his page can see that he is a complete woman-hater and a real jerk.

I know that you take Defamation, Threats and Hate Speech very seriously and this is clearly Defamatory material and sent with ill-intent. She will now block him but I appreciate you doing something about it as well.

Thank you.
Sincerely, Christopher King J.D.















always acts likes he is a victim of
everything and he always needs
money money money . Sadly he
pushes himself up onto people
and people are forced to engage
because of his personality. That's
all I can say. I don't want him
coming after me . I already been
burnt by this guy

He is toxic in my eyes and many
others

All I am saying is keep your eyes
and ears open .



I was one of the lucky ones to sense the game he was playing . I just like to warn people . Us woman go threw enough and any weakness you show he uses that as his strength. I don't want to bash the guy I am just looking out cause you seem like a wholesome loving woman . I don't want u to be the next victim. Thank god the others saw . I hope he don't do it to you. Hey if your happy with him . I am happy for you just keep













**Christopher King** And this. Why can't I edit the comment?

Like · Reply · 1m

**Christopher King** What I said was this: Who the fuck are YOU is the question. Shae Watson asked you and you didn't answer as to how you know me yet you respond after I talk about someone scamming money for attorney fees after they killed my dog, yet those costs were covered so the asshole got paid to kill Livi. You ever heard of forensic computer science? It's coming.

Like · Reply · 1m