UNITED STATES DISTRICT FEDERAL COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CHRISTOPHER KING, JD<br>A/K/A KingCast,_ | ) | CASE NO. 19-CV-1987 |
| | ) | |
| Plaintiff, | | |
| | ) | JUDGE WILLIAM ORRICK |
| vs. | | |
| | ) | |
| FACEBOOK, INC.,<br>and | ) | |
| DOES UNKNOWN, | | |
| | ) | |
| Defendants. | | |

**REPLY BRIEF OF PLAINTIFF KING**
**IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

I.    Factual Backdrop.

It is patently clear the Facebook's stated policies do not allow them to censor or to

remove content just because it is critical of them unless they rely on the abusive catch-all

phrase "we can take down anything because we have more money than God and you

don't."  They may remove content for several purported reasons, but being critical of

them is not enumerated anywhere in their propaganda or in their self-serving Declarations

as filed with this Court. But alas, they did it to Senator Elizabeth Warren so you know

they will do it to a political nobody such as Plaintiff, particularly as a black man. That

much is evident by how Facebook still treats its blacks on the campus and platform.[1]

---

[1] And the problem is getting worse. Plaintiff explained on prior occasion that he only dismissed
his 42 USC §1981 claim in Lieu of filing a new Complaint in the Lower Court. This was done
prior to Defendant even answering the Complaint so that Plaintiff could maintain Jurisdiction on
that Court and run video, as a video journalist. As such, he should not have been subjected to the
general rules regarding Dismissal with Prejudice. The Court's prior Order granting Defendant's
Motion to Dismiss incorrectly states that Plaintiff did not address the matter in his briefing. He
did. In any event this is not a pure race claim. The fact that Defendant is engaged in retaliatory
actions because Plaintiff complains about their racism provides at least two roads to recovery:
Retaliatory Breach of Contract/Good Faith & Fair Dealing and Breach of Contract based on race.

Facebook's own Vice President of Diversity stated that racism and unreasonable Censorship occurs at Facebook Campus and on the Platform. He stated this *while he was still employed by the corporate behemoth as a Rule 801 Party Admission* and as such that is what is called a Party Admission because of his rank as a Vice President, fact.

https://www.facebook.com/notes/mark-s-luckie/facebook-is-failing-its-black-employees-and-its-black-users/1931075116975013/
Facebook is failing its black employees and its black users
MARK S LUCKIE·TUESDAY, NOVEMBER 27, 2018·

> Black people are driving the kind of meaningful social interactions Facebook is striving to facilitate. Black people are finding that their attempts to create "safe spaces" on Facebook for conversation among themselves are being derailed by the platform itself. Non-black people are reporting what are meant to be positive efforts as hate speech, despite them often not violating Facebook's terms of service. Their content is removed without notice. Accounts are suspended indefinitely.

Next, Plaintiff noted that Facebook's own policy is to allow members in a racial or ethnic or other identified group to self-refer in terms that might be otherwise derogatory. This is true when it comes to white folks but not blacks because Faceboik retaliates against blacks. Defendant banned Plaintiff for saying he was being treated like a nigger, but white girls can self-proclaim as "cracker trash" and that's OK, fact, see p.3.

**Furthermore, Plaintiff was put in Facebook Jail for saying that Facebook had "Gunned down another nigger…. We're dropping like flies." And there is no explanation as to why people could not like Plaintiff's content, or why content that was not verboten in the U.S. was not made visible in the UK on a anti-racism page or why Plaintiff's request for review sat there for two solid weeks until Plaintiff notified the Court and social media about the abuse. Similarly there is no explanation as to why two women sustained adverse consequences on their Instagram pages immediately after promoting T-Shirts for this lawsuit.**

2



Such conduct and the plain language that Facebook can purportedly remove anything it wants to at any time renders the purported User Agreement and Terms of Service nothing more than abusive, adhesion clause illusory contracts, as noted by Plaintiff in a different context on prior occasion and that's the whole problem with Facebook: Congress did not intend to allow this entity to own the entire Country as it does, and this Court ought help put a stop to it.  Facebook's conduct is patently egregious and the conduct toward blacks on campus and on the Platforms is increasingly negative, as we shall see at the end of Section IV, *infra*.

Facebook has long been discriminating against blacks, and the Court may take Judicial Notice that the U.S.A. Today noted it:

https://www.usatoday.com/story/news/2019/04/24/facebook-while-black-zucked-users-say- they-get-blocked-racism-discussion/2859593002/?fbclid=IwAR1v3n_Duzo3ynbDepsmjtdfYDJyrkgmpIT8LpDXiW2 M7vLzJ_V22NsxjoQ

**Facebook while black: Users call it getting 'Zucked,' say talking about racism is censored as hate speech**
**USA Today, April 24, 201**

…….and the Court may take note that even the NAACP boycotted Facebook:
https://www.bloomberg.com/news/articles/2018-12-17/naacp-calls-for-week-long-facebook-boycott-over-racial-targeting

**NAACP Seeks Week-Long Facebook Boycott Over Racial Targeting**

Facebook has been facing a barrage of criticism, with a <u>collection 31 civil rights groups</u> calling for changes to its top management. Organizations including MoveOn and Muslim Advocates want Chief Executive Officer Mark Zuckerberg to step down as chairman and for Chief Operating Officer Sheryl Sandberg to leave the board entirely.

……and Congresswoman Joyce Beatty (D-3 Ohio) recently railed on Mark Zuckerberg

for his company's long-running disrespect of racial issues:

https://www.businessinsider.com/mark-zuckerberg-joyce-beatty-facebook-diversity-race-congress-2019-10

**Ohio congresswoman rips into Mark Zuckerberg, calling it 'appalling and disgusting' that he failed to answer questions about Facebook's civil rights and diversity problems**



In addition to the racial concerns Facebook faces Anti-Trust and First

Amendment battles in the DC Federal Court of Appeals in *Freedom Watch & Loomer v.*

*Google et al.*, U.S. Ct. App. DC 19-730 (August 20, 2019). et al. in which the Court held:

> In rejecting the entire opinion of the Lower Court the Court of Appeals succinctly stated in its per curiam ORDER: "Upon consideration of the motion for summary affirmance, the oppositions thereto, and the replies, it is ORDERED that the motion for summary affirmance be denied. The merits of the parties' positions are not so clear as to warrant summary action. See *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987) (per curiam).

II.     The Duffy Declaration is Not Dispositive and Actually Helps Plaintiff.[2]

Let's examine the salient portions of the Duffey Declaration that point toward the Retaliatory Breech of Contract here:

**Safety**
We do our best to keep Facebook safe, but we cannot guarantee it. We need your help to do that, which includes the following germane commitments:

6.  You will not bully, intimidate, or harass any user.
7.  You will not post content that is hateful, threatening, pornographic, or that contains nudity or graphic or gratuitous violence.

**Protecting Other People's Rights**
We respect other people's rights, and expect you to do the same.

1.  You will not post content or take any action on Facebook that infringes or violates someone else's rights or otherwise violates the law.
2.  We can remove any content or information you post on Facebook if we believe that it violates this Statement.

14. **Termination**
If you violate the letter or spirit of this Statement, or otherwise create possible legal exposure for us, we can stop providing all or part of Facebook to you. We will notify you by email or at the next time you attempt to access your account. You may also delete your account or disable your application at any time. In all such cases, this Statement shall terminate, but the following provisions will still apply: 2.2, 2.4, 3-5, 8.2, 9.1-9.3, 9.9, 9.10, 9.13, 9.15.1, 9.18,10.3, 11.2, 11.5, 11.6, 11.9, 11.9, 11.12, 11.13, and 14-18.

---

[2] See Section V, *infra*.

Please see Plaintiff's attached Declaration at Appendix A but suffice it to say that he been treated as if he was actually in violation of something when in point of fact he never was. This is because Plaintiff is a strident voice against the culturally hegemonic hand of Facebook. U.S.Senator Elizabeth Warren is aware of this phenomenon as well, with Facebook taking down her political ads the moment she called for regulation. They eventually put them back up but it demonstrates the mentality of the company who can do whatever it wants to apparently:

https://www.politico.com/story/2019/03/11/facebook-removes-elizabeth-warren-ads-1216757

**TECHNOLOGY**

# Facebook backtracks after removing Warren ads calling for Facebook breakup

By **CRISTIANO LIMA**

03/11/2019 06:32 PM EDT
Updated 03/11/2019 08:24 PM EDT

Facebook removed several ads placed by Sen. Elizabeth Warren's presidential campaign that called for the breakup of Facebook and other tech giants. But the social network later reversed course after POLITICO reported on the takedown, with the company saying it wanted to allow for "robust debate."

> "Curious why I think FB has too much power? Let's start with their ability to shut down a debate over whether FB has too much power," she tweeted. "Thanks for restoring my posts. But I want a social media marketplace that isn't dominated by a single censor."

**Plaintiff will now take a quick moment to review any possible violations that**

**Facebook has alleged against him relative to the Duffey Declaration and User**

**Agreements:**

**Safety:**

By any objective standard it is patently clear that Plaintiff has not violated any of these Principles. The Court, in a review of any contract – even pursuant to Section 230 – must employ an objective standard or the law means nothing, or in the words of Mr. Bumble, the Law is an as – an idiot. As such, it is obvious that as Plaintiff continued to criticize Facebook they continued to shut him down for stating that Facebook "gunned down another nigger."

**Protecting Other People's Rights:**

By any objective standard it is patently clear that Plaintiff has not disrespected other people's rights nor has he posted any content or take any action on Facebook that infringed or violated someone else's rights or otherwise violated the law.
As such, Defendant *cannot* "remove any content or information ……"

Once again any objective reviewer can see that Plaintiff had not violated these principles. What he did do, however, was to complain about Facebook to his detriment. As such, the Court is free to conduct inquiry into the facts of this particular case, and determine whether or not the Defendant is indeed lying about its reasons for placing Plaintiff in Facebook Jail are pretexual for their pattern and practice of retaliation.

III.   <u>The William Hicks Declaration is of no Moment</u>.

Counsel for Defendant is attempting to claim that Plaintiff is not seeking to Amend any Pleadings to conform to evidence by citing to a comment taken well out of context. Yes Plaintiff's End Game continues on past this litigation in the instant case, and that means potential litigation in subsequent fora, continuing classroom seminars and a documentary movie about all of this. That last time Plaintiff checked he still had such Inalienable Rights, but not if Facebook has anything to say about it because it is painfully evident that Fuhrer Zuckerberg does not want anyone to have any rights other than the elite of his company.

In this particular email Plaintiff informs Counsel for Defendant that his client is "full of shit" and that the War will continue on whether or not Plaintiff wins this litigation at this level, the appellate level or in the Supreme Court of the United States. Thus, the "End Game" referred to is the full Judicial and/or legislative recognition that the way these cases have been handled is no longer appropriate. And indeed, several new First Amendment cases have arisen to prove Plaintiff's precise point.

Further, Plaintiff spoke of matters of opinion and his inalienable Right to pursue litigation against Facebook…. Litigation that is far from frivolous whether opposing Counsel or Facebook like it or not. In contrast, Counsel for Facebook, in line with his client's corporate ethos, attempted to once again denigrate the negro by issuing materially false statements of Law and Fact in a 2 May, 2019 email as noted at Appendix A:

> It is premature at this time to engage in a Rule 26(f) conference, especially because you still have failed to pay the judgment entered by the King County Superior Court as a sanction for your frivolous motion practice in that case. You should pay the outstanding judgment in Washington before proceeding with a substantially similar case in California.

*There is no such legal precept and no such finding ever occurred, fact.* As such, Plaintiff is not exactly sure exactly what Defendant is trying to get at with this Declaration unless of course Defendant is attempting to in some way truncate his lawful Rights of Appeal. Let's move on the next issue then, this one being shown to be a complete non sequitur and waste of time.

IV.   <u>Judicial Economy Militates in Favor of reviewing a First Amendment claim in light of  New Cases, *Pruneyard* and its progeny</u>.

> "Whoever would overthrow the liberty of a nation, must begin by subduing the freedom of speech" - Benjamin Franklin

First of all Plaintiff means no disrespect to this Honorable Court in issuing a First Amendment Complaint, however the doctrinal developments in this area immediately prior to and after the Decision shed new light on the traditional Defense that Facebook is a truly a teflon entity when it comes to liability for its abusive and unethical activities. Plaintiff is merely requesting the Court to Amend the Pleadings to conform to the evidence and recently and currently developing law. There's nothing unusual about that.

Next, *Davison v. Facebook, Inc*., 370 F. Supp. 3d 621, 629 (E.D. Va.) was heard in Virginia and Virginia does not adopt a *Pruneyard* analysis when it comes to speech and private property/public venue[3] but California…. *Does.*  So this issue is far from clear-cut as Defendant wishfully believes and it should be addressed in this Court.

---

[3] See *Collins v. Shoppers' World*, citation unavailable.
https://www.rutherford.org/publications_resources/on_the_front_lines/VA_Supreme_Court_Refuses_to_Hear_Free_Speech_Case_Involving_Local_Politicia
Attorneys for The Rutherford Institute, working with the American Civil Liberties Union, brought an action in Virginia Circuit Court, asserting that the guarantee to free speech and expression contained in the Virginia Constitution protected Collins' right to engage in political speech connected with an election at privately-owned shopping centers that are open and available to the public.

Next, Plaintiff finds it interesting that Defendant's own cited case of *Fed. Agency of News LLC v. Facebook, Inc* 2019 WL 3254208, at *8 (N.D. Cal. July 20, 2019) indeed cites to the very same Freedom Watch Case of *Freedom Watch & Loomer v. Google et al*., U.S. Ct. App. DC 19-730 (August 20, 2019) in which the Court of Appeals subsequently DENIED Summary Affirmance on this exact issue and others. Platintiff cites to it himself.  So the tide is turning and mark Plaintiff's words:  Facebook's days as a teflon entity are indeed numbered.

Judge Koh's Order in *Fed. Agency of News LLC v. Facebook, Inc does not cite to Pruneyard or California Law, but rather to Lloyd and Landgon v. Google,* 474 F.Supp.2d 622 (2007).[4]  *Langdon* is a case that in Internet terms is ancient history. In 2007 Facebook was barely a household name. The intervening twelve years have completely changed the character of breath of Facebook and the Court's rationale – also reiterated in *Prager Univ. v. Google LLC* 2018 WL 1471939  (another Judge Koh Decision) is just flat out wrong on a *Pruneyard* analysis because Facebook is totally a public forum. *It is the core function of the thing in itself.*  It is used by politicians World Wide. It is used by Billions of people who exchange political and social thoughts, dreams, and desires on the world's largest social media platform and as such, Plaintiff challenges this Court to recognize the obvious error of Judge Koh's reasoning.

Her Honor also cited to *Lloyd Corp., Ltd. v. Tanner*, 407 U.S. 551 (1972) but *Lloyd* is inapposite here because the holding in Lloyd was that there has been no dedication of petitioner's privately owned and operated shopping center to public use so

---

[4] This is significant because an individual State, may, under its own auspices, afford greater Constitutional protections than granted in the Federal Scheme, but it may not afford less. California affords more. Regardless, Judge Koh's rationale is also wrong for other reasons explained herein.

as to entitle respondents to exercise First Amendment rights therein that are unrelated to the center's operations.

To the contrary, it is patently obvious in this case the Facebook's entire platform exists for the dissemination of speech! That is a complete 180-degree about-face that leads to the obvious conclusion that Facebook is indeed, a public forum as Justice Kennedy intimated as "the modern public square."

With respect to Fn.4 see *Fashion Valley Mall v. NLRB* 42 Cal 4th 850  (2007) citing  *Schwartz-Torrance Investment Corp. v. Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766 (1964) (following *Marsh*)

> We recognized that peaceful picketing by a labor union "involves an exercise of the constitutionally protected right of freedom of speech." (*Id.* at p. 769.) We rejected the shopping center's argument that its right to "the exclusive possession and enjoyment of private property" outweighed the union's right to picket:
>
> "Because of the public character of the shopping center, however, the impairment of plaintiff's interest must be largely theoretical. Plaintiff has fully opened his property to the public." (*Id.* at p. 771.)

Has not Facebook "fully opened its property to the public?" That is the sine qua non of its very existence so Her Honor is quite incorrect. Accord *Ralphs Grocery Co. v. United Food and Commercial Workers Union Local 8*, No. S185544 (Dec. 27, 2012) citing *Pruneyard*:

> A privately owned shopping center may constitute a public forum under the state Constitution because of —the growing importance of the shopping center‖ (*Pruneyard*, at p. 907) as a place for large groups of citizens to congregate' and to take advantage of the numerous amenities offered‖ there, and also because of the public character of the shopping center,‖ ' ‖ which is a result of the shopping center's owner having fully opened his property to the public‖ ' ‖ (id. at p. 910 & fn. 5).

Recall that it was Defendant who wanted to have this case heard in a California Court, the home of *Pruneyard*, so Defendant lives by the sword and dies by the sword.

As noted by Columbia University's Knight First Amendment Institute Director Jameel

Jaffer, Esq. relative to the successful lawsuit against President Trump for blocking

dissenters on Twitter in *Knight First Amendment Inst. at Columbia Univ. v. Trump*, No.

1:17-cv-5205 (S.D.N.Y.), No. 18-1691 (2d Cir.):

https://www.vox.com/2018/11/19/18103081/first-amendment-facebook-jameel-jaffer-freedom-speech-alex-jones-decode-podcast-kara-swisher

> "Facebook has its own First Amendment rights here," Jaffer said. "It
> expresses them by ejecting Alex Jones from the platform. I think none of
> that would raise difficult questions if it weren't for Facebook's scale. It's
> the fact that Facebook is so big and that Facebook arguably controls the
> public square or arguably controls a large segment of the public square."
>
> "That's when I think free speech advocates start to get nervous about
> Facebook excluding people from the platform, especially when there's an
> argument that they're excluding people on the basis of viewpoint," he
> added. "You can think whatever you want to about Alex Jones, but I
> worry not about Alex Jones, but about the next person or the next year.
> Who is it that Facebook is going to be excluding next year?"[5]

Accord *Packingham v. North Carolina* 137 S. Ct. 1730 (2017) Justice Anthony

Kennedy, in full rhetorical mode, referred to the internet as "the modern public square."

*Id.* at 1737. See Harvard Law Review 131 Harv. L. Rev 233 (Nov. 10, 2017).

Writing for the majority, Justice Kennedy was joined by Justices Ginsburg,

Breyer, Sotomayor, and Kagan. faulted the North Carolina statute as "a prohibition

unprecedented in the scope of First Amendment speech it burdens," invalidating it as an

impermissible limit on lawful speech. The Court reiterated the "fundamental" First

Amendment principle "that all persons have access to places where they can speak and

listen, and then, after reflection, speak and listen once more. *Packingham*, 137 S. at 1737.

---

[5] Jaffer successfully sued President Donald Trump over Facebook First Amendment issues. This is the next shoe to drop, and given the fact that the DC Court of Appeals is reviewing First Amendment Claims and DENIED summary affirmance we all know it is only a matter of time. That time has come and this Court must take a stand given the clear-cut law of *Packingham v. North Carolina* 137 S. Ct. 1730 (2017), Pruneyard and progeny.

The Court also counseled "extreme caution before suggesting that the First Amendment provides scant protection for access to [the] vast networks" of the internet, "[t]he forces and directions" of which "are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow. *Id.* at 1736.

Defendant could never adequately respond to *NAACP v. Thompson*, 648 F.Supp. 195 D.Md.,(1986), *Pruneyard v. Robbins*, 447 U.S. 74 (1980) or *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972) or the other California cases cited below so it just hopes and prays that the Court will not allow the First Amendment Claim. But the Court should grant the Claim because of intervening and superseding developments in the law immediately before and after the Decision in this case as Plaintiff noted in his post-Hearing Memoranda. If the Court should not grant the Claim Plaintiff is sure to bring it again at a later date anyway. That's more of the End Game.[6]

So where does that leave us, then: That leaves us a quick drive up the motorway from *Pruneyard* to this Court is where it leaves us:

> Because appellants have not shown that the limited right of access held to be afforded by the California Constitution burdened their First and Fourteenth Amendment rights in the circumstances presented, I join the judgment of the Court. I do not interpret our decision today as a blanket approval for state efforts to transform privately owned commercial property into public forums. Any such state action would raise substantial federal constitutional questions not present in this case. (*Pruneyard*, 101)

That leaves us with a horse of another color because unlike private shopping malls with an incidental Free Speech component, we have privately-owned speech platforms that are *specifically designed* to host speech, allegedly on a neutral basis and free from Retaliatory viewpoint or content-based discrimination.  As such, the California case of *Ralphs Grocery Co. v. United Food and Commerical Workers Union Local 8*, No. S185544 (Dec. 27, 2012) is inapposite because, again, Facebook was designed to facilitate public speech. As such, there is no argument of an unauthorized taking to be made because they are already in the business of speech, *ab initio*.

---

[6] See Declaration of Facebook Counsel William Hicks.

Significantly, note that this is not a *Taylor v. Twitter*  A154973 (Cal. App. Ct. Aug. 17, 2018) case.  In Taylor you have a white nationalist conducting activity that is clearly outside of the parameters of what Defendant allows on its platform. In that sense Plaintiff is going to agree with Attorney Goldman on this level *because Taylor is a racist clearly violating twitter policies against hate speech*. Plaintiff is clearly not doing so.

### Twitter Gets Powerful Win in "Must-Carry" Lawsuit–Taylor v. Twitter

*August 18, 2018* · *by Eric Goldman* · *in Content Regulation, Derivative Liability, Marketing*
https://blog.ericgoldman.org/archives/2018/08/twitter-gets-powerful-win-in-must-carry-lawsuit-taylor-v-twitter.htm

In contrast to Taylor, we all know that Plaintiff is allowed to self-refer in what would otherwise be a deprecatory manner so that's apples to oranges in such a comparison. In point of fact if the platform is attempting not to promote racism then it is failing miserably because consensus with blacks at Facebook state that the company is actually getting worse:

https://medium.com/@blindfb2020/facebook-empowers-racism-against-its-employees-of-color-fbbfaf55ab76

### Facebook Empowers Racism Against Its Employees of Color

*Facebook still has a black people problem. And a problem with individual contributors who are not white. (by frightened anonymous employees see Ex. A).*

As seen in Section IV, infra, this is where the Retaliatory Breach comes in because the same contempt that Facebook has for uppity nigger employees is the same contempt it has for uppity nigger platform users:

> We are remaining anonymous because Facebook creates a hostile culture where anyone that is non-white is made to feel fear for their job and their safety to report any bad behaviors. There is little to no equity in terms of responsibilities, ratings, and reviews. Bad behaviors from non-POCs are elevated while normal actions from POCs are treated as aggressive, angry, and abnormal. Even positive ratings are shared with a negative, threatening tone.

If this post gets any outside attention, the response will be met by M team as "we view diversity as important", "this behavior is not acceptable," and "we will increase our efforts to make things better". And then the cycle will repeat. Facebook is not doing the best it can, and it will continue to be hostile to POCs as long as middle managers and ICs in majority groups are not held accountable. The result of this negligent, hostile, and aggressive behavior from Facebook managers and representatives in HR has caused a significant decline in our physical and mental health and made it significantly difficult, if not impossible, to continue working.

Unfortunately, as long as impact at all costs remains the theme at Facebook, nothing will change. We fear for our safety, our career prospects, and the potential spotlight, lest we be given media attention that we do not want or asked to testify to a Congress that will not take action.

We simply do not have the resources to take action against Facebook. We cannot afford to be vulnerable externally because Facebook has made us a vulnerable target internally. The only thing we can hope for in this cathartic exercise is to influence change by sharing our stories and hope that no one else experiences the same discriminatory behaviors that we have.

Because even when you try to shut us down, our voices matter. And no one will listen unless we speak.

So then, against that backdrop we now turn to the Retaliatory Breach:

V.      Retaliatory Breach and Covenant of Good Faith and Fair Dealing.

A.      Identifying the Claim.

Defendant's entire argument is yet again one of absolute immunity: Facebook can do no wrong.  The Terms of Service are not a Contract and the User Agreement and CDA §230 allows Facebook to terminate anyone for any reason at will.

Significantly Plaintiff noted that the purported clickwrap contract is abusive and illusory at Oral Argument several months ago:

> The legislature did not intend to have a company with as much power as Facebook has to deny fair application of the terms and conditions of their own Contract because then the purported Contract would be merely illusory and that makes no common sense. This way Facebook may continue to mistreat people and thumb its nose at any notion of accountability. (July 17, 2019 Tr p.4)

Facebook is acutely aware of its actions against Plaintiff and he has reiterated same time and time again the basis for liability and while Facebook feigns ignorance Plaintiff does not that he did not attach the Appendix again showing the violations so he attaches it now as Appendix B and once again we see how Facebook retaliated against him for claiming that the Snohomish County Sheriff's office treated him like a nigger; we see how Facebook retaliated against him by throwing him in Facebook Jail repeatedly for criticizing them and challenging them.

Defendant is incorrect when it claims that Plaintiff has failed to identify the contractual provision that he claims Facebook has breached. *See Woods v. Google Inc.,* 2011 WL 3501403, at *3 (N.D. Cal. Aug. 10, 2011) ("In an action for breach of a written contract, a plaintiff must allege the specific provisions in the contract creating the obligation the defendant is said to have breached."). "To properly plead breach of contract, '[t]he complaint must identify the specific provision of the contract allegedly breached by the defendant.'"

16

Plaintiff has time and time again pointed directly at the hate speech policy that is incorporated into the Contract between the Parties and he hereby notes he believes that FB ToS are indeed part of a Contract and are part of an abusive clickwrap scheme anyway.

**However,** in addition to that, now that Defendant has produced the entire underlying Contract Plaintiff has demonstrated that he has not violated any of those terms by any objective measure so if anything needed to be made clear then Plaintiff has now done so pursuant to Defendant's concerns in *Caraccioli,* 167 F. Supp. 3d at 1064. Plaintiff notes that their own cited case includes a reference to *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 340 (2011) (explaining that under California law, "[a] finding of unconscionability requires a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results" (citation omitted)).

Yes in this case we have an overly harsh situation and His Honor is already aware of the harsh nature of clickwrap/adhesion clause agreements and finds them presumptively suspect. As Plaintiff has noted on prior occasion at his blog that Defendant hates, see *Wadler et al v. Custard Insurance Adjusters, Inc*, 17-CV-05840 (11 April 2018), Fees awarded five (5) days after Oral Argument in the case at bar, or 22 July 2019. The case involved clickwrap or adhesion-clause abuse in an unequal arms-length situation. Mark Zuckerberg alone is worth $85B.  Plaintiff is worth approximately $30,000.00 at the moment, or .0000003529% of that. From *Wadler*:

> Procedural unconscionability occurs where a contract or clause involves oppression, consisting of a lack of negotiation and meaningful choice, or surprise, such as where the term at issue is hidden within a wordy document. Id. "California law treats contracts of adhesion, or at least terms over which a party of lesser bargaining power had no opportunity to negotiate, as procedurally unconscionable to at least some degree."

> *Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996,
> 1004 (9th Cir. 2010).
>
> Substantive unconscionability occurs where the provision at issue
> "reallocates risks in an objectively unreasonable or unexpected manner."
> *Lhotka*, 181 Cal. App. 4th at 821 (citation omitted). "Substantive
> unconscionability focuses on the one-sidedness or overly harsh effect of
> the contract term or clause." Id. at 824–25 (citation omitted).........
> https://howtosuefacebook.blogspot.com/2019/08/judge-in-facebook-cda-
> 230-immunity.html

Defendant also argues:

"…..while Plaintiff may believe that Facebook purportedly retaliated against him

by blocking his content, Facebook's removal of content cannot, as a matter of law, give

rise to liability for breach of contract."

Well that is a question of law for the Court to determine isn't it? That's why we

are here.

How long can this consumer and user abuse continue while entities like Facebook

can just run amok and make a mockery of our Laws and larger implications of First

Amendment Freedoms in the "the modern public square" as Justice Kennedy calls it?

Facebook Amicus Counsel David P. Lukmire said it should have ended a long time ago:

> *Can the Courts Tame the Communications Decency Act? The Reverberations of
> Zeran v. America Online.* Attorney Lukmire has written *Amici* Briefs alongside
> and in support of Facebook and Microsoft: He is an Industry expert:
> http://migration.nyulaw.me/sites/default/files/upload_documents/NYU-Annual-
> Survey-66-2- Lukmire.pdf
>
> Second, before deciding whether an online entity is immune because of the type
> of entity it is or the type of role it played in disseminating illegal content, courts
> should consider whether section 230 should apply based on the theory of liability
> advanced by the plaintiff.
>
> The case for restricting the subject matter of section 230 immunity is equally
> strong...... **One thing is for certain: unless courts narrow their interpretations
> of section 230, deserving plaintiffs will be without redress.**

As discussed, the statute should be interpreted in light of its language, which clearly sounds in defamation law. Allowing certain claims that are close to textbook defamation will help clear up whether the plaintiff has artfully pleaded garden variety tort claims in order to evade the proper boundaries of section 230. **Courts should almost never dismiss other claims, such as allegations under civil rights laws or breach of contract claims, on section 230 grounds, for they are much too far removed from the tort of defamation.** (emphasis added)

So thus, in spite of not violating the Terms of Service or the larger underlying Contract Plaintiff has been removed from the Platform repeatedly after he criticized Facebook and it is unlawful retaliation unless the Court chooses to honor what is essentially an illusory contract with absolutely no obligations on the Facebook side.

B.    <u>Damages and Covenant of Good Faith and Fair Dealing</u>.

First of all the Covenant of Good Faith and Fair Dealing is implicit in every Contract so it rides along with the Notion of Retaliatory Breach. It can't be removed any more than mustard can be removed from a hot dog: It's part of the deal.

The Judicial Council of California Civil Jury Instructions (2017 edition) ac CACI No. 325 "Breach of Covenant of good Faith and Fair Dealing" Notes "In every contract or agreement there is an implied promise of good faith and fair dealing…… Neither party will do anything which will injure the right of the other to receive the benefits of the agreement." Further, when one party to a contract retains unilateral privileges the exercise of such privileges is constrained by the Covenant of Good Faith and Fair Dealing. *Cobb v. Ironwood Country Club* 233 Cal.App. 4th 960 (2015).

It is true that cases permitting recovery for emotional distress typically involve mental anguish stemming from more personal undertakings the traumatic results of which were unavoidable.

Thus, when the express object of the contract is the mental and emotional well-being of one of the contracting parties, the breach of the contract may give rise to damages for mental suffering or emotional distress." (*Erlich, supra*, 21 Cal.4th at p. 559).

Here is the thing: Even without an express finding that Facebook is a First Amendment Enterprise, the Record is clear that Plaintiff is a rather productive Social Justice advocate whether Defendant cares to admit it or not. He wins more cases than he loses and many of these cases involve public records violations, animal abuse and things of that nature.  For Facebook to strip those Rights away on their vertically and horizontally positioned monopoly definitely induces mental and emotional anguish to a person in Plaintif's postion on what is purportedly "the marketplace of ideas."[7]

Facebook is walking that line and trying to have its cake and eat it too. The underlying contract is not for mental and emotional well-being per se, but it does involve the exercise of First Amendment Rights and expression as Justice Kennedy noted at "the modern public square."  Plaintiff was not allowed to freely discuss his mother's passing from this Earth with his 2,000 Facebook Friends and followers on the World's largest speech platform ever seen. Qualified medical personnel are available to discuss the emotional and physical manifestations of Facebook's repeated retaliatory breaches of Contract. Thus, even if monetary damages cannot be quantified he is at least allowed Specific Performance and Declaratory Judgment.

---

[7] Defendant, likely sensing the hypocritical nature of its long-held motto, recently changed it to "bring the World closer together." Spare me – and the collective World -- the noise: Changing the motto after fourteen (14) years of being the purported "marketplace of ideas" hardly changes the stripes on this zebra.

And he has sustained substantial damages including, but not limited to, the right to freely discuss the passing of his mother from this Earth.  Medical personnel will discuss the emotional and physical manifestations of these wrongs against Plaintiff.

As noted on prior occasion – and as continued via more Facebook employees – Facebook will not hesitate to denigrate black folks: Particularly black folks who dare to challenge the corporate behemoth in any way on the Platform or on the campus.  See below in addition to the Party Admission by Vice President Mark Luckie as someone in the Control Group *before* he resigned, we have more current and ongoing examples demonstrate the pervasive attitude towards the niggers who support the international juggernaut either by working for it or by participating on the platform.

The USA Today noted as much as well:

**Black Facebook employees complain racism, discrimination have gotten worse**
Jessica Guynn Nov. 8 2019
https://www.usatoday.com/story/tech/2019/11/08/facebooks-current-and-former-black-employees-allege-growing-racism/2534615001/?fbclid=IwAR1fhTMSjWo-EvzCS0u6KYv0QcFDE6TcunsTC5Xfkt4g8yirfZxWJDA0rvI

The treatment of people of color inside Facebook has an impact on members of marginalized groups on its platforms, current and former employees say.

USA TODAY has reported extensively on the experience of black users on Facebook who say hate speech policies and content moderation systems formulated by a company built by and dominated by white men fail the very people Facebook says it's trying to protect. Not only are the voices of marginalized groups disproportionately stifled, Facebook rarely takes action on repeated reports of racial slurs, violent threats and harassment campaigns targeting black users, they told USA TODAY.

Look at the underlying sentiment at Facebook towards blacks and recognize that we are indeed, hated. Especially when we have the nerve to speak up and naturally they retaliate. As VP Mark Luckie stated as a Rule 801 Party Admission noted the attitude and treatment occurs both on the campus and on the platform.

Apparently, we just like to complain about things with no basis:



## Are blacks really treated poorly or do they just like to complain?

Yesterday

Anyone read Black@ or Mark Lucky's viral post and these people make it seem like they work for the KKK. They should feel privileged that they were diversity hires and got in the company after we lowered our hiring standards. That's just my opinion though.

Votes: 65
Select only one answer

| | |
|---|---|
| They just complain to get attention | **43** (66.2%) |
| FB is racists!! | **11** (16.9%) |
| All Lives Matter | **11** (16.9%) |



While eating breakfast, two white employees asked me to clean up after their mess. I am a program manager. I told my manager about the incident. She told me I need to dress more professionally.

I spoke at a regular team meeting and gave my opinion about a topic I am a subject matter expert on. I was told after the meeting by the manager that I was disrespectful for speaking at this meeting, that my opinion was not wanted, that I was being arrogant in sharing that opinion, and not to speak at any future meetings unless called upon.

"We may be smiling. We may post on Instagram with industry influencers and celebrities. We may use the IG 'Share Black Stories' filter and be featured on marketing pieces. We may embrace each other and share how happy we are to have the opportunity to work with a company that impacts nearly three billion people," the anonymous memo says. "On the inside, we are sad. Angry. Oppressed. Depressed. And treated every day through the micro and macro aggressions as if we do not belong here."

That is precisely because we ***don't*** belong with Facebook. They just use niggers for revenue generation and as to the rest of it, well we had damn well better know our place and where we stand subservient at the feet of this grand white establishment. It's why Mark Luckie left. It's why these employees feel trapped and disrespected. And it's why Defendant Facebook unlawfully retaliated against Plaintiff in the Case at Bar.

In opposition to all of this Defendant again relies on the old and fast-fading notion that they have absolute immunity in the face of a rapidly-changing reality.

V.      <u>Conclusion:    Evil and Insidious</u>.

Put simply, this must become the New Standard. This comports with His Honor's Decision in *Wadler, supra*, although it is actually an even higher standard. If an objective observer can look at the facts of any particular case and determine that the conduct of an ISP has become retaliatory and evil and insidious then there is grounds to determine not only that they have committed a retaliatory breach, but that they have crossed the First Amendment threshold as well Per *Knight, supra, Packingham, supra*, and potentially *Freedom Watch/Loomer, supra* as that case develops. There is no reason for this Court to lag behind however. Now is the time to make the natural doctrinal movement forward as warranted in California by *Pruneyard* on the First Amendment Claim and by *Wadler* on the Retaliatory Breach Claim.

For the time being there are boundaries on Facebook or Twitter speech. Plaintiff does not agree that there should be any such boundaries short of actual physical threats but for the purposes of this litigation he agrees that these boundaries are sacrosanct. That being said, when the victim of Facebook's unlawful retaliation is perpetually banned for conduct that is clearly not in violation of such boundaries when the User is criticizing Facebook a Court is free to protect the User at Law and at Equity.

If Facebook will punish a white woman with the power of Senator and Candidate Elizabeth Warren, *supra*, and we have seen the blatant racism against blacks on campus and on the platform, *supra*, then Facebook can – and did – unlawfully retaliate against a small unimportant nigger such as Plaintiff, and it has come time for these abusive corporate behemoths to learn that they no longer wield their power in such an ungainly and oppressive manner.

Plaintiff's job as a litigant here is to point out socially and legally relevant issues pertaining to the evils that Facebook fastidiously foists upon our society each and every day in the hopes that this Honorable Court will indeed recognize that there are ways in which Facebook can indeed be found liable because the status quo has created a monster of immense proportions… a monster so ugly that its own co-founder noted that it "poses a threat to our Democracy" whether the Eric Goldmans of the World and other largely white male Facebook apologists care to acknowledge it or not, it is a fact. Time will tell. The whole scheme and infrastructure is just….. **wrong.**  And the whole Country knows it.

Respectfully submitted,

Christopher King, J.D.
Dated: 13 November 2019